UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
FILE NO.: 1:21-cv-284

| | | |
|---|---|---|
| AMANDA TIMPSON, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| L.T. (minor child) | ) | **COMPLAINT** |
| | ) | **(JURY TRIAL DEMANDED)** |
| by and through the GUARDIAN AD | ) | |
| LITEM, JOY McIVER | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHEROKEE COUNTY; | ) | |
| SCOTT LINDSAY, in both his individual | ) | |
| capacity and official capacity as DSS | ) | |
| attorney for Cherokee County; | ) | |
| CINDY PALMER, in both her individual | ) | |
| capacity and official capacity as Director | ) | |
| of the Cherokee County Department of | ) | |
| Social Services;, | ) | |
| Defendants. | ) | |

NOW COME the Plaintiffs, by and through undersigned counsel, to file this Complaint. This action alleges the following Claims for Relief seeking recovery of damages and for injuries incurred as a proximate cause of the acts and omissions of Defendants arising from the conduct of the Defendants in their official and individual capacities, as described more particularly in this Complaint:

## **INTRODUCTION**

1. Plaintiffs are parents and child, who at the time of these events, were located in Cherokee County, North Carolina. They were victims of a scheme undertaken by Defendants and their agents leading to multiple events, transactions and occurrences, referenced and described in this Complaint, involving the unlawful taking of minor children by the Defendants. Defendants' conduct violated state and federal law, policy, and the constitutional rights of both the parents and the child.

2. Defendants illegally took minor children from the custody of their biological parents using a variety of unlawful documents titled Custody and Visitation Agreements (hereinafter "CVA"), Powers of Attorney (hereinafter "POA"), Family Safety

Agreements (hereinafter "FSA"), Safety Plans, and other similarly substantive documents and agreements (all of which are referred to herein collectively as CVAs). The Defendants were the creators of these unlawful documents and were the only ones to use them in the state of North Carolina.

3.  These alternative removal mechanisms were designed to, and did in fact, avoid Court time and judicial oversight in violation of the statutory process to remove children from their parents' custody. They were also designed to reduce costs for social services in to Cherokee County's budget for the Department of Social Services ("DSS").

4.  Plaintiffs were at one time an intact family. However, due to Defendants' conduct, their families were shattered when Defendants removed children from their home without affording Plaintiffs the statutory and constitutional protections to which they were entitled. Plaintiffs were injured by the Defendants' illegal and unconstitutional practices and policies of using CVAs and similar documents and processes.

5.  Copies of pertinent documents are provided as exhibits herein.

6.  As of the date of this filing, Defendants Palmer, Hughes and Lindsay have been charged with crimes for acts that occurred during their employment with CCDSS involving CVAs.

7.  Defendant Palmer was terminated as director but was immediately re-hired as the business director for CCDSS.

8.  In 2018, NCDHHS requested Cherokee County to audit 7,000-plus DSS files to determine with certainty what happened in every child's case. As of the date of this filing, Cherokee County refuses to comply with this request. As a result, the whereabouts and welfare of many children are still unknown.

### PARTIES AND JURISDICTION

9.  Parent Amanda Timpson is the parent of L.T.

10. The above-named plaintiffs are citizens and residents of North Carolina.

11. Joy McIver has been appointed as the guardian ad litem for the minor child.

12. McIver, on behalf of the child, brings this action for damages and redress of harms suffered by the Child Plaintiff, who have been damaged and harmed as the result of like conduct by all named Defendants and other Department of Social Services employees of Cherokee County, who are state/government actors as defined by law.

13. Defendant Cindy Palmer (hereinafter "Palmer") was, at all relevant times, an agent or employee of Cherokee County who was employed as either a Social Worker or Business Manager or the Director of Social Services. Defendant Palmer at all times relevant has been a health and community worker.

    a. Defendant Palmer was the Director of Social Services for Cherokee County on an interim basis from November 30, 2009 until July 2010, and again from August 1, 2015 until March 23, 2016. Palmer was the permanent Director of Social Services from March 23, 2016 until June 11, 2018. Defendant Palmer was also a Social Worker in 2004-2006 for Cherokee County DSS.

    b. Defendant Palmer has been, at all relevant times, an agent or employee of Cherokee County and a health and community worker.

    c. Defendant Palmer, at all relevant times, was trained in the applicable policies, procedures, and laws of the State of North Carolina as they pertain to her duties as Director of Social Services for Cherokee County, including Chapter 7B of the North Carolina General Statutes.

    d. Defendant Palmer was not lawfully qualified to be the Director when she was appointed to that position. Cherokee County sought and obtained a waiver from NCDHHS for her appointment.

14. Defendant Palmer held, during the times aforementioned, a public office created by state statute whereby they exercised a position of power and discretion, as allowed by law as set forth in N.C. Gen. Stat. § 7B-100 *et. seq* and Chapter 108A of the North Carolina General Statutes.

15. Defendant Palmer was trained in the rules, regulations, policies and procedures of the Department of Social Services as promulgated by the NCDHHS and the associated laws of the state of North Carolina after assuming their responsibilities and duties.

16. Defendant Palmer exercised personal and professional deliberation, made decisions and exercised personal and professional judgment as set forth herein.

17. Defendant Palmer, as Director of Social Services for Cherokee County, had both the authority and responsibility to set policies and practices for Cherokee County related to the County's obligation under state law to provide social services, including those complained of in this action.

18. As Cherokee County's Director of Social Services, Defendant Palmer, had a duty of her office to, at all times, act in the best interest of each minor child over whom the County exercises its social services powers and to follow the law regarding placement of minors in the care of persons other than their biological parents.

19. Defendant Palmer was official policy makers for Cherokee County as set forth by North Carolina law.

20. Defendant Palmer, was public officers as defined by applicable law, including the law of North Carolina.

21. Defendant Scott Lindsay served as DSS staff Attorney during all times relevant to this lawsuit and used CVAs, FSAs, Safety Plans, and other similar documents during the respective tenures of Palmer, Crawford and Davis as Directors of Cherokee County DSS.

22. Defendant Cherokee County (hereinafter "Cherokee County") is a political subdivision of the State of North Carolina, organized and governed by the laws of the State of North Carolina.

23. Defendant Lindsay is a citizen and resident of Cherokee County, North Carolina.

24. Defendant Palmer is a citizen and resident of Cherokee County, North Carolina.

25. The unlawful acts and/or omissions which are the subject of this action took place in Cherokee County, North Carolina.

26. Defendants are not entitled to absolute, prosecutorial, or governmental immunity because, *inter alia*, the actions complained of herein were not undertaken during the process of prosecuting any claim of abuse, neglect, or dependency in a proceeding before the District Court of Cherokee County, North Carolina or another Court similarly situated.

27. Defendants have waived any governmental immunity that may arguably apply, pursuant to N.C. Gen. Stat. § 153A-435 by the purchase of insurance and/or participation in the North Carolina Association of County Commissioners Risk Management Pool, which provides coverage for the acts and omissions alleged against the Defendants herein.

28. Defendant Cherokee County also has a cash reserve that is liable for any damages arising from the conduct set forth herein.

29. Each claim for relief against each individual defendant, their predecessors, and other employees of Cherokee County is brought against that Defendant in both his/her

individual and official capacities, based on the applicable time period unless otherwise specified below.

30. The identities of all persons who are or have been social workers, supervisors, health and community workers, and others who took part in, were involved in, or had knowledge of the process of removing minor children from proper custodial parents without lawful authority and in derogation of the rights and privileges of those parents and minor children, have yet to be identified. However, those persons will be identified through discovery and the determination of the merits of this action. Plaintiffs reserve their right to amend this Complaint to add those persons as Defendants to this case as they become known.

31. Upon information and belief, Defendants have made no effort to provide services to the minor children since they were placed with their individual respective placements.

32. Each Defendant, both those known and yet to be identified through discovery in this action, committed the acts complained of herein while acting in both their individual and official capacities.

## FACTS RELEVANT TO THE PLAINTIFF FAMILY

33. Plaintiff Amanda Timpson (also known as Amanda Docker) ("Dockery" of "Timpson" herein) is the biological mother of L.T., born May 24, 2013.

34. At the time of L.T.'s birth, Dockery was married to Travis Timpson, the biological father of L.T.

35. William "Bill" Timpson is the paternal grandfather of L.T.

36. William "Bill" Timpson was granted legal custody of L.T. by the District Court of Cherokee County, 17-CVD-66 (*Timpson v. Timpson*) on February 8, 2017.

37. The parental rights of Dockery were not terminated in *Timpson v. Timpson*.

38. After obtaining legal custody of L.T., William "Bill" Timpson was arrested for offenses unrelated to L.T. and incarcerated in the Cherokee County Detention Center.

39. During William "Bill" Timpson's incarceration, the Cherokee County Director of Social Services or her designee filed a petition alleging that L.T. was an abused, neglected, or dependent child.

40. Social Services employees of Cherokee County, in conjunction with filing the petition, also obtained an order of non-secured custody for L.T. pursuant to Chapter 7B of the

North Carolina General Statutes.

41. The Petition alleging that L.T. was an abused, neglected, or dependent juvenile was adjudicated on June 13, 2017. The Department did not prove abuse, neglect or dependency, and as a result, the non-secure custody order was dissolved and the petition was dismissed.

42. While William "Bill" Timpson was incarcerated, and while L.T. was in the non-secured custody of DSS, Dockery filed a motion to regain custody of L.T. in *Timpson v. Timpson* on June 13, 2017.

43. After the DSS petition was dismissed and the non-secure custody order was dissolved, but while Dockery's motion to regain custody of L.T. was pending, Social Services employees, David Hughes and Courtney Myers, Social Services employees of Cherokee County, on June 15, 2017, presented William "Bill" Timpson (who remained incarcerated) with a CVA purporting to transfer his custodial rights to Christopher Coker and Melissa Coker, the maternal uncle and aunt of L.T.

44. William "Bill" Timpson was told by the Social Services employees that if he did not sign the CVA, L.T. would be placed in a random foster placement.

45. At the time they presented the CVA to William "Bill" Timpson, Courtney Myers and David Hughes knew that the Cherokee County District Court had dismissed the petition alleging abuse, neglect, or dependency, and therefore that William "Bill" Timpson would not lose custody of L.T.

46. At all times in their dealings with L.T. and William "Bill" Timpson, Social Services employees Cortney Myers and David Hughes were acting as agents and employees of Cherokee County and with the authority of and at the direction of the Director of Social Services for the County.

47. The misrepresentation that L.T. would be placed in a random foster placement was coercive and overcame the will of William "Bill" Timpson. As a result, he signed the proffered CVA.

48. The CVA was never presented to Dockery, even though her parental rights had never been terminated and she had a motion to regain custody pending in the District Court of Cherokee County at the time the CVA was executed.

49. William "Bill" Timpson had no right to transfer custody to a third party under North

Carolina law, as he was bound by the terms of the consent judgment recorded in *Timpson v. Timpson*.

50. Social Services employees of Cherokee County, including Defendant Lindsay, were aware of *Timpson v. Timpson* and the provisions of its judgment because they are expressly referenced in the CVA.

51. Neither Dockery or William "Bill" Timpson were advised of their rights to court-appointed counsel in any proceeding that could result in their losing custody of a child. Neither person was provided counsel. Neither person was given an opportunity to seek legal counsel in connection with this CVA.

52. Despite knowing (1) that Dockery retained parental rights in regard to L.T., (2) that Dockery had filed a motion to regain custody after William "Bill" Timpson's arrest, and (3) that Dockery would be a necessary party to any judicial determination of custody of L.T., Social Services employees of Cherokee County, acting with the authority of and at the direction of Defendant Palmer, used the CVA to unlawfully deprive Dockery of an opportunity to regain custody of L.T.

53. The CVA was drafted and created by Social Services employees of Cherokee County acting under the authority and at the direction of the Director of Social Services and in conjunction with, at the direction of, and with and the approval of the Cherokee County DSS Attorney Scott Lindsay.

54. Further, Social Services employees of Cherokee County, by means of the methods and action described in this Amended Complaint, dispossessed Dockery of a constitutionally protected liberty interest, *to wit* her right to participate in a custody hearing before the District Court of Cherokee County.

55. Dockery was deprived of not only of her parental rights, but also her rights to seek reunification through her pending motion to reclaim custody by the actions of the Defendants in violation of her substantive due process rights under the Fourteenth Amendment to the Constitution of the United States.

56. Dockery was deprived of her right to procedural due process. The use of CVA and the manner in which it was secured prevented Dockery from having a fair and meaningful opportunity to be heard before she could pursue her right to regain custody.

57. Upon the execution of the CVA, custody of L.T. was assumed by Christopher and

Melissa Coker.

58. Had Social Services employees of Cherokee County and the Director of Social Services (Palmer) used the correct and legal method of placing L.T. (e.g., full adjudication of abuse/neglect/dependency and disposition as mandated by Chapter 7B of the North Carolina General Statutes), Dockery would have been a necessary party and her constitutional rights as a parent would have been protected.

59. Dockery might have regained custody at a dispositional hearing, but she was deprived of that opportunity to be heard by the actions of the Defendants.

60. Instead, the Social Services employees of Cherokee County utilized the coercive and unlawful CVA to function as a *de facto* termination of Dockery's parental rights without even obtaining her signature on it.

61. Dockery was deprived of her rights to substantive due process because Defendants unlawfully took L.T. and deprived her of her parental rights by means of the coercive and unlawful CVA.

62. Dockery was deprived of her procedural rights to due process because Defendants' coercive and unlawful use of the CVA deprived Dockery of a fair and meaningful opportunity to be heard by a court prior to losing her constitutional parental rights.

63. As a proximate result of Defendants' conduct, Dockery and L.T. suffered sadness, pain and emotional distress as:

    a. Dockery was denied the opportunity to provide care, love, and affection to her minor child;

    b. L.T. lost the services, care, protection, and assistance of Dockery and potential future services, care, protection, and assistance of Dockery;

    c. Dockery and L.T. lost society, companionship, comfort, guidance, kindly offices, and advice of each other; and

    d. Such other damages as may be proven at trial.

64. Because L.T. was taken outside of the lawful process of a dispositional hearing in DSS Court and by means of the unlawful CVA, Cherokee County did not provide medical care and other services and benefits that it would have been required to provide had the lawful process of a court proceeding been undertaken. Therefore, L.T. was separately and directly harmed by Defendants' unlawful taking of him from his mother's legal

custody by losing medical care and other beneficial services to which he would have been entitled.

65. Parent learned removal was unlawful in 2018.

66. Plaintiffs incorporate by reference, and adopt in their entireties, all of the information enclosed in **Exhibit B**, a flowchart, which graphically depicts the information stated above in a more reader friendly format and incorporates a draft copy of the CVA used to remove the minor child. The contents are incorporated as though fully set forth in the body of this Complaint.

67. Plaintiffs further incorporate by reference **Exhibit A**, which sets forth a number of parents and children whose rights were violated by the use of a CVA or substantively similar document.

68. **Exhibits D and E** are, respectively, the transcript of a proceeding in the District Court Division of Cherokee County on February 28, 2018, wherein Defendants Lindsay and Palmer testified regarding CVAs and a Declaratory Judgment entered by the Honorable Tessa Seller, North Carolina District Court Judge presiding following the evidence presented in the matter.

69. All Exhibits to this Complaint, A-E, are incorporated by reference as though fully set out in the body of the Complaint.

70. Defendant Palmer at all times cited above was responsible and accountable for all acts performed by all social workers, supervisors, and Defendant Lindsay.

71. Defendant Scott Lindsay (hereinafter "Lindsay") has been at all relevant times, the attorney for Cherokee County DSS, an agent and employee of Cherokee County, and a Social Services employee of Cherokee County under the direct guidance and control of its Director.

72. Defendant Lindsay is a government actor as it relates to the allegations set forth herein.

73. Defendant Lindsay exercised personal and professional deliberation, made decisions and exercised personal and professional judgment as set forth herein.

74. Defendant Lindsay has been trained for more than 18 years in the rules, regulations, policies and procedures of the Department of Social Services as promulgated by the North Carolina Department of Health and Human Services ("NCDHHS") and the

associated cases and laws of the state of North Carolina, the Constitution of the United States, and applicable federal laws, including corresponding federal cases and statutes.

    a. Defendant Lindsay, as an agent for Cherokee County and for the Director of the Department of Social Services, is statutorily obligated to act in the best interest of each minor child and to ensure each child's health and safety at all times when acting in regard to Cherokee County (and its constituent Department of Social Services) and carrying out its duties.

    b. Defendant Lindsay, as an agent for Cherokee County and for the Director of the Department of Social Services, is obligated to ensure the legal rights of each and every parent are protected at all times when a minor child is being removed from a parent's care, custody and control, by Cherokee County (and its constituent Department of Social Services).

    c. He is obligated to follow all the laws of the State of North Carolina at all times.

    d. He owes a duty, as the DSS Attorney for Cherokee County and as a Social Services employee of Cherokee County, operating with the authority of and at the direction of the County Director of Social Services, to act in accordance and conformity with all applicable state and federal laws, policies, and procedures toward all adults and children who are provided social services by Cherokee County and its Social Services employees.

75. Defendant Lindsay had been continuously employed as both the County Attorney and DSS Attorney for Cherokee County simultaneously for many years making in excess of a six-figure income from Cherokee County and the CCDSS.

76. Further, Defendant Lindsay has represented Cherokee County as DSS attorney and provided advice and guidance to the then-incumbent Directors of Social Services as the official policy makers for Cherokee County and Cherokee County's Social Services employees regarding all social services-related investigations and practices during all times relevant to the allegations contained within this Complaint.

77. Defendant Cindy Palmer (hereinafter "Palmer") was, at relevant times, the Director of Social Services for Cherokee County and has been an agent or employee of Cherokee County at all relevant times. Defendant Palmer is a health and community worker.

a. Defendant Palmer was the Director of Social Services for Cherokee County on an interim basis from November 30, 2009 until July 2010, and again from August 1, 2015 until March 23, 2016 and was the permanent Director of Social Services from March 23, 2016 until June 11, 2018.

b. Defendant Palmer has been, at all relevant times, an agent or employee of Cherokee County and a health and community worker.

c. Defendant Palmer, at all relevant times, was trained in the applicable policies, procedures, and laws of the State of North Carolina as they pertain to her duties as Director of Social Services for Cherokee County, including Chapter 7B of the North Carolina General Statutes and how to perform the duties of a Social Worker.

d. Defendant Palmer was not lawfully qualified to be the Director and a waiver was sought for her appointment by Cherokee County.

e. Defendant Scott Lindsay served as DSS staff Attorney for this Director and used the CVAs and other similar documents for these affected families during Palmer's tenure and during the tenure of the directors that preceded her.

78. Defendant Palmer held, during the times aforementioned, a public office created by state statute whereby she/they exercised a position of power and discretion, as allowed by law as set forth in N.C. Gen. Stat. § 7B-100 *et. seq.* and Chapter 108A of the North Carolina General Statutes.

79. All persons who have held the position of Director of Social Services for Defendant Cherokee County during the times relevant to this Complaint are policy makers for the County, empowered to set social services policies for Cherokee County pursuant to Chapter 108A, 7B and other relevant North Carolina law.

80. Defendant Palmer was trained in the rules, regulations, policies and procedures of the Department of Social Services as promulgated by the NCDHHS and the associated laws of the state of North Carolina after assuming their responsibilities and duties.

81. Defendant Palmer, as the Director of Social Services for Cherokee County, exercised personal and professional deliberation, made decisions and exercised personal and professional judgment as set forth herein.

82. While a Director may rely on a Department attorney for advice, the Director, is the final policy maker for all policies and procedures established to govern the operations and activities for the Department of Social Services.

83. Defendant Palmer, as Director of Social Services for Cherokee County, had both the authority and responsibility to set policies and practices for Cherokee County related to the County's obligation under state law to provide social services, including those complained of in this action.

84. As Cherokee County's Director of Social Services, Defendants Palmer, had a duty of her office to, at all times, act in the best interest of each minor child over whom the County exercises its social services powers and to follow the law regarding placement of minors in the care of persons other than their biological parents including these minor children.

85. Defendant Palmer was official policymakers for Cherokee County as created and set forth by North Carolina law.

86. Defendant Palmer was public officers as defined by applicable law, including the law of North Carolina.

87. At this time, Plaintiffs are unaware of the identities of other persons who are or have been social workers, supervisors, health and community workers and others who took part in, were involved in or, had knowledge of the process by which the children were removed from their biological parents' custody without lawful authority.

88. Each and every agent and employee of Cherokee County, including each and every past and present social worker, supervisor, attorney, and Director of Social Services, is obligated to act, at all times, in the best interest of each minor child over whom the County exercises its social services powers and to follow the law regarding placement of minors in the care of persons other than their biological parents.

89. Each and every agent and employee of Cherokee County, including each and every past and present social worker, supervisor, attorney, and Director of Social Services, is obligated to act, at all times, in the best interest of each minor child over whom the County exercises its social services powers and to follow the applicable law, policy and procedure as it relates to the removal/taking and placement of minor children in the care of persons other than their biological parents.

90. Each and every agent and employee of Cherokee County, including each and every past and present social worker, supervisor, attorney, and Director of Social Services, is obligated to act, at all times, in the best interest of each minor child over whom the County exercises its social services powers and to follow the applicable law, policy and procedure to provide services as required by law to the biological parents, guardians and persons to whom minor children were sent.

91. At all relevant times, Cherokee County had a Social Services Board, which had oversight authority over the County's Department of Social Services.

    a. At all relevant times, at least one County Commissioner served on the County Board of Social Services and was aware, or should have been aware, of the conduct of Defendant Lindsay. At times relevant to this Complaint, upon information and belief, Dan Eichenbaum was the Commissioner assigned.

    b. At all relevant times, the Cherokee County Commissioner serving on the Board of Social Services, as well as the Board itself, had a duty imposed by law to ensure that Social Services employees of the County complied with all applicable policies, procedures, and state and federal laws, including but not limited to, laws related to the taking of minor children from their parents, and to review records on a periodic basis as set forth by N.C. Gen. Stat. § 108A *et. seq*.

    c. At all relevant times, the Cherokee County Commissioner serving on the Board of Social Services, as well as the Board itself, had actual knowledge, through an N.C. Dept. of Health and Human Services audit, that the Cherokee County Department of Social Services:

        i. Was grossly understaffed and underfunded;

        ii. Had an unacceptable social worker/open case ratio;

        iii. Was not being given adequate supervision by the director; and

        iv. Was otherwise failing to provide adequate social services in compliance with law and policy.

92. At all relevant times, Cherokee County, by and through its employees (including its Directors of Social Services) was aware, or should have been aware, of the Defendants' conduct, as described throughout this Complaint. As a direct and proximate result of their deliberate indifference that shocks the conscience, Cherokee County effected the loss

and deprivations referenced in this Complaint through its policy, pattern, practice, and custom of unlawfully taking minor children by use of illegal documents which acted as alternative removal mechanisms to avoid court involvement and judicial oversight. Yet, Cherokee County did nothing to object or intervene.

93. The Defendants and the Social Services employees of Cherokee County, acting with the authority of and at the direction of the Defendants, at the times relevant, improperly billed local, state and/or federal government funding sources while engaging in the CVA process with these Plaintiffs.

94. Upon information and belief:

   a. The names of the documents and the specific mechanics of each used to accomplish the illegal taking of children from the biological parents or lawful court-appointed foster parent and to deprive biological parents of their rights to substantive and procedural due process has varied through the years.

   b. At various times, these documents used for the illegal takings, were referred to as "Custody and Visitation Agreements," "CVAs," "Custody Agreements," "Voluntary Placement Agreements," "VPAs," Powers of Attorney "POAs", Family Safety Agreements ("FSA"), Temporary Safety Agreements ("TSA"), Family Safety Plans ("FSP"), or such similar terms. Plaintiffs use the generic term "CVA" to encompass all such substantively similar documents or documents utilized to accomplish Defendants' unlawful objectives.

   c. Regardless of the title given to the document, the unlawful act was using the documents prepared by Social Services employees of the County to illegally take a child to which a biological parent retained his/her constitutional rights to custody and to deprive that parent of his/her rights to substantive and procedural due process.

   d. Courtney Myers, who previously worked for Cherokee County as a Social Worker for approximately three years, estimates that she or co-workers completed between 30 and 50 CVAs during their respective tenures.

   e. Upon information and belief, based on the above estimation, if the use of these documents by Child Protective Service Social Workers to effectuate illegal

takings was calculated on average, and used over the time period from 1998 until 2017, the number of affected families and or children would be several hundred.

 f. Upon information and belief, despite a request from NCDHHS, Cherokee County refused to fund and conduct an audit of the nearly 7,000 DSS records to determine the whereabouts and welfare of all of the affected children.

 g. As of the date of the filing of this complaint, Cherokee County continues to employ Defendant Palmer as the business manager of DSS, despite receiving reports from NCDHHS indicating concerns and Defendant Palmer being indicted by the State of North Carolina for actions she took in her role as Director of DSS.

95. Defendant Lindsay would communicate about the draft CVAs with Cherokee County Social Services employees to input the particular factual information.

 a. For example, social workers Katie Brown, Laurel Smith, Joyce Bernier, and Courtney Myers, and other Social Services employees of Cherokee County would receive the draft CVA from Defendant Lindsay and input the information applicable to a particular case and send the draft CVA via email back to Defendant Lindsay for his approval. He would approve of them and return them accordingly.

 b. All of the above-referenced social workers prepared similar agreements only with the approval of Defendant Lindsay and/or their social worker supervisor (whose authority is directly derived from and can only be exercised with the consent of the County Social Services Director) who were following the policies and guidance of the Director of Social Services for Cherokee County, at the time.

 c. All knowledge of Defendant Lindsay, as well as the social workers and supervisors, are imputed to the Director of Social Services for Cherokee County at relevant times.

 d. CVAs other similar documents were often used as Alternative Removal Mechanism when Defendant Lindsay did not feel the case was "serious enough" for Court involvement.

96. Upon information and belief, these CVAs, POAs, FSAs, Safety Plan or other similar documents were sent to and from Defendant Lindsay's Cherokee County-provided and private email addresses since 1999.

    a. These CVAs, POAs, FSAs, Safety Plan or other similar documents have been used by Cherokee County Social Services employees and County Social Services directors to unlawfully take children from the lawful custody of a parent and deprive the parent of substantive and procedural due process since 1999.

    b. Ms. Brown, as well as several other social workers, did question the legality and validity of the CVAs to both the Defendant Lindsay and Cherokee County Directors of Social Services, including Palmer, Crawford and Davis .

    c. Defendant Lindsay and/or social worker supervisors and/or Cherokee County Social Services Directors, including Palmer, Crawford and Davis, advised these social workers that the use of CVAs was legal and permissible.

    d. Cherokee County, by and through its Director of Social Services and Social Services employees, utilized unlawful CVAs, POAs, FSAs, Safety Plan or other similar documents as alternative removal mechanisms, frequently.

    e. Social Services employees of Cherokee County created and induced parents to enter into dozens, if not more (possibly several hundred) CVA's, POAs, FSAs, Safety Plans or other similar documents as alternative removal mechanisms -- all of which were created, effected, and enforced by Social Services employees of Cherokee County or the county Director of Social Services, or Defendant Lindsay.

    f. No CVAs, POAs, FSAs, Safety Plan or other similar documents were done without the direct or indirect approval, guidance and participation of Defendant Lindsay and/or the then-incumbent or actual Cherokee County Director of Social Services, including Palmer, Crawford and/or Davis.

    g. Some of these agreements have been placed in closed court files in the Cherokee County courthouse by Defendant Lindsay or Social Services employees of Cherokee County, while others were not. This placement was done at the

direction of either a director, defendant Lindsay, DSS supervisor, or other employee with supervisory authority.

97. Defendant Palmer, the Cherokee County Director of Social Services, and persons who held the public office of Cherokee County Social Services Director prior to her (including Defendants Crawford and Davis) are and were aware of the CVAs, POAs, FSAs, Safety Plans and similar documents as alternative removal mechanisms and approved of them, both expressly and tacitly.

   a. Use of the CVA's, POA's, FSAs, Safety Plans and substantively similar agreements to remove minor children from their parents without court involvement was an official policy of Cherokee County, implemented by Palmer, Crawford and/or Davis as the county Social Services Director.

   b. The Director takes counsel and advice from her Attorney, supervisors and social workers, by statute and law, she is ultimately responsible and accountable for all of the policies and acts as it relates to each and every child Cherokee County DSS works with and removes from their biological parents.

   c. The Director may not delegate to any other employee final responsibility for discharging her official duties.

   d. The Director may hire employees to assist her in the performance of their duties, but remains liable and accountable for their conduct and actions.

   e. Use of the CVA's, POA's, FSAs, Safety Plans and substantively similar agreements to remove minor children from their parents without court involvement was an accepted custom and practice of CCDSS, known to its policymakers and accepted and encouraged by the policymakers.

   f. The practice of utilizing CVAs, POAs, FSAs, Safety Plan or other similar documents to remove minor children from their parents was so widespread and so obviously illegal that the failure of the Cherokee County Board of Commissioners or the Cherokee County Board of Social Services to exercise their statutory oversight authority and prevent or correct the unlawful actions of Cherokee County Social Services directors and employees constitutes deliberate indifference to the constitutional rights of the parents and children of Cherokee County.

g. On multiple occasions, the decision to proceed with a CVA or other similar document was made in consultation and agreement between the then-incumbent Director of Social Services (including Defendants Palmer, Crawford, and Davis) and Social Services employees of Cherokee County.

98. On multiple occasions, the decision to proceed with a CVA or other similar document was made in consultation between Defendant Lindsay and Social Services employees of Cherokee County during case review, case staffing, or other times.

   a. These documents were used to achieve Cherokee County's and its Social Services directors, employees, and Defendant Lindsay's goal of removing minor children from lawful custody when they lacked sufficient evidence or a legal basis to file a petition or seek non-secure custody of a minor child pursuant to N.C. Gen. Stat. § 7B-100 *et. seq.,*

   b. CVAs, POAs, FSAs, Safety Plans or other similar documents were used to interfere with parental relationships in cases in which Cherokee County, its Social Services Director (including Palmer, Crawford and Davis) and other Social Services employees and Defendant Lindsay knew such interference was not legally justified.

      i. Moreover, CVAs and POAs and other similar documents were used to avoid judicial oversight into the activities of the Cherokee County Director of Social Services, other Social Services employees, and Defendant Lindsay.

      ii. Further, CVAs and POAS and other similar documents were utilized to avoid scrutiny by the Court and to deprive the parents of their right to appointed counsel to advise them on such agreements.

   c. CVAs, POAs, FSAs, Safety Plan or other similar documents were used to avoid, and in fact did result in, Cherokee County not providing any follow-up care (including *inter alia* medical care) that Cherokee County is required to provide to children who are placed in an out-of-home placement, pursuant to N.C. Gen. Stat. § 7B-100 *et seq*.

   d. Upon information and belief, Palmer, Crawford, Davis and Lindsay received salary increases during applicable times as set forth herein.

e. No Parent had counsel when presented with a CVA, POA, FSA, or substantively similar document.

99. No Parent Plaintiff was provided court-appointed counsel or informed of his/her right to consult counsel when presented with the CVA, POA, FSA or substantively similar document.

100. No Parent Plaintiff voluntarily signed the CVA, POA, FSA, or substantively similar document; the signatures were all obtained by means of deception, fraud, coercion, and duress.

101. No Social Services employee of Cherokee County informed any Plaintiff Parent that, in a DSS Court proceeding in the North Carolina District Court, that Parent would have had the assistance of counsel, and that DSS is required by law to attempt to reunify parents who have lost custody of the children in a DSS proceeding.

102. These false, threatening, coercive, and oppressive statements and omissions overcame each Parent's free will, and he or she signed the CVA, POA, FSA, or substantively similar document under this duress.

103. Parents were deprived of their rights to substantive due process because Defendants unlawfully took the Minors and deprived Parents of their parental rights by means of the coercive and unlawful CVA.

104. Parents were deprived of their procedural rights to due process because Defendants' coercive and unlawful use of the CVA deprived Parents of a fair and meaningful opportunity to be heard by a court prior to losing their constitutional parental rights.

105. DHHS advised in a December 20, 2017, letter to all county directors of social services that "facilitating such private custody agreements without the oversight of the Court falls outside of both law and policy." A true and accurate copy of this letter has been filed with the Court. **Exhibit C.**

106. District Court Judge Monica Leslie reported the use of the CVAs and the actions of the Cherokee County Department of Social Services and Defendant Lindsay to NCDHHS.

107. The District Court of North Carolina retains exclusive jurisdiction to determine the status of a minor child, the relationship between a minor child and a biological parent, whether a parent's rights should be terminated, the best interest of the minor child and other similar decisions involving children within the Courts.

108. The Defendants' conduct is the proximate cause of harm to the biological parents of children, who were unlawfully coerced into signing a CVAs, POAs, FSAs, Safety Plan or other similar documents.

109. The Defendants unlawfully coerced the Parents into surrendering custody of their minor children in violation of their constitutional rights.

    a. Several Parents were told their children would be placed in foster care if they did not sign the agreement.

    b. Several Parents were told they would not see their children again if they did not sign the agreement.

    c. Several parents were told they couldn't see their children until they turned 18.

    d. Several parents were told they could go to jail if they did not sign the agreement.

    e. CCDSS exerted unlawful pressure on each parent during the removal process.

110. The Defendants deprived the Parents of their constitutional rights to substantive due process of law through the CVAs and tactics employed to obtain the Plaintiff Parents' signatures on the CVAs and similar documents.

111. The Defendants deprived the Parent Plaintiffs of their constitutional rights to procedural due process of law through the CVAs and the tactics employed to obtain the Adult Plaintiffs' signatures on the CVAs and similar documents.

112. The Parent-Plaintiffs have a constitutionally protected liberty interest in a family unit.

113. The Child-Plaintiff has a constitutionally protected liberty interest in a family unit.

114. The Parent-Plaintiffs have a constitutionally protected liberty interest in raising their children.

115. The actions of the Defendants have wrought a substantial deprivation of these liberty interests without due process upon the Parent-Plaintiffs and Child-Plaintiffs.

116. The harm to all these Plaintiffs, both parents and child is ongoing, therefore, there is no end to their deprivation of liberty interest without due process.

117. The Defendants' conduct is the proximate cause of harm to the minor children who were unlawfully taken away from their biological parents by use of unlawful and coercive CVAs or substantively similar agreements.

    a. The Child Plaintiff was unlawfully taken from the custody of the biological parents

by the Defendants in violation of their constitutional rights.

    a. The Child Plaintiff lost access to services that they are entitled to by law, had the Defendants used the proper procedures to remove them from their biological parents' custody in a DSS Court proceeding.

118. As a proximate cause of Defendants' conduct, the Plaintiffs have been damaged as follows:

    a. Parents have not been allowed to see, visit, care for, or otherwise interact with their children, who were unlawfully taken from them by use of the CVA's, POA's, FSAs, Safety Plans or other substantively similar agreements.

    b. Parents and child have endured suffering sadness, pain and emotional distress resulting from the use of the CVA's POA's, FSAs, Safety Plans or other substantively similar agreements.

    c. Parents have been denied the opportunity to provide care, love, and affection to Minors.

    d. Child has lost the services, care, protection, and assistance of their Parents.

    e. Child has suffered physical, mental and emotional abuse and injuries while in the custody of persons selected by DSS to be their caretakers.

    f. Parents and Child have both been deprived of and have endured lost society, companionship, comfort, guidance, kindly offices, and advice of each other respectively to their family.

    g. Child has been deprived of medical care and other types of care and assistance that Cherokee County would have been required to provide under N.C. Gen. Stat. § 7B-100 *et seq.* had the Minors been removed from their biological parents pursuant to law.

    h. Such other damages as may be proven at trial.

119. The parental/familial relationships between Parents and the Child have been interrupted, damaged, harmed and or destroyed due to the conduct of the Defendants.

120. Because each minor child plaintiff was taken from his/her parent outside of the lawful process of a dispositional hearing in DSS Court and by means of the unlawful CVA, POA, FSA, or substantively similar document, Cherokee County did not provide medical care and other services and benefits that it would have been required to provide had the lawful

process of a court proceeding been undertaken. Therefore, each minor child plaintiff was separately and directly harmed by Defendants' unlawful taking of him/her from his his/her parents' legal custody by losing medical care and other beneficial services to which he would have been entitled.

    a. After the illegality of the CVA documents came to light in early 2018, NCDHHS took control of child protective services in Cherokee County.

    b. During that time, NCDHHS sent an investigator, Tamela Shook to, *inter alia*, investigate the status of the children unlawfully taken pursuant to the CVAs, POAs, FSAs, and substantively similar documents.

    c. Based upon information communicated to her by Defendant Cherokee County, Shook located many of the minor children who are plaintiffs in this action, and, on the instructions of Defendant Cherokee County, made assurances to the minor children that they would receive services to help them overcome the harms they had suffered as a result of their unlawful takings.

    d. As of the date of the filing of this Complaint, no defendant has provided any follow-up assistance or services to any of these minor children.

121. The names of the documents and the specific mechanics of each used to accomplish the illegal taking of children from the biological parents or lawful court-appointed custodians deprived the parents in this action of their rights to substantive and procedural due process has varied through the years. The District Court of North Carolina retains exclusive jurisdiction to determine the status of a minor child, the relationship between a minor child and a biological parent, whether a parent's rights should be terminated, the best interest of the minor child and other similar decisions involving children within the Courts.

122. Each Plaintiff who was a parent whose child was taken by means of a CVA believed at the time of the taking that the CVA or other document was lawful.

123. The belief described in the preceding paragraph resulted from the material representations of the Defendants (or agents and employees authorized to speak on Defendants' behalf).

124. Defendants (or persons empowered to speak on their behalf and exercise their authority) failed to inform any Plaintiff who was a parent whose child was taken by means of a CVA of their statutory and constitutional rights, despite Defendants being obligated to follow

the law and only act in a manner that protects the constitutional rights of parents and children. *See* N.C. Gen. Stat. § 7B-100.

125. At the time that any Plaintiff who was a parent whose child was taken by means of a CVA signed the CVA, that Plaintiff did not know that he or she had been hurt and that the Defendants (or persons empowered to speak on their behalf and exercise their authority) caused her injury.

126. Plaintiffs who were parents whose child was taken by means of a CVA became aware that Defendants' conduct was unlawful, at the earliest, when Judge Sellers declared all CVAs to be unconstitutional and illegal in March of 2018.

127. Only then were Parent Plaintiffs required to inquire about the details of negligence that are reasonably discoverable.

128. No parent Plaintiff would have had the means to know that Defendants had deceived them until Defendant Lindsay, acting within his course and scope of his employment as staff attorney for the Defendants, told the Court, there was no legal authority for the CVAs, in December of 2017.

129. At the time the CVAs were signed, Parent Plaintiffs unknowingly trusted the representations of the Defendants, including the representations of the Defendants that they and their agents were authorized by law to do what they did;

130. The Defendants, by way of their position, authority and power, represented to the Plaintiffs that the CVA was a legal document.

131. Parents would not have signed the CVAs and given up their child(ren) in that manner had they known it was illegal.

132. Parent Plaintiffs have been induced by Defendants' acts to believe that certain facts exist, and they rightfully relied and acted upon that belief to their detriment.

133. Each removal had separate facts individual to the event itself, at separate times and was done by separate workers. However, certain facts are common to each of the victims:

    a. The use of the CVA or similar document was approved by policy of the Cherokee County Director of Social Services during their respective tenures.

    b. In each instance, Scott Lindsay reviewed and approved the CVA or similar document.

c. Each Parent-Plaintiff suffered the deprivation of their constitutional rights by the unlawful actions of the Defendants.

d. Each time a Parent-Plaintiff was presented with a CVA or similar document, Defendants (or agents and employees thereof who were authorized to speak on behalf of and with the authority of Defendants) represented to the Parent-Plaintiff that the CVA was lawful and in conformity with the Parent-Plaintiff's constitutional rights.

e. No Parent-Plaintiff was notified of his/her right to counsel during a removal or termination of parental rights proceeding under Chapter 7B of the North Carolina General Statutes.

f. No Parent-Plaintiff had the assistance of counsel in dealing with the CVA presented by Defendants (or agents and employees thereof who were authorized to speak on behalf of and with the authority of Defendants).

g. Each child suffered an identical base of damages, to wit emotional distress inherent to the breakup of a family unit, and then each child suffered differing amounts of additional damages as a direct and proximate cause of the removal.

134. Plaintiffs who were children taken from their lawful parents by use of a CVA were all minors, under the age of 18, at the time their rights were violated by Defendants.

135. Children who have now reached the age of 18 did not learn of the Defendants' illegal acts and unconstitutional acts until March of 2018 for the same reasons stated above.

## CLAIMS FOR RELIEF

## COUNT I: DEPRIVATION OF RIGHTS 42 U.S.C. § 1983

## (Against Palmer and Lindsay in their individual and official capacities)

136. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

137. Defendant Lindsay and Defendant Palmer are "persons" as that term is used in 42 U.S.C. § 1983.

138. At all relevant times, Defendants were acting under color of state law.

139. The CVAs and POAs, FSAs, Safety Plans, and other similar documents were entered into in the course and scope of Cherokee County's child welfare, family services, and child protective services efforts. However, the facilitation of these agreements falls

outside the duties and responsibilities of Cherokee County, its Directors of Social Services, and Defendant Lindsay imposed by, *inter alia*, N.C. Gen. Stat. §§ 7B-108A, -108A(14), -108A(18) and other applicable statutes and laws.

140. At no time after the removal of Child-Plaintiff did any of the Defendants, or Social Services employees of Cherokee County acting with the authority of and at the direction the Defendants, or health or community workers, review the placement as required by N.C. Gen. Stat. § 7B-100 *et. seq.*, or check on the health, safety, or welfare of the Children-Plaintiffs.

141. At all times relevant, Defendant Cherokee County's social services policies were established by the respective Director, who acts under the authorization of North Carolina law.

142. At all relevant times, the respective Director was further responsible for the oversight, supervision, policies, and procedures regarding implementation of social services by both Cherokee County policy and North Carolina law.

143. Pursuant to N.C. Gen. Stat. § 7B-100 *et seq.* and other relevant North Carolina statutes, including Chapters 108A and 153A*,* the respective Director, was at all times relevant to this Complaint, the final policymaker with regard to all investigative and placement activities conducted by DSS staff, subordinates, attorney, and employees.

144. The respective Director, at all times relevant to this Complaint, was acting under the color of state law in her individual and official capacities.

145. At the times relevant, all Social Services employees of Cherokee County were acting under color of state law and with the authorization of and direction of the respective county Director of Social Services and Defendant Lindsay.

146. At all times relevant, each defendant Director, supervisor, social worker, staff employee, employee of Cherokee County and Defendant Lindsay were health and community workers, acting within the scope of their employment.

147. At the times relevant, all named Defendants were acting under color of state law in his/her individual and official capacities when engaged in the unlawful conduct described throughout this Complaint.

148. At the times relevant, the Defendants Palmer, Crawford and Davis, as well as supervisors, social workers, staff employees, Social Services employees of Cherokee

County, health and community workers and Defendant Lindsay were acting within the scope of their employment.

149. Children, including Children-Plaintiffs, have a right under the Constitution of the United States, the Constitution of North Carolina, and the laws of the United States and North Carolina to live with their parent or parents free from involvement and interference of Cherokee County, absent proof by clear, cogent and convincing evidence of abuse, neglect, or dependency being produced in a court of law.

150. Parents and children including the Plaintiffs, have the right to live together as a family without government interference.

151. The only way a social worker, agent or the Director of a DSS may lawfully remove a child from a biological parent's custody under North Carolina law is by clear, cogent and convincing evidence, based on allegations of abuse, neglect or dependency.

152. Only a Court Order resulting from due deliberation, duly signed by a judge, and filed with the Court, can be used to interfere, interrupt, or prevent the relationship between a parent and a child, including the Plaintiffs in this action.

153. There is no judicial authorization for any CVA or other document described herein that removed a child from a lawful parent's custody.

154. At the times relevant, the Defendants, as set forth herein, lacked any legal right to remove the Children-Plaintiffs from the custody of a lawful parent or guardian.

155. At the times relevant, there existed no legal authority for the Defendants to remove Children-Plaintiffs from the custody of a lawful parent or guardian.

156. At no relevant time was the Child-Plaintiffs provided counsel, the appointment of a guardian *ad litem*, or an attorney for a guardian *ad litem*, as required by North Carolina law.

157. The conduct on behalf of the Defendants toward Plaintiffs shocks the conscience. At no time was Defendants' conduct supported in law or fact.

158. The right to parent one's child is enshrined in the Due Process Clause of the 14th Amendment to the Constitution of the United States and the Law of the Land Clause in Article I, Section 19 if the North Carolina Constitution.

159. The Defendants' conduct violated clearly established constitutional rights of any person who had a lawful right to the custody of Children-Plaintiffs, and these rights were clearly established at the time these violations occurred.

160. Defendants' actions deprived all Plaintiffs of their constitutional rights and violated their rights to both procedural and substantive due process.

161. The actions of the Cherokee County Social Services employees resulted an unlawful seizure of the Children-Plaintiffs, in violation of the Fourth Amendment to the Constitution of the United States.

162. The actions of the Cherokee County Social Services employees unlawfully deprived Children-Plaintiffs of their right to associate with any lawful parent or guardian in violation of the First Amendment to the Constitution of the United States.

163. The actions of the Cherokee County Social Services employees deprived all Plaintiffs of procedural due process by interfering with their right to freedom of association in violation of her respective rights under the First Amendment to the Constitution of the United States.

164. The actions of the Cherokee County Social Services employees deprived all Plaintiffs of substantive due process in that they shock the conscience of the Court.

   a. The use of the CVA was intended to (and did) allow Cherokee County and its Social Services employees to evade judicial review of their coercive and unlawful action and to separate Plaintiffs without lawful authority.

   b. These actions by the Cherokee County Social Services employees violated all Plaintiffs' rights to substantive due process in violation of the Fourteenth Amendment of the Constitution of the United States.

165. Defendants each engaged in conduct in furtherance of the object of this conspiracy and induced others to engage in conduct in furtherance of those conspiracies.

166. Defendants engaged in such conduct in bad faith and with intentionally, recklessly, and with callous disregard for, and deliberate indifference to all Plaintiffs' rights.

167. As a direct and foreseeable consequence of this deprivation:

   a. Child-Plaintiff was removed against their will and without due process of law;

b. Child-Plaintiff lost the services, care, protection, and assistance of their parents and potential future services, care, protection, and assistance of their Parent-Plaintiffs;

c. Children-Plaintiffs lost the services, care, protection, and assistance of any lawfully appointed guardian and potential future services, care, protection, and assistance of a lawfully appointed guardian;

d. Such other damages as may be proven at trial.

168. The CVA violated Child-Plaintiff's rights guaranteed under the U.S. Constitution, including but not limited to:

a. The agreement is not permitted by, did not comply with, and is contrary to the provisions of N.C. Gen. Stat. § 7B-100 *et. seq.,* of the North Carolina General Statutes (which is the means by which the constitutional rights of parents and juveniles are protected in North Carolina, *see, inter alia,* N.C. Gen. Stat. § 7B- 100(1)) because, *inter alia*:

   i. The agreement did not allow Children-Plaintiffs specified minimum visitation with Parent-Plaintiffs, in violation of N.C. Gen. Stat. § 7B-905.1.

   ii. The agreement failed to follow the mandate of N.C. Gen. Stat. § 7B- 507(a), which provides that any order placing or continuing the placement of a juvenile in the custody or placement responsibility of a county department of social services (whether it is an Order for non-secure custody, continued non-secure custody, a dispositional Order, or a review Order):

      1. Shall contain a finding the juvenile's removal or continuation in or return to the juvenile's home would be contrary to the juvenile's best interest;

      2. Shall contain findings as to whether the county Department of Social Services has made reasonable efforts to prevent or eliminate the need for placement of the juvenile, unless the court has previously determined that such efforts are not required and shall cease;

      3. Shall contain findings as to whether a county Department of Social Services should continue to make reasonable efforts to prevent or eliminate the need for placement of the juvenile;

4. Shall specify that the juvenile's placement and care is the responsibility of the county Department of Social Services and that the agency is to provide or arrange for the foster care or other placement of the juvenile; and

5. May provide for services or other efforts aimed at returning the juvenile to a safe home or at achieving another permanent plan for the juvenile.

iii. The agreement violates N.C. Gen. Stat. § 7B-100 *et. seq.,* which does not authorize Cherokee County or its Social Services employees to enter into or facilitate private custody agreements, powers of attorneys, file private custody actions, or take any actions regarding custody of a minor child without judicial action.

1. These CVAs, POAs, FSAs, Safety Plans, or other similar documents are more similar to a private parental custody agreement than a custody order entered under the authority of N.C. Gen. Stat. § 7B-100 *et. seq.*

2. These CVAs, POAs, FSAs, Safety Plans, or other similar documents, while similar to a private parental custody agreement, are not authorized under N.C. Gen. Stat § 50-13.1 *et seq.* or N.C. Gen. Stat § 50A-101 *et seq.*

3. These CVAs, POAs, FSAs, Safety Plans, or other similar documents, though appearing to be similar to a private parental custody agreement, are prohibited by law.

4. Under N.C. Gen. Stat § 7B-905(b), a dispositional order under which a juvenile is removed from the custody of a parent, guardian, custodian, or caretaker shall direct that a review hearing (as required by N.C Gen. Stat § 7B-906) be held with 90 days from the date of the dispositional hearing.

iv. It was not executed under the supervision of the District Court of Cherokee County, North Carolina, which possesses original and exclusive jurisdiction over all juveniles alleged to be abused, neglected, dependent, undisciplined, or delinquent within the County. *See* N.C. Gen. Stat. § 7B-200, 7B-1600, and 7B-1601.

v. It was not executed under the supervision of the District Court of Cherokee County, North Carolina, which possesses original and

exclusive jurisdiction over all child custody actions. *See* N.C. Gen. Stat. § 50A- 201(b) and N.C. Gen. Stat § Chapter 50-13.1 *et seq.*,

    vi. It was not reviewed by a court official or guardian *ad litem* for the minor child and was not filed in the minor child's juvenile action court file.

    vii. North Carolina District Court has the original and exclusive jurisdiction over all matters regarding all minor children within the state (excluding adoptions).

b. The CVAs, POAs, FSAs, Safety Plans, or other similar documents failed to follow the North Carolina Rules of Practice and Rules of Civil Procedure by *inter alia*:

    i. They were not signed by a judge or filed with the Cherokee County Clerk of Court's office.

    ii. Cherokee County DSS did not file any motion, notice on for hearing, or in any other way bring before or otherwise seek court approval or oversight in entering into the CVAs.

c. The execution of the CVAs, POAs, FSAs, Safety Plans, or other similar documents, was lacking in any legal safeguards for the rights of Parent-Plaintiffs or Children-Plaintiffs, as required by N.C. Gen. Stat. § 7B-100 *et. seq.,* and the Constitutions of the United States and the State of North Carolina.

d. The CVAs, POAs, FSAs, Safety Plans, or other similar documents often contained no provisions to revoke or otherwise modify the terms contained therein and contained no provision to allow judicial review or ratification at any time.

e. The CVAs, POAs, FSAs, Safety Plans, or other similar documents was used to deprive the Plaintiffs of the right to procedural due process and substantive due process.

f. Other ways that shall be ascertained through discovery and proven at trial.

169. The CVA was drafted and formatted in such a manner as to resemble a Court Order.

170. Each Defendant Director, and others who were in the position to establish and promulgate the policies and official practices of Cherokee County were aware of, approved, and directed the use of the CVA and substantively similar "agreements."

171. Defendant Lindsay drafted multiple CVAs, POAs, FSAs, Safety Plan or other similar documents involving many parents and children over the course of multiple years.

    a. The CVAs, POAs, FSAs, Safety Plans, or other similar documents were prepared, propagated, and produced by CCDSS based upon Defendant Lindsay's advice, drafting, and/or counsel. The CVA was designed to be a bilateral "agreement" requiring the signatures of both the parents and the recipient adults.

    b. Upon information and belief, Defendant Lindsay, Defendant Palmer, and/or Cherokee County are in possession of electronic copies of many, if not all, of the CVAs, POAs, FSAs, Safety Plan or other similar documents utilized by the Defendants.

        i. Cherokee County, its Social Services employees, and health and community workers of Cherokee County are liable for their tortious actions, particularly in light of the deliberate indifference of Cherokee County, and its employees, its agents and other defendants yet to be determined through the discovery process.

        ii. Cherokee County, its Directors of Social Services and other policy makers are liable for the direct activity and actions of the DSS and its officials and employees through their individual acts and actions, as well as the official policies and *de facto* policies.

        iii. These unlawful "agreements" were crafted and utilized to unlawfully take minor children from the custody of their parents with the knowledge and approval of the Cherokee County DSS Director or Defendant Lindsay or both.

172. The Defendants combined, confederated, and agreed to act in conformity with their unlawful patterns, customs, and policies. Each member of the conspiracy shared the same conspiratorial objective to deprive the Plaintiffs of their federally protected rights resulting in the harm and damages that the Plaintiffs have incurred.

173. The unlawful conduct described throughout the Complaint demonstrates that:

    a. Defendants established as official policy or custom the use of CVAs to unlawfully remove minor children and coerce parents to surrender custody of

children in violation of their rights under the First, Fourth and Fourteenth Amendments to the Constitution of the United States

b. Defendants maintained a policy, custom, or pattern and practice of promoting, facilitating, and condoning the improper, illegal, and unconstitutional techniques by Cherokee County Social Services employees.

c. Defendants demonstrated deliberate indifference to the unlawful, unconstitutional, and unconscionable actions of their delegated policymakers, and further failed to adequately train, supervise, or discipline Social Services employees in connection with protecting and ensuring the constitutional rights of the Plaintiffs.

174. As a direct and proximate cause of Defendants' negligence, as set forth herein, the Plaintiffs have suffered damages in excess of $25,000.00.

## COUNT II: DEPRIVATION OF RIGHTS 42 U.S.C. § 1983

### (Defendant Cherokee County - *Monnell v. Dep't of Social Services*, 436 U.S. 658)

175. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

176. The Cherokee County Department of Social Services is a constituent department of Cherokee County. Cherokee County is governed by a Board of Commissioners, which has oversight over all county programs and departments.

177. The Director of Social Services for Cherokee County, pursuant to N.C. Gen. Stat. § 7B-100 *et. seq.,* and other relevant North Carolina statutes, including Chapters 108A and 153A, is the final policymaker for all policies and procedures established to govern the operations and activities of the Cherokee County DSS.

178. Defendant Palmer was the Director of Social Services for Cherokee County on an interim basis from November 30, 2009 until July 2010, and again from August 1, 2015 until March 23, 2016. Palmer was the permanent Director of Social Services from March 23, 2016 until June 11, 2018. Her predecessors served during their respective tenures.

179. While a Director may rely on a Department attorney for advice, the Director, is the final policy maker for all policies and procedures established to govern the operations and activities for the Department of Social Services.

180. The Defendants, as well as unnamed and other as yet unknown supervisors, directors, policymakers, and other responsible individuals are "persons," as defined pursuant to 42 U.S.C. §1983 and *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018 (1978), and its progeny.

181. Defendant Lindsay was, at the relevant times, simultaneously the attorney hired to represent Cherokee County in juvenile DSS court proceedings, as well as serving as the attorney for Cherokee County.

    a. Defendant Lindsay was also an advisor to Social Services employees of Cherokee County, including its directors.

    b. Defendant Lindsay was also a policymaker for Cherokee County.

182. Defendants Lindsay, Palmer, Crawford, and Davis established as official policy or custom the use of CVAs to coerce biological parents to surrender custody of their children in violation of their rights under the First, Fourth and Fourteenth Amendments to the Constitution of the United States.

183. The fundamental right to familial relations is constitutionally protected.

184. Cherokee County, by and through its final policymaker, maintained a policy, custom, or pattern and practice of promoting, facilitating, and condoning the improper, illegal, and unconstitutional techniques used by Cherokee County Social Services employees and Defendant Lindsay.

185. Cherokee County demonstrated deliberate indifference to the unlawful, unconstitutional, and unconscionable actions of their delegated policymakers. Cherokee County failed to adequately train, supervise, or discipline the directors of Social Services as set forth herein in connection with protecting and ensuring the constitutional rights of the biological parents and their children.

186. Because the County Commissioners of Cherokee County and/or the County Board of Social Services and/or the Cherokee County Director of Social Services and/or Defendant Scott Lindsay were the final policymakers during the past 19 years, their acts or omissions during that time constituted the policy, custom, or pattern and practice of Cherokee County.

187. As the final policymaker for Cherokee County, the County Commissioners of Cherokee County and/or the respective Director of Social Services (Palmer, Davis and Crawford)

and/or Defendant Lindsay created, promulgated, and maintained the following policies, customs, or practices that deprived the Plaintiffs of their constitutionally protected rights by:

a.  Failing to properly train and supervise Cherokee County Social Services employees with regard to their duties not to (1) fabricate purportedly legal documents, (2) coerce signatures from biological parents whereby they gave up their right to parent, (3) separate a parent from a child, (4) remove a child from his/her family, (5) conceal the CVA process from NCDHSS auditors, (6) intentionally and recklessly failed to follow the procedures as set forth in N.C. Gen. Stat. § 7B- 100 *et. seq.,* (7) ignore the policies and guidelines as set forth by NCDHHS as it relates to safety plans, removal procedures, maintaining contact between parents and children, providing a reunification plan for parents and children and following up on placement of the minor children to ensure their safety, health and essential needs are being adequately met.

b.  Encouraging, promoting and condoning Cherokee County Social Services employees to (1) fabricate purportedly legal documents, (2) coerce signatures from biological parents whereby they gave up their right to parent, (3) separate a parent from a child, (4) remove a child from his/her family, (5) conceal the CVA, POA, Family Safety Agreement, Safety Plan and similar processes from NCDHSS auditors. (6) intentionally and recklessly failed to follow the procedures as set forth in N.C. Gen. Stat. § 7B-100 *et seq.,* (7) ignore the policies and guidelines as set forth by NCDHHS as it relates to safety plans, removal procedures, maintaining contact between parents and children, providing a reunification plan for parents and children and following up on placement of the minor children to ensure their safety, health and essential needs are being adequately met; (8) fostering a climate of impunity for engaging in such unconstitutional conduct.

c.  Creating, promulgating, and maintain a policy, custom, or practice of failing to follow the law as set forth in N.C. Gen. Stat. § 7B-100 *et seq.,* the policies, procedures and guidelines as set forth by NCDHHS and other behaviors, conduct or practices to be learned through discovery and proved at trial.

188. The wrongful acts and omissions that deprived the Parent-Plaintiffs of custody of their Child-Plaintiff and their right to parent occurred pursuant to Cherokee County's policies, customs, patterns, practices and conduct.

189. The policies, practices, customs and patterns of conduct of Cherokee County were the direct and proximate cause of the violation of all Plaintiffs' constitutional rights, as described throughout this Complaint, and also the proximate cause of the damages to all Plaintiffs described throughout this Complaint.

190. As a direct and proximate cause of Defendant's negligence, as set forth herein, the Plaintiffs have suffered damages in excess of $25,000.00.

## COUNT III: ATTORNEY'S FEES
### (Against All Defendants)

191. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

192. Plaintiffs are entitled to an award of attorney's fees pursuant to 42 U.S.C. § 1988(b) and other applicable federal and state statutes related to the allegations as set forth herein.

193. In addition to compensatory damages, Plaintiffs seek to recover their attorneys' fees from Defendants.

## COUNT IV: INJUNCTIVE RELIEF
### (Against Cherokee County)

194. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

195. The use of CVAs, POAs, FSAs, Safety Plans or other similar documents as set forth throughout this Complaint is in violation of the due process clause of the Fourteenth Amendment to the Constitution of the United States.

196. Use of the CVAs, POAs, FSAs, Safety Plans or other similar documents is the official policy of Cherokee County, as promulgated by its Social Services policy makers.

197. Use of the CVAs, POAs, FSAs, Safety Plans or other similar documents is an accepted and ratified custom and unofficial policy to the extent that it is not an official policy.

198. Use of the CVAs, POAs, FSAs, Safety Plans or other similar documents is known and tolerated by the final policymakers of Cherokee County, such that their failure to take adequate steps to prohibit such use constitutes deliberate indifference to the

constitutional rights of the people of Cherokee County, including but not limited to, the Plaintiffs in this action.

199. Upon information and belief, policymakers of Cherokee County deny any wrongdoing or illegality in the use of CVAs, POAs, FSAs, Safety Plans or other similar documents, and are likely to continue using this process in the future.

200. This Court is empowered to issue injunctions to prevent the continuation of this unlawful practice.

201. Plaintiffs pray for the entry of an injunction prohibiting any named Defendant, Cherokee County, or any agent, servant, or employee of Cherokee County from using a CVA, POA, FSA, Safety Plan or other similar document to facilitate a transfer of custody of any minor child, and to restrain all named Defendants, their agents, and those acting in concert with them, from taking any action to remove a minor child from the custody of his/her biological parent, except through an action filed in the North Carolina General Court of Justice.

**WHEREFORE** the Plaintiffs by and through undersigned Counsel pray the Court and demand Judgment:

1. For an award to Plaintiffs for injuries and damages, including but not limited to, pain and suffering, compensatory, consequential, and other such damages, as well as interest thereon, in an amount in excess of $25,000.00 to be proven at trial;

2. For an award to Plaintiffs for injuries and damages, including but not limited to, punitive damages, as well as interest thereon, in an amount in excess of $25,000.00 to be proven at trial;

3. Appoint a neutral, qualified third party to do the following, at the expense of Cherokee County:

   a. Conduct a comprehensive audit of all files in the possession of Cherokee County Department of Social Services relating to child protective services from the time that Scott Lindsay provided legal services for DSS to the present to identify all children and parents who have been the victims of Defendants' unlawful policy, practices and procedures of using extrajudicial documents to separate them from their families without use of judicial oversight and the required legal process;

b. As to the children identified above, provide judicial oversight to determine each child's present status and to determine the necessary and appropriate social services each child needs;

c. Assess whether the present placement is in the best interests of each child or whether the child should be returned to his/her biological parents.

d. Report the findings to the appropriate Court under seal, so that the Court may determine the appropriate action that Cherokee County should take with regard to each child;

4. For entry of an order adjudicating the proper placement of the minor child plaintiff who remains a minor, thereby eliminating the "legal limbo" that the actions of Defendants have inflicted on them.

5. For an injunction prohibiting any named Defendant, Cherokee County, or any agent, servant, or employee of Cherokee County from using a CVA, POA, FSA, Safety Plan or other similar document to facilitate a transfer of custody of any minor child, and to restrain all named Defendants, their agents, and those acting in concert with them, from taking any action to remove a minor child from the custody of his/her biological parent, except through an action and order filed in the North Carolina General Court of Justice.

6. For pre-judgment and post-judgment interest as allowed by law.

7. For an award of attorney's fees and costs as allowable by all applicable laws;

8. For a trial by jury;

9. For an acknowledgement of wrongdoing by the named Defendants and a written apology by each Defendant for the same the Plaintiffs in this matter; and

10. For such other and further relief as the Court may deem just and proper.

THIS the 11th day of October, 2021.


/s/ David A. Wijewickrama
David A. Wijewickrama
N.C. State Bar No.: 30694
Law Office of David A. Wijewickrama, PLLC
95 Depot Street
Waynesville, NC 28786
Phone: 828-452-5801
Fax:    828-454-1990

/s/ Ronald L. Moore
Ronald L. Moore
N.C. State Bar No.: 9619
Post Office Box 18402
Asheville, NC 28814
Phone: (828) 777-1812
Fax: (828) 253-2717

/s/ Melissa Jackson                       /s/ D. Brandon Christian
Melissa Jackson                         D. Brandon Christian
N.C. State Bar No.: 34013          N.C. State Bar No.: 39579
95 Depot Street                         3344 Presson Road
Waynesville, NC 28786           Monroe, NC 28112
Phone: 828-452-5801             Phone :(910) 750-2265

*Attorneys for Plaintiffs*

| INITIALS | NAME | PARENTS (F) | PARENT (M) | Date Signed | Notes |
|---|---|---|---|---|---|
| PA | Patrick Allen | Jamie Allen | Melanie Dyer | Sep-16 | |
| GA | Georgia Allen | | | | |
| JA | John Allen | | | | |
| | | | | | |
| MD | Maddox Davenport | Nathan Davenport | Melanie Dyer | Oct-16 | |
| | | | | | |
| CD | Corbin Davenport | Nathan Davenport | Katrina Ledford | Sep-16 | |
| KD | Katelyn Davenport | | | | |
| | | | | | |
| LT | Luke Timpson | | Amanda Timpson | Jun-17 | |
| | | | | | |
| CA | Colton Ashe | Stephen Ashe | Tienda Rose Phillips | Oct-17 | |
| | | | | | |
| CL | Cody Lovingood | | Samantha Bailey (Torres) | | |
| KL | Kaylee Lovingood | | | | |
| | | | | | |
| AD | Anthony Downey | Stephen Downey | Sherry Garland | Aug-16 | |
| | | | | | |
| MC | Mya Crapse | | Sarah Crapse (Esler) | Oct-17 | |
| AC | Audrey Colvin | | | | |
| | | | | | |
| JS | Joy Shipers | | Kelly Walker | Mar-17 | |
| SW | Sharlee Walker | | | | |
| VW | Vayda Walker | | | | |
| | | | | | |
| AR | Alana Roberts | Michael Mathieu | Shalees Greenlee | Nov-16 | |
| | | | | | |
| AH | Alisa Hernandez | | Elizabeth (Libby) Helms (Simo | Jan-14 | |
| JH | Jose Hernandez | | | Jan-14 | |
| | | | | | |
| ZA | Zachariah Allen | Desmond Champange | Hannah Allen | Feb-16 | |
| | | | | | |
| DS | Dakoda Silvers | Jeremay Silvers | | Oct-14 | |
| | | | | | |
| AuD | Austin Derreberry | Robert Derreberry | Alice Derreberry | Sep-16 | |
| AdD | Addison Derreberry | | | | |

EXHIBIT

tabbies

4

| | | | | | |
|---|---|---|---|---|---|
| EM | Emily Maney | | Regina Maney | Oct-17 | |
| PM | | | | | |
| KC | Kobe Carter | | | | |
| MC | Michael Carter | | | | |
| | | | | | |
| AB | Addison Burnette | Caine Burnette | | Oct. -17 | |
| JB | James Burnette | | | | |
| | | | | | |
| TP | Tyler Patterson | Amir Patterson | Desiree Reilly | Nov-14 | |
| DeP | Desean Patterson | | | | |
| DaP | Dakoda Patterson | | | | |
| | | | | | |
| BS | Brianna Sherman | | Martha Killian | Oct-16 | |
| | | | | | |
| DamW | Damon Walters | | Jessica Farquhar | Oct-09 | |
| DarW | Darian Walters | | | Oct-09 | |
| | | | | | |
| ZB | Zasa Brady | | Sheena Dockery | Oct.-16 | |
| | | | | | |
| LR | Leland Rogers | | Patricia Simonds | May- 17 | |
| | | | | | |
| JD | Justice Dorsey | | Tessa Dorsey | 2008-2009 | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| PARENT | CHILDREN | |
|---|---|---|
| Jamie Allen | JA | John |
| Melanie Dyer | GA | Georgia |
| Nathan Davenport | PA | Patrick |
| Katrina Ledford | MD | Maddox |
| | CD | Corbin |
| | KD | Katelyn |
| | | |
| Amanda Timpson | LT | Luke |
| | | |
| Samantha Torres | CL | Cody |
| | KL | Kaylee |
| | | |
| Jessica Farquhar | DamW | Damon |
| | DarW | Darian |
| | | |
| Jeremy Silvers | DS | Dakoda |
| | | |
| Elizabeth (Libby) Helms | AH | Alisia |
| | JH | Jose |
| | | |
| Stephen Downey | AD | Anthony |
| Sherry Garland | | |
| | | |
| Regina Maney | EM | Emily |
| | PM (?) | not on CVA |
| | MC | Michael |
| | KC | Kobe |
| | | |
| Tienda Rose Phillips | CA | Colton |
| Stephen Ashe | | |
| | | |
| Sarah Crapse | AC | Audry |
| | MC | Mya |
| | | |
| Kelley Walker | JS | Joy |
| | SW | Sharlee |
| | VW | Vayda |
| | | |
| Sheena Dockery | ZB | Zssa |
| | | |
| Caine Burnette | AB | Addison |
| | JB | James |

| | | |
|---|---|---|
| Desiree Reilly | DeP | DeSean |
| Amir (Desean) Patterson | TP | Tyler |
| | DaP | Dakoda |
| | | |
| Shalees Greenlee | AM | Alana (Roberts) |
| Michael Mathieu | | |
| | | |
| Martha Killian | BS | Breanna |
| | | |
| Hannah Allen | ZA | Zachariah |
| Desmond Champange | | |
| | | |
| Alice Derreberry | AdD | Addison |
| Robert Derreberry | AuD | Austin |
| | | |
| Patricia Simonds | LR | Leland |
| | | |
| Tessa Dorsey | JD | Justice |



**FATHER**

Travis Timpson

**MOTHER**

Amanda Timpson

Murphy, NC     (Dockery)

CHILD/ CHILDREN

Luke Timpson (4) now 7

*PLACEMENT*

CVA CHEROKEE COUNTY

2017 (prior to June)

William Timpson
Paternal Grandfather

*PLACEMENT*

CVA CHEROKEE COUNTY

2017 (June)

Melissa Coker
Maternal Aunt
**Christopher Coker
Uncle**

CCDSS STAFF
Meyers
Lindsey

*INFORMATION*

Palmer knew GF was getting ready to be arrested

DSS told W Timpson was only one approved to have child - No prior DSS cases - thought it was temp custody

Gave GF no option - had to sign CVA to Coker

Mother said no to Coker - feared abuse in home - DSS placed child anyway

Jan 2018 when mother got weekend visits - child disclosed sexual abuse - Mother got emergency custody

M does not believe first doc was CVA - did not recognize form

**Aunt claims report was false to get exparte**

May 2018 - Mom's drug indicment

EXHIBIT

B

NORTH CAROLINA

CHEROKEE COUNTY                    CUSTODY AND VISITATION AGREEMENT

THIS CUSTODY AND VISITATION AGREEMENT is made and entered into this the _____ day of June, 2017, by and between WILLIAM "BILL" TIMPSON, of Cherokee County, North Carolina (hereinafter referred to as "Mr. Timpson"), and CHRISTOPHER COKER and wife, MELISSA COKER, of Cherokee County, North Carolina (hereinafter sometimes referred to as "Mr. and Mrs. Coker") ;

### WITNESSETH:

Whereas, Travis Timpson and wife, Amanda Timpson, are the parents of ████████ ████████ (hereinafter sometimes referred to as "the child") whose date of birth is May 24, 2013; and .

Whereas, William "Bill" Timpson is grandfather of ████████ and

Whereas, Christopher Coker and wife, Melissa Coker are the maternal aunt and uncle of ████ and

Whereas, William "Bill" Timpson was granted the legal care and custody of ████████ in a case entitled *William "Bill" Timpson vs. Travis Timpson and wife, Amanda Timpson*, 17-CVD-66 on file in the Office of the Clerk of Superior Court of Cherokee County, North Carolina;

Whereas, William "Bill" Timpson is currently incarcerated in the Cherokee County Detention Center and unable to provide care for ████████

Whereas, Christopher Coker and wife, Melissa Coker, are able to provide a loving and stable home environment for said child and can provide for the support and maintenance of said child if the said child resides with her in her home; and

Whereas, the parties hereto desire to enter into this Agreement setting forth the terms and conditions for the care, custody and control of ████████ which the parties hereto deem to be in the best interest of said child in order to adequately provide a loving and stable future for said child now and in the future.

NOW, THEREFORE, William "Bill" Timpson and Christopher Coker and wife, Melissa Coker, do hereby stipulate and agree as follows:

1. CUSTODY OF THE CHILD: The legal and physical care, custody and control of ████████ ████ hereinafter sometimes referred to as ████ shall be placed with his maternal uncle and aunt, Mr. and Mrs. Coker, until such time as ████ shall become 18 years of age or is otherwise emancipated.

2. Mr. Timpson, the child's grandfather, shall have the right to have visitation with the child at

Case 1:21-cv-00284   Document 1   Filed 10/11/21   Page 44 of 119

reasonable times and for a reasonable length of time on each visitation period as Mr. and Mrs. Coker and Mr. Timpson may agree from time to time in the future subject to the following terms and conditions: (a) the child shall not be removed from Cherokee County, Georgia by Mr. Timpson without the knowledge and consent of Mr. and Mrs. Coker; (b) no visitation will be exercised by Mr. Timpson with the child at any time which interferes with the children's normal social, school or church activities; (c) Mr. Timpson shall not have, use or possess any alcoholic beverage or controlled substance during any visitation period or for 96 hours prior to any time he may have visitation with the child; and (d) Mr. Timpson shall not allow any person who has, possesses or is using or has used any alcoholic beverage or controlled substance within 96 hours to be in the presence of the child at any time or during any visitation period he is visiting with the child.

3. The child's parents may visit with the child only in accordance with the terms and conditions set forth in custody order entered in the case entitled *William "Bill" Timpson vs. Travis Timpson and wife, Amanda Timpson*, 17-CVD-66 on file in the Office of the Clerk of Superior Court of Cherokee County, North Carolina.

4. If Mr. and Mrs. Coker detects the odor of alcohol or any controlled substance on or about the person of Mr. Timpson or any person he has with him at any time when he comes to exercise the visitation with the child or if she are able to determine within a reasonable degree of certainty that Mr. Timpson or any other person with him is under the influence of any alcoholic beverage or any controlled substance, then, and in that event, Mr. and Mrs. Coker shall have the right to deny any visitation period between Mr. Timpson and Luke while he or any other person with him is in violation of the terms and conditions of this provision.

5. If Mr. and Mrs. Coker detects the odor of alcohol or any controlled substance on or about the persons of the child's mother and father or any person they have with them at any time when they may be entitled to exercise the visitation with the child or if Mr. and Mrs. Coker are able to determine within a reasonable degree of certainty that the child's mother and father or any other person with them is under the influence of any alcoholic beverage or any controlled substance, then, and in that event, Mr. and Mrs. Coker shall have the right to deny any visitation period between the child's and Luke while she or any other person with her is in violation of the terms and conditions of this provision.

6. It is stipulated and agreed that Mr. and Mrs. Coker shall have full power and authority to seek, obtain and consent to and for any medical care or health care, emergency or otherwise, which may be necessary or advisable in providing for the best interests and care of ████. It is further stipulated and agreed that Mr. and Mrs. Coker shall have full power and authority to enroll the child in school, and Mr. and Mrs. Coker shall have the power and authority to consent to any and all activities and programs which are necessary or beneficial to provide for the complete and well rounded education of the child.

7. It is stipulated and agreed that Mr. and Mrs. Coker may enroll and carry the child on their health care insurance or any other insurance for which the child may qualify as a member of Mr. and Mrs. Coker's home and household. It is further stipulated and agreed that for purposes of filing State and/or Federal income tax returns that Mr. and Mrs. Coker may claim the child as a

dependent and as an exemption and, Mr. and Mrs. Coker shall be entitled to any claim and take advantage of any other tax benefit available to her because the child is a member of Mr. and Mrs. Coker's home and household.

8. It is hereto stipulated and agreed that the home state of the child as defined by the Uniform Child Custody Jurisdiction Act is North Carolina and any and all legal proceedings involving the custody of or visitation with the child shall and must be filed, litigated and decided in the Courts of the State of North Carolina pursuant to applicable North Carolina law and North Carolina judicial decisions, unless and until the child has resided in the State of Georgia for six (6) months after the child was first placed in the care and physical custody of Mr. and Mrs. Coker.

9. It is hereto stipulated and agreed that the site of this Agreement is North Carolina and said Agreement shall be interpreted in accordance with and governed by the laws and judicial decisions of the State of North Carolina.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals, the day and year first above written on duplicate originals, one of which has been retained by each of the parties to this Agreement.

_____ (SEAL)
William "Bill" Timpson, the child's grandfather

_____ (SEAL)
Christopher Coker, the child's maternal uncle

_____ (SEAL)
Melissa Coker, the child's maternal uncle

STATE OF NORTH CAROLINA

COUNTY OF CHEROKEE

I, _____, a Notary Public of said State and County, do hereby certify that
William "Bill" Timpson, the child's father, personally appeared before me this day and acknowledged
the due execution of the foregoing instrument.

WITNESS my hand and Notarial Seal, this _____ day of June, 2017.

_____
Notary Public

My Commission Expires:

_____


STATE OF NORTH CAROLINA

COUNTY OF CHEROKEE

I, _____, a Notary Public of said State and County, do hereby certify that
Christopher Coker and wife, Melissa Coker, personally appeared before me this day and acknowledged
the due execution of the foregoing instrument.

WITNESS my hand and Notarial Seal, this _____ day of June, 2017.

_____
Notary Public

My Commission Expires:

_____

# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## DIVISION OF SOCIAL SERVICES
### CHILD WELFARE SERVICES

ROY COOPER
GOVERNOR

MANDY COHEN, MD, MPH
SECRETARY

WAYNE E. BLACK
DIRECTOR

December 20, 2017

DEAR COUNTY DIRECTORS OF SOCIAL SERVICES

SUBJECT:          : POLICY AND PRACTICE ALERT: PRIVATE CUSTODY AGREEMENTS

It has come to our attention that child welfare staff in some county Departments of Social Services may be facilitating the completion of private custody agreements between the parent(s) of children involved in Child Protective Services and other family members or other individuals, without the oversight of the Court. Counties thought to be facilitating such agreements have been contacted directly.   This letter is a reminder that <u>facilitating such private custody agreements without the oversight of the Court falls outside of both law and policy.</u>

NCGS 108A–14(a)(11) provides that a director of social services has the duty and responsibility to "assess reports of child abuse and neglect and to take appropriate action to protect such children pursuant to the Child Abuse Reporting Law, Article 3 of Chapter 7B of the General Statutes." Article 3 of Chapter 7B of the General Statutes and DHHS policy set forth the duties and responsibilities of county Departments of Social Services related to the placement and custody of children involved in Child Protective Services. The use of agency resources to facilitate private custody agreements without the oversight of the Court does not fall within the provision of Child Protective Services, and is therefore beyond the scope of a County Department of Social Services' duties and responsibilities.

As a reminder, the goal of Child Protective Services is to support and improve parental/caregiver abilities to assure a safe and nurturing home for each child. In-Home Services engages families in the planning process while producing better outcomes of safety, permanence, and well-being for children, and encourages families to develop a support network that can assist them in planning for coping with future challenges.

If you have questions, please consult with your agency attorney or contact your Children's Program Representative.

Sincerely,

Lisa T. Cauley
Deputy Director

CWS-50-2017

WWW.NCDHHS.GOV
TEL 919-527-6370 • FAX 877-625-4374
LOCATION: 820 S. BOYLAN AVE. • MCBRYDE BUILDING • RALEIGH, NC 27603
MAILING ADDRESS: 2445 MAIL SERVICE CENTER • RALEIGH, NC 27699-2445

Case 1:21-cv-00284  Document 1  Filed 10/11/21  Page 48 of 119



EXHIBIT

C

STATE OF NORTH CAROLINA    )    IN THE GENERAL COURT OF JUSTICE
                          )    DISTRICT COURT DIVISION
COUNTY OF CHEROKEE COUNTY  )    FILE NO.: 18-CVD-0046

---

                                )
MICHAEL MATHIEU,                )
                                )
            Plaintiff,          )
                                )
      v.                        )          PROCEEDINGS
                                )
SHALEES GREENLEE,               )
                                )
            Defendant.          )
                                )

---

On Wednesday, February 28, 2018, commencing at 9:28 a.m., the above-captioned Proceedings were taken in the General Court of Justice, District Court Division, Cherokee County, North Carolina, before the Honorable Tessa Shelton Sellers, Judge Presiding, and was attended by Counsel as follows:

APPEARANCES:

    ZEYLAND G. MCKINNEY, JR., ESQ.
    McKinney Law Firm PA
    23 Valley River Avenue
    Murphy, North Carolina  28906
    on behalf of the Plaintiff

    DAVID A. WIJEWICKRAMA, ESQ.
    MELISSA JACKSON, ESQ.
    BRANDON CHRISTIAN, ESQ.
    95 Depot Street
    Waynesville, North Carolina  28786
    on behalf of the Defendant

    RON MOORE, ESQ.
    P.O. Box 18402
    Asheville, North Carolina  28804
    on behalf of the Defendant

(Appearances continue)



EXHIBIT
P

## Page 2

APPEARANCES CONTINUED:

DAVID D. MOORE, ESQ.
559 West Main Street
Sylva, North Carolina 28779
on behalf of Cherokee County DSS

C. CALEB DECKER, ESQ.
61 North Market Street
Asheville, North Carolina 28801
on behalf of David C. Roberts

REPORTED BY: Mai-Beth Ketch, CVR-M, CCR
ASHEVILLE REPORTING SERVICE

## Page 3

1   (Document TL1361)
2               INDEX
3   Proceedings . . . . . . . . . . . . . . . .   5
4   WITNESS: MICHAEL MATHIEU
5   Direct Examination By Mr. McKinney . . . . . .   30
6   Cross-Examination By Ms. Jackson . . . . . . .   45
7   Redirect Examination By Mr. McKinney . . . . .   57
8   WITNESS: SHEILA ANN MATHIEU
9   Direct Examination By Mr. McKinney . . . . . .   58
10  Cross-Examination By Ms. Jackson . . . . . . .   67
11  WITNESS: SHALEES MARIE GREENLEE
12  Direct Examination By Ms. Jackson . . . . . .   74
13  Cross-Examination By Mr. McKinney . . . . . .   99
14  Redirect Examination By Ms. Jackson . . . . .   109
15  WITNESS: DAVID HUGHES
16  Direct Examination By Ms. Jackson . . . . . .   112
17  Cross-Examination By Mr. McKinney . . . . . .   140
18  Redirect Examination By Ms. Jackson . . . . .   143
19  Recross-Examination By Mr. McKinney . . . . .   147
20  Re-redirect Examination By Ms. Jackson . . . .   149
21  WITNESS: CINDY PALMER
22  Direct Examination By Mr. Ron Moore . . . . .   157
23  Cross-Examination By Mr. McKinney . . . . . .   186
24
25  (Index Continues)

## Page 4

1   INDEX CONTINUED:
2   WITNESS: RONNIE SCOTT LINDSAY
3   Direct Examination By Mr. Ron Moore . . . . .   189
4   Certificate of Notary . . . . . . . . . . .   205
5   EXHIBITS:                      MARKED   ADMITTED
6   Plaintiff's Exhibit No. 1        39        41
7   Plaintiff's Exhibit No. 2        39        41
8   Defendant's Exhibit No. 1        92        94
9   Defendant's Exhibit No. 2       145       ----
10  Defendant's Exhibit No. 3       147       ----
11  Defendant's Exhibit No. 4       167       186
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 5

1            P R O C E E D I N G S
2   FEBRUARY 28, 2018                    9:28 A.M.
3   (BEFORE THE HONORABLE TESSA SHELTON SELLERS)
4   BY THE COURT:
5       All right, Madam Clerk, this would be
6       18-CVD-0046, Michael Mathieu versus Shalees
7       Greenlee.  Is there anything before we
8       proceed?
9   BY MR. WIJEWICKRAMA:
10      Your Honor, if it Please the Court, if I could
11      go out of order with Mr. McKinney's consent,
12      we have a few motions for the Court's
13      consideration today that were timely filed.
14      The first one is for a complete recordation by
15      a court reporter.  We have our court reporter
16      present.  We also have a motion for
17      sequestration of the witnesses both before and
18      after testimony.  We also have a motion to
19      permit video-recording of the witnesses'
20      testimony.  We also have a motion for
21      designation under 2.1, Judge, and a motion for
22      a protective order.  Your Honor, if it Please
23      the Court, we would request that the Court
24      allow a complete recordation of this matter,
25      as I believe we will need to make use of this

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@asheviIlereporting.com

Case 1:21-cv-00284   Document 1   Filed 10/11/21   Page 50 of 119

1     at a later date, the findings of this hearing.
2     Representing Ms. Shalees Greenlee today are
3     myself, David Wijewackrama, from the Haywood
4     Country bar. I'll let everyone else introduce
5     themselves.
6 BY MS. JACKSON:
7     I'm Melissa Jackson.
8 BY MR. CHRISTIAN:
9     Your Honor, I'm Brandon Christian. I'm
10     Cumberland County bar. And with the Court's
11     permission, I'm making a limited appearance
12     for this hearing in this case today only.
13 BY THE COURT:
14     Yes, sir.
15 BY MR. CHRISTIAN:
16     Thank you, Your Honor.
17 BY MR. RON MOORE:
18     Your Honor, Ron Moore from Buncombe County.
19 BY MR. WIJEWICKRAMA:
20     Your Honor, if it Please the Court, I have a
21     proposed order for the Court's consideration
22     at the end of today, if I may approach.
23 BY THE COURT:
24     You may.
25 BY MR. WIJEWICKRAMA:

1     Your Honor, if it Please the Court, Mr.
2     McKinney was kind enough prior to today's
3     hearing to file a reply to our motions and to
4     consent to all of the motions, and we are
5     grateful to him for his kindness.
6     Specifically, Mr. McKinney stated in his
7     response that the defendant has no objection
8     as it relates to Motions 2 through 7 to the
9     Court entering an order making declaration for
10     complete recordation, for permitting witness
11     testimony, requiring sequestration, granting a
12     protective order, and for designation of this
13     case as exceptional if the Court deemed fit.
14     Your Honor, as a road map for today, we
15     provided Mr. McKinney with a memorandum of
16     law, we also sent a copy to the Court. If it
17     Please the Court, before we get into the
18     substance of Mr. McKinney's complaint, we wish
19     to proceed on the declaratory judgment portion
20     by consent which we believe will have direct
21     bearing on the Court's rulings in the
22     underlying complaint.
23 BY THE COURT:
24     Mr. McKinney, any response?
25 BY MR. MCKINNEY:

1     I did file a response to their motions, and I
2     don't have any objection as Mr. Wijewackrama
3     said to what I've delineated, but I think
4     there's a problem with proceeding with this
5     matter if the Court designates this case as an
6     exceptional case. I don't think --- first of
7     all, I question whether or not the custody
8     action itself can be designated an exceptional
9     case. That's not what I'm consenting to.
10     What I'm consenting to is I have no problem
11     with the Court designating this an exceptional
12     case or whoever is supposed to under the
13     statute. I've been in a number of business
14     court cases, but I've never been in an
15     exceptional case. But I think it's the chief
16     justice that may have to designate it. It is
17     in business court cases. I've been in a
18     number of those cases. I think that if the
19     chief justice designates it an exceptional
20     case, then it has to go before another judge.
21     That judge can hear it. You're outside the
22     county. If it's a jury matter, it has to be
23     heard in this county, but I think you can hear
24     motions outside the county. But if that's
25     what they're asking for with respect to the --

1 BY THE COURT:
2     I agree with you. I can't make the
3     designation.
4 BY MR. MCKINNEY:
5     Right.
6 BY THE COURT:
7     I can make a recommendation to Judge Walker or
8     to Judge Coward who then make their
9     recommendation to the chief justice ----
10 BY MR. MCKINNEY:
11     Right.
12 BY THE COURT:
13     --- in order for that to happen.
14 BY MR. MCKINNEY:
15     Right. But my point is, Your Honor, with
16     respect to the custody agreement that was
17     entered into by the parties, if he's asking
18     for a declaratory judgment and he's asking for
19     a designation of that as an exceptional case,
20     I don't think we can hear anything with
21     respect to that today. And what I'm willing
22     to stipulate to for the purposes of this
23     custody action -- I'm willing to stipulate
24     that the custody agreement is not an order of
25     the Court, that it has no legal force or

Case 1:21-cv-00284   Document 1   Filed 10/11/21   Page 51 of 119

1  effect as an order of the Court. But I think
2  the Court is going to have to take evidence --
3  I don't know if you have to take evidence, but
4  -- there seems to be some willingness to argue
5  that whatever status quo is created by this
6  agreement that the Court should consider that.
7  And if that's where they're coming from, then
8  I think that's something that Your Honor is
9  going to have to look at once you determine
10 the circumstances surrounding the execution of
11 that agreement. And my argument to the Court
12 on that point would be it really doesn't
13 matter. It doesn't matter whether there was -
14 - there was fraud in the execution of the
15 agreement. It doesn't matter whether there
16 was -- whether there was coercion. For
17 purposes my action, what I'm saying is the
18 Court is the status quo for a year has been
19 that this child has been in this location,
20 it's doing fine, and we don't want the child
21 drug around and upset until we can have a full
22 hearing on the merits. That's my position.
23 But I'm not going to get involved in whether
24 there was fraud, whether there was coercion.
25 There's no reason for me to do that. I don't

1  think there's any reason really, Your Honor,
2  for the Court to do that because I am
3  consenting and stipulating that that agreement
4  does not have the effect of a court order.
5  I'll let somebody smarter than me decide
6  whether or not it was outside 7B and whether
7  it was improper and so forth. All I'm
8  interested in is keeping this child safe.
9  BY THE COURT:
10     Can I see parties at the bench?
11 BY MR. WIJEWICKRAMA:
12     Your Honor, if I may also ---
13 BY THE COURT:
14     May I see the parties at the bench?
15 BY MR. WIJEWICKRAMA:
16     Sorry.
17 (BENCH CONFERENCE)
18 BY MR. WIJEWICKRAMA:
19     Your Honor, if it Please the Court, if I may
20     be heard on one issue?
21 BY THE COURT:
22     Yes, sir.
23 BY MR. WIJEWICKRAMA:
24     I made a clerical error when filing my
25     response to pleadings, and I apologize to the

1  Court for that. I put the declaratory
2  judgment action under the motions section as
3  opposed to the counterclaim. I've spoken to
4  Mr. McKinney, and consents to me being allowed
5  to consider this as -- present this as a
6  counterclaim, waives his to answer as such. I
7  did also want to say that I agree with
8  everything that Mr. McKinney said, and I
9  apologize if I misstated it earlier. We would
10 only ask that the court consider the request
11 for a 2.1 at the end of today's hearing. The
12 last thing I would like to ask the Court is
13 that based on the fact that there is no jury
14 present, I know that we're limited to the four
15 corners of the document. But since we're also
16 looking for some information that's been
17 subpoenaed and we're also trying to prepare
18 for the declaratory judgment, should the Court
19 grant it, we may ask some questions outside
20 the four corners of the initial complaint.
21 BY THE COURT:
22     Do you have any response, Mr. McKinney?
23 BY MR. MCKINNEY:
24     I have no objection to that, Your Honor.
25 BY THE COURT:

1  All right, based on the preliminary matters
2  that are before the Court, the Court will
3  allow, since the parties have stipulated so,
4  to complete recordation. The Court will grant
5  the sequestration motion. The Court will also
6  grant the protective order and present.
7  However, the Court will hold that -- any
8  ruling on the motion for a 2.1 judge until the
9  end of the evidence today. And so who would
10 be the first witness to be called?
11 BY MR. MCKINNEY:
12     Michael Mathieu, Your Honor.
13 BY MR. DAVID MOORE:
14     Your Honor, there was a motion to quash filed
15     on behalf of the Department of Social
16     Services, and we are not a party to this
17     action. I ---
18 BY THE COURT:
19     I don't have a motion to quash.
20 BY MR. WIJEWICKRAMA:
21     We have not received any motions.
22 BY MR. DAVID MOORE:
23     Okay.
24 BY THE COURT:
25     I don't have it in the file, Mr. Moore.

828-254-9230     ASHEVILLE REPORTING SERVICE     800-357-5007
ars@ashevillereporting.com

1  BY MR. DAVID MOORE:
2     Okay.
3  BY THE COURT:
4     So is there -- I have the initial complaint,
5  Judge Leslie's ex parte order, the response by
6  Mr. Wijewackram with the counterclaim, and
7  then Mr. McKinney's reply.
8  BY MR. DAVID MOORE:
9     All right.
10  BY MR. LINDSAY:
11     I'm not party either, but I have certain
12  documents subpoenaed from me. I received that
13  yesterday morning. It's kind of difficult to
14  get all this stuff that was asked for
15  together. So I have some stuff, but probably
16  not all of this stuff.
17  BY THE COURT:
18     Okay.
19  BY MR. MCKINNEY:
20     Your Honor, I would just note that the
21  subpoenas were sent to me -- copies of the
22  subpoenas were sent to me on February 2nd.
23  BY MR. WIJEWICKRAMA:
24     Your Honor, if it Please the Court ---
25  BY THE COURT:

1     I'm listening.
2  BY MR. WIJEWICKRAMA:
3     Your Honor, Mr. Moore and I had a conversation
4  in good faith, and he did relate to me he was
5  at the School of Government at a program, and
6  he said he intended to request a protective
7  order, and I understood that to be the case.
8  Regardless of whether the motion was timely
9  filed, I think -- well, I can't speak for Mr.
10  McKinney, but I believe everyone agrees that
11  there should be a protective order. And I
12  would like the Court to note that in the order
13  that is presented to the Court, there is a
14  language for a protective order to keep the
15  CPA documents sealed. The reason I did that,
16  Your Honor, is because I hadn't gotten a
17  chance to catch up with Mr. Moore to see if
18  one was sent over, but I did put one in this
19  morning when I was preparing this order. And
20  in all candor, Mr. Moore and I did have an
21  understanding. I did talk to co-counsel about
22  making sure there would be a protective order.
23
24  BY MR. DAVID MOORE:
25     And whether or not there's a written one that

1  has made its way to the Court or not, I would
2  be making an oral motion pursuant to Rule 45
3  today because the juvenile code does in fact
4  protect the confidentiality of certain
5  records. And we can -- and I will provide a
6  protective order that I would use normally for
7  production of juvenile records which allows
8  for the redaction of certain information.
9  Because we had not been heard yet on that and
10  because there's not an entered protective
11  order, those documents are not going to be
12  available from the witnesses who were
13  subpoenaed today because of that. And I
14  apologize if there was a misunderstanding
15  because that was not my -- we're not a party
16  to this action. So we're in an unusual spot
17  here. There are also witnesses who have been
18  subpoenaed from the Department of Social
19  Services. I'm here on behalf of the
20  department and the witnesses in their official
21  capacities, and I obviously can't participate
22  on what may be relevant or may not be relevant
23  documents that I might believe --- so I --- I'm
24  hand strung in what I can do other than
25  provide a protective order and then we will

1  have documents provided for this hearing.
2  BY MR. WIJEWICKRAMA:
3     Your Honor, I do have to agree. However,
4  while we did consent to a protective order
5  being entered, I did subpoena these documents.
6  And while I agree with Mr. Moore, 7B applies
7  to parties, and we issued this subpoena under
8  the North Carolina rules of civil procedure,
9  Rule 45. And we did ask that they produce --
10  that they bring these documents so that the
11  Court could review these documents in camera.
12  BY MR. DAVID MOORE:
13     We can have those documents. I mean, that's --
14  - that's -- we have the file here -- and we've
15  got the file here. It's just not been
16  redacted is my point, that -- with reporters'
17  names and -- it's not been, has it? The
18  redactions have occurred. So the file is
19  present in order to be reviewed in camera by
20  the Court, but it also does fall out, to Mr.
21  Wijewickrama's point, outside of Chapter 7B
22  which raises the entire different level of
23  confidentiality for purposes of a private
24  custody action. I -- it was my understanding
25  and impression that we were going to deal with

1    the confidentiality issue today because I'm
2    not a party, and I can not -- I don't have any
3    formal role here. I can't sit here and
4    object.
5  BY MR. WIJEWICKRAMA:
6    Your Honor, Mr. Moore and his client are the
7    same as Apple or IBM or Microsoft. If they
8    are subpoenaed to produce documents, they are
9    to produce the documents for the Court to
10    review under the -- and this subpoena was
11    signed by Your Honor, by a judge, and it was -
12    --
13  BY THE COURT:
14    And the documents are here.
15  BY MR. WIJEWICKRAMA:
16    Yes.
17  BY THE COURT:
18    I think Mr. Moore is just wanting the record
19    to reflect that there is the additional layer
20    of the protective order in which he is
21    requesting on behalf of the fact that they're
22    juvenile records.
23  BY MR. WIJEWICKRAMA:
24    I agree and that's in the order.
25  BY THE COURT:

1    Correct?
2  BY MR. DAVID MOORE:
3    That's correct.
4  BY THE COURT:
5    So ordered.
6  BY MR. DAVID MOORE:
7    Thank you.
8  BY MR. WIJEWICKRAMA:
9    Thank you. Would Your Honor like to do the
10    consent order right now?
11  BY THE COURT:
12    Mr. Decker?
13  BY MR. WIJEWICKRAMA:
14    There is one other issue that we have to deal
15    with before we get started, and I'll let Ms.
16    Jackson and Mr. Decker ---
17  BY MR. DECKER:
18    Oh, I thought he was about to bring something
19    else up. Your Honor, I've been retained to
20    represent Mr. David Roberts ---
21  BY THE COURT:
22    Yes, sir.
23  BY MR. DECKER:
24    --- who is the legal father.
25  BY THE COURT:

1    Yes, sir.
2  BY MR. DECKER:
3    There is now evidence that he is not the
4    biological father, and I believe that, one, he
5    wishes to be removed as a party as he is not
6    the biological father, and I think there is
7    some paperwork in the mix of all this
8    loveliness that will legitimate the biological
9    father.
10  BY THE COURT:
11    Okay.
12  BY MR. DECKER:
13    So I've spoken with him, told him what to
14    expect. He understands and he is here and for
15    the record waives any requirement of notice to
16    any further hearings and would ask to be, I
17    guess, excused as a party to this hearing.
18  BY THE COURT:
19    So -- Mr. Decker, so that I am clear ---
20  BY MR. DECKER:
21    Yes.
22  BY THE COURT:
23    --- you represent David Cody Roberts ---
24  BY MR. DECKER:
25    Yes.

1  BY THE COURT:
2    --- who has been noted as the legal father ---
3  BY MR. DECKER:
4    Yes.
5  BY THE COURT:
6    --- of this juvenile that is part of this
7    custody action?
8  BY MR. DECKER:
9    Yes.
10  BY THE COURT:
11    And you have indicated to the Court, which was
12    a question of the Court when the Court read
13    the pleadings last night, that there is
14    evidence to which indicates that he is not the
15    father -- the biological father of the minor
16    child?
17  BY MR. DECKER:
18    Yes.
19  BY THE COURT:
20    Would that be in the form of a DNA test?
21  BY MR. DECKER:
22    Yes, Your Honor.
23  BY THE COURT:
24    And there will be evidence of such DNA test?
25  BY MR. DECKER:

828-254-9230      ASHEVILLE REPORTING SERVICE      800-357-5007
ars@ashevillereporting.com

## Page 22

```
1        Well, I can't really forecast the learned
2     minds in this room's actions.  I would assume
3     that, yes, there is going to be ----
4  BY THE COURT:
5        And he now waives any other ----
6  BY MR. DECKER:
7        Yes.
8  BY THE COURT:
9        ---- right that he may have to this child ---
10 BY MR. DECKER:
11       Yes.
12 BY THE COURT:
13       --- or to be a part of this proceeding?
14 BY MR. DECKER:
15       That is correct.
16 BY MR. MCKINNEY:
17       Your Honor, we would stipulate to that.
18 BY THE COURT:
19       Thank you, Mr. McKinney.
20 BY MR. DECKER:
21       And with that being said, I would -- even
22    though I'm sure this is going to be a whole
23    lot of fun to watch, but I would ask to be
24    excused, Your Honor.
25 BY THE COURT:
```

## Page 23

```
1        Have a lovely afternoon, Mr. Decker.
2  BY MR. DECKER:
3        Thank you.
4  BY THE COURT:
5        Always a pleasure.  Mr. Roberts, you're free
6     to go, sir.
7  BY MR. ROBERTS:
8        Thank you.  You have a good day.
9  BY THE COURT:
10       Now, before we go on for just a moment, Mr.
11    Lindsay, you indicated that you were just
12    served with a subpoena; is that correct?
13 BY MR. LINDSAY:
14       Yesterday morning, Your Honor.
15 BY THE COURT:
16       And that you do not have documentation with
17    you?
18 BY MR. LINDSAY:
19       I have some, Your Honor.
20 BY THE COURT:
21       I show that you were also served with a
22    subpoena on February 5th; is that correct?
23 BY MR. LINDSAY:
24       That was, as I recall, the documentation that
25    was in the possession of the Department of
```

## Page 24

```
1     Social Services in which I have not had access
2     to any of those records or the Department
3     since January 10th.  I've not produced any of
4     that.
5  BY THE COURT:
6        All right, well, we will take it as it comes.
7     Do the parties have lists of proposed
8     witnesses?  If not, I suggest that they write
9     them out now.
10 BY MR. MCKINNEY:
11       Your Honor, can we approach?
12 BY THE COURT:
13       You may.
14 (BENCH CONFERENCE)
15 BY THE COURT:
16       Ladies and gentleman, it's my understanding
17    the parties are going to review medical
18    records that were subpoenaed in this
19    particular case.  We'll be at ease for about
20    20 minutes.
21 BY MR. MCKINNEY:
22       Thank you, Your Honor.
23 (OFF THE RECORD)
24 BY MR. DAVID MOORE:
25       Your Honor, if I may approach, I do have your
```

## Page 25

```
1     protective order proposed, and I have shown
2     counsel now.
3  BY MR. WIJEWICKRAMA:
4        We consent on the record, Your Honor, on
5     behalf of the defense.
6  BY MR. WIJEWICKRAMA:
7        I don't have any objection.
8  BY THE COURT:
9        All right.
10 BY MR. DAVID MOORE:
11       If I may approach?
12 BY THE COURT:
13       You may.  Thank you, Mr. Moore.
14 BY MR. DAVID MOORE:
15       Do I need to file it, or are you going to just
16    leave it here?
17 BY THE COURT:
18       I'll just leave it here.  That's fine, Mr.
19    Moore.
20 BY MR. WIJEWICKRAMA:
21       Your Honor, if it Please the Court, there was
22    one issue earlier that we need to clarify
23    before we start calling the witness list.
24 BY THE COURT:
25       What?
```

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
                    ars@ashevillereporting.com

1  BY MR. WIJEWICKRAMA:
2      Your Honor, in speaking with Mr. Lindsay
3  earlier and him speaking with the Court, I did
4  need to make an issue of clarification.  It is
5  true that we did issue a second subpoena that
6  Judge Kris Earwood signed on 2-28.  That list
7  which he received yesterday requested
8  information regarding his continuing education
9  and travel records.  However, Your Honor, Mr.
10  Lindsay has been in possession of the subpoena
11  since February 5th for him to produce for the
12  Court to review all CVAs or emails or
13  documents in his possession involving any of
14  the CVAs that he may have knowledge or
15  possession of.  While I respect the fact that
16  Mr. Lindsay has been the county attorney for
17  four years, the state bar does require him to
18  keep possession of his records for six years.
19  And what we were asking for were the records
20  that would have been kept off site or at his
21  residence or at another location.  And I
22  understand that he does not have access to the
23  documents at the Department of Social
24  Services.  What I was asking for in this
25  subpoena, which Your Honor signed on February

1  5th which Mr. Lindsay was served on February
2  5th, I wanted to know what documentation Mr.
3  Lindsay had personal possession of either at
4  his former office, on any computer that he may
5  have access to or possess, or his residence.
6  BY THE COURT:
7      And I understand that, and I ----
8  BY MR. LINDSAY:
9      If it Please the Court, I have CVAs that I
10  have -- I think I have approximately 30.  I
11  have those.  And I don't have access to the
12  county email.
13  BY THE COURT:
14      And what I said earlier on the record is we'll
15  take it as it comes.
16  BY MR. WIJEWICKRAMA:
17      Thank you, Your Honor.
18  BY THE COURT:
19      But right now it's too premature for us to
20  make any decisions on any of that.
21  BY MR. WIJEWICKRAMA:
22      Thank you, Your Honor.
23  BY THE COURT:
24      So we'll see where that road leads us later,
25  if anywhere.

1  BY MR. WIJEWICKRAMA:
2      I just wanted to -- yes, Your Honor.
3  BY THE COURT:
4      All right, are we ready to proceed with
5  evidence?
6  BY MR. MCKINNEY:
7      Yes, Your Honor.
8  BY THE COURT:
9      All right, I'm going to go through a list of
10  potential witnesses.  If I call your name, you
11  are to go to the grand jury room.  I believe
12  that bailiffs have set that up for all the
13  witnesses.  It is a complete sequestering of
14  the witnesses.  When you are in here to
15  testify, you are not to discuss your testimony
16  or any questions that may have been asked of
17  you in front of any of the other witnesses.
18  What happens in the courtroom stays in the
19  courtroom, so to speak.  Do I make myself
20  clear?  If I call your name, other than the
21  parties who are allowed to remain, you will
22  need to leave the courtroom.  David Cody
23  Roberts has left.  He no longer wishes to be a
24  part.  Scott Lindsay, David Hughes, Cindy
25  Palmer.  Is it Sheila, Mr. McKinney?  Sheila

1  Mathieu?
2  BY MR. MCKINNEY:
3      Yes, Your Honor.
4  BY THE COURT:
5      And Larry Brazil.  The other two witnesses
6  that I have on the list are both parties to
7  the action which would be Shalees Greenlee and
8  Michael Mathieu.
9  BY MS. JACKSON:
10      And, Your Honor, as well I need to make one
11  addition to that list, Ms. Melissa Thrasher
12  or Melissa Heron.  She has shown up, and she
13  potentially may be called.  So in the
14  abundance of caution, I would add her, Your
15  Honor.
16  BY THE COURT:
17      Melissa Thrasher, are you in the courtroom?
18  Ma'am, I'm going to ask you to step out also.
19  Any other additions to the list?
20  BY MS. JACKSON:
21      No, Your Honor.
22  BY THE COURT:
23      All right, Mr. McKinney, you may call your
24  first witness.
25  BY MR. MCKINNEY:

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@ashevillereporting.com

1    We call Michael Mathieu.
2  BY THE COURT:
3       All right, Mr. Mathieu, if you will, come
4       around and be sworn.  Mr. McKinney, the
5       witness is with you.
6       MICHAEL MATHIEU, being duly sworn to tell the
7  truth, the whole truth, and nothing but the truth
8  of his own knowledge concerning the within matter,
9  testified as follows:
10  DIRECT EXAMINATION BY MR. MCKINNEY:
11  Q   Would you please state your name?
12  A   Michael Mathieu.
13  Q   Michael, where do you live?
14  A   Murphy, North Carolina or here.
15  Q   How old are you?
16  A   Twenty-seven.
17  Q   How long have you lived in Murphy?
18  A   About all my life.
19  Q   Are you presently employed?
20  A   Yes, sir.
21  Q   How are you employed?
22  A   I work at Murphy Medical Center ---
23  Q   How long have you been employed there?
24  A   For about almost five months.
25  Q   What do you do?

1  A   I work in the nursing home.
2  Q   What sort of employment did you have before
3       that?
4  A   I was working at Brother's Restaurant for
5       about almost a year.
6  Q   What did you do at Brother's Restaurant?
7  A   I was a cook.
8  Q   Do you know Shalees Greenlee?
9  A   Yes, sir.
10  Q   How do you know her?
11  A   We used to date.
12  Q   And do you have a child with Shalees Greenlee?
13  A   Yes, sir.
14  Q   What is the name and age of that child?
15  A   Alana Roberts, and her age is a year old --
16       almost two.
17  Q   Was she born on July the 5th, 2016?
18  A   Yes, sir.
19  Q   At the time that Alana was born, were there
20       any complications with her -- with her birth
21       and Shalees' pregnancy?
22  A   Yes, sir.
23  Q   Can you tell the Court about that?
24  A   I know that while Shalees was pregnant with
25       her, she had overdosed two times, and Alana

1       was going through withdrawals.
2  BY THE COURT:
3       I'm sorry, I didn't hear what you said.  Alana
4       was born what?
5  BY THE WITNESS:
6       With withdrawals.
7  DIRECT EXAMINATION RESUMED BY MR. MCKINNEY:
8  Q   And was she -- did she in fact receive
9       morphine treatment for those withdrawals
10       before she was released from the hospital when
11       she was born?
12  A   I believe so.
13  Q   And where was the child -- where did you all
14       take the child after the child was born?
15  A   I was out of town working at the time.  So I'm
16       not sure where Shalees had taken her.
17  Q   Where were you working?
18  A   I was working for an employer in Florida.  So
19       I was out of town most of the time.
20  Q   Okay, and when you got back in town, did you
21       go see your child?
22  A   Yes, I got a call saying that Shalees was
23       willing to sign her rights over to me
24       temporary at the time.
25  Q   Who did you get that call from?

1  A   From my mom.
2  Q   And who is your mother?
3  A   Sheila Mathieu.
4  Q   And, Michael, where are you living right now?
5  A   At 410 Hiawassee Street in Murphy.
6  Q   And is that your mother's residence?
7  A   Yes, sir.
8  Q   How long have you been living with your
9       mother?
10  A   This -- well, I did have my own place with my
11       ex-girlfriend.  We were living together, and
12       we broke up.  So I moved back in with my mom.
13       So about -- probably it's been two years.
14  Q   And who else resides there besides you,
15       Michael?
16  A   My father and my sister.
17  Q   What is your father's name?
18  A   Michael Mathieu.
19  Q   And what does he do?
20  A   He works for Amos Refrigeration.
21  Q   And how long has he worked for Amos
22       Refrigeration?
23  A   Probably ten-plus years.
24  Q   And who is your sister?
25  A   Heather Mathieu.

9 (Pages 30 to 33)

1 Q And how old is she?
2 A She is 18 --- 18.
3 Q And once you got that phone call about
4 assuming temporary custody of the child, did
5 you go get the child?
6 A Yes, sir.
7 Q And where was the child when you went to pick
8 her up?
9 A She was in daycare.
10 Q And what daycare was she in?
11 A It was --- I don't know the name, but it was in
12 Peachtree.
13 Q And have you had your daughter since that
14 time?
15 A Yes.
16 Q And have you provided care for your daughter
17 since that time?
18 A Yes, sir.
19 Q Have you lived continuously with your mother
20 during that period of time?
21 A Yes, sir.
22 Q And can you tell me what sort of things that
23 you do for your child?
24 A I feed her, bathe her, buy her anything she
25 needs, diapers, wipes. I take her to the

1 park, play with her, just anything she wants.
2 Q Have you received any financial support at all
3 from Shalees Greenlee for the child?
4 A I think she gave me like $20 one time.
5 Q And, Michael, has there been a DNA test done
6 to determine parentage of the child?
7 A Yes, sir.
8 Q And what were the results of that DNA test?
9 A That I was 99.9 percent the father.
10 Q And do you want custody of your daughter?
11 A Yes, sir.
12 Q Does your daughter have any health problems at
13 the present time, Michael?
14 A I think she's fine right now. She's got
15 allergies, but ---
16 Q Who takes her to the doctor?
17 A Me or my mom.
18 Q Michael, when --- after you went to pick your
19 daughter up at the daycare, did you have any
20 involvement with respect to that child with
21 the Department of Social Services here in
22 Cherokee County?
23 A What do you mean?
24 Q Well, at some point in time, did you talk to
25 Shalees about who was going to have custody of

1 the child?
2 A Yeah, she told me she wanted to sign her over
3 to me.
4 Q Okay, when did she tell you that?
5 A Alana was probably almost three months old.
6 Q And did you meet with any of the workers from
7 the Department of Social Services about your
8 daughter?
9 A Yes, sir.
10 Q When did you do that?
11 A It was probably right after I talked to
12 Shalees. I went there and signed the papers
13 of the custody.
14 Q Okay, and ---
15 BY THE COURT:
16 Can we stop for just a moment, Mr. McKinney?
17 Can you put a time frame on when he picked her
18 up at the daycare so that I've got some
19 clarification when he came back in town and he
20 actually ---
21 BY MR. MCKINNEY:
22 Okay.
23 DIRECT EXAMINATION RESUMED BY MR. MCKINNEY:
24 Q How old was your daughter when you picked her
25 up at the daycare?

1 A She was about three months old.
2 Q Now, you had seen your daughter prior to that
3 time; hadn't you?
4 A Yes, sir.
5 Q Had you seen her --- how many times had you
6 seen her between the time she was born and the
7 time you picked her up at the daycare?
8 A Well, before I got full custody of her, I had
9 temporary custody. So I was --- I was on and
10 off. Shalees would have her and then I would
11 have her after.
12 Q Well, let me restate the question, Michael.
13 During the first three months of your child's
14 life, how much time did you spend with her?
15 A Probably half --- a month and a half of three
16 months.
17 Q Now, after you picked her up at the daycare
18 then, did Shalees Greenlee continue to visit
19 with her?
20 A Maybe once or twice.
21 Q Before you met with DSS?
22 A Yes.
23 Q And this meeting that you had with DSS, who
24 told you to go to DSS?
25 A I think Shalees had called my mom because I

10 (Pages 34 to 37)

1      was out of town. And then when I got in town,
2      I went to DSS to sign papers for full custody.
3 Q   But who told you to go to the DSS building to
4      sign these custody papers?
5 A   My mom called me and told me.
6 Q   All right, and when you got to the DSS
7      building, tell me what happened.
8 A   I was talking to a lady who had the custody
9      papers, and Shalees had already signed them.
10      She told me I signed them and I have full
11      custody of her.
12 Q   And do you know who that woman was?
13 A   I don't remember her name.
14 Q   But Shalees had already signed the papers when
15      you arrived there?
16 A   Yes, sir.
17 Q   And did you talk to Shalees about why she was
18      doing what she was doing? .
19 A   She -- Shalees told me that it was best for
20      Alana to be with me. That was pretty much it.
21 Q   Now, did you also sign a temporary
22      guardianship agreement with respect to Alana
23      Lilly Roberts?
24 A   I'm not sure if I did or not. I don't
25      remember.

1 (PLAINTIFF'S EXHIBIT NO. 1 MARKED)
2 DIRECT EXAMINATION RESUMED BY MR. MCKINNEY:
3 Q   Michael, I'm going to show you first
4      Plaintiff's Exhibit No. 1 and ask you if you
5      recognize that? You can look at each page of
6      it. (Tenders)
7 A   (Upon review) Yes, sir, I remember this.
8 Q   Okay, and what is that?
9 A   This is the custody and visitation agreement.
10 Q   And did you sign that before a notary public?
11 A   This is where I signed at Social Services.
12 (PLAINTIFF'S EXHIBIT NO. 2 MARKED)
13 DIRECT EXAMINATION RESUMED BY MR. MCKINNEY:
14 Q   Okay, and I want to hand you what's been
15      marked Plaintiff's Exhibit No. 2 and ask you
16      if you recognize that. (Tenders)
17 A   (Upon review) Yes, sir, that's the temporary
18      agreement.
19 Q   Now, do you remember where you signed the
20      temporary agreement?
21 A   I think there was a notary expressly --
22      somebody was a notarizer.
23 Q   How did you get this document, Plaintiff's
24      Exhibit No. 2? How did it come into your
25      hands?

1 A   I think that's the paper that Shalees brought.
2 Q   Shalees brought this to you?
3 A   Yeah, we went to a notary or -- yeah,
4      expressly to sign it.
5 Q   Juanita Hampton, do you know her?
6 A   That was the Social Worker, I believe. That's
7      her name -- or was that the -- I'm sorry,
8      that's the notarizer?
9 Q   Uh-huh. (Affirmative) And you signed it on
10      October the 6th, 2016?
11 A   Yes, sir.
12 Q   What was your understanding of why you were
13      signing Plaintiff's Exhibit No. 2?
14 A   She was giving me temporary custody.
15 Q   Okay, is that what she told you?
16 A   Yes.
17 Q   Okay, and what was your understanding of why
18      you were signing Plaintiff's Exhibit No. 1?
19 A   This was -- I was getting full custody of her.
20 Q   Okay, and at the time ----
21 BY MR. MCKINNEY:
22      Your Honor, we would move to admit Plaintiff's
23      Exhibits 1 and 2 into evidence.
24 BY THE COURT:
25      Any objection?

1 BY MS. JACKSON:
2      No objection.
3 BY THE COURT:
4      So admitted.
5 (PLAINTIFF'S EXHIBIT NOS. 1 AND 2 ADMITTED)
6 DIRECT EXAMINATION RESUMED BY MR. MCKINNEY:
7 Q   Michael, when you signed these two documents
8      here, Plaintiff's Exhibit 1 and 2, were you
9      represented by an attorney?
10 A   No, sir.
11 Q   So you weren't represented by an attorney when
12      you signed the temporary guardianship
13      agreement; is that correct?
14 A   Correct.
15 Q   And you weren't represented by an attorney
16      when you signed the custody agreement?
17 A   Correct.
18 Q   Do you know whether or not Shalees Greenlee
19      was represented by an attorney at the time she
20      signed those documents?
21 A   I'm not sure if she was or not.
22 Q   Other than the representation made by the DSS
23      worker at the Cherokee County Department of
24      Social Services to the effect that that
25      document was giving you full custody of your

828-254-9230      ASHEVILLE REPORTING SERVICE      800-357-5007
ars@ashevillereporting.com

1  daughter, did any other employees or workers
2  with the Cherokee County Department of Social
3  Services make any sort of representations to
4  you with respect to that Plaintiff's Exhibit
5  No. 1?
6  A  No.
7  Q  Did any workers or employees of the Cherokee
8  County Department of Social Services make any
9  representations to you with respect to
10  Plaintiff's Exhibit No. 2 ---
11  A  No.
12  Q  --- the temporary guardianship agreement?
13  A  No.
14  Q  Did you ever meet with Mr. Scott Lindsay, the
15  Cherokee County Department of Social Services
16  attorney?
17  A  No.
18  Q  Did you ever speak with him?
19  A  No.
20  Q  Did your mother have more contact with the
21  Cherokee County Department of Social Services
22  than you did?
23  A  I think we had about the same.  She was with
24  me.
25  Q  She went with you that day to the -- to meet

1  with the people ---
2  A  Yes, sir.
3  Q  --- at the Cherokee County Department of
4  Social Services?
5  A  Yes, sir.
6  Q  Was it your understanding when you signed
7  Plaintiff's Exhibit No. 1 that you were going
8  to have custody of your daughter until she was
9  18?
10  A  Yes, sir.
11  Q  And in the past three months, have you had
12  contact with Shalees Greenlee?
13  A  No, sir.
14  Q  And why did you file this complaint and this
15  action?
16  A  File what?  What do you mean?
17  Q  Why did you file this action to get custody of
18  your daughter?
19  A  Because Shalees came to my house and took
20  Alana, just walked out the door with her as
21  she was visiting her.
22  Q  And did she tell you that she wasn't going to
23  bring her back?
24  A  Right, yes, she did.
25  Q  And did you finally get her back?

1  A  Yes, sir.
2  Q  How did you get her back?
3  A  I came to you and got an ex parte to go get
4  her back.
5  Q  Had you been allowing Shalees to visit with
6  the child since that custody agreement,
7  Plaintiff's Exhibit No. 1 -- since the two of
8  you executed that agreement?
9  A  Yes, sir.
10  Q  And how much visitation had Shalees exercise
11  during that period of time?
12  A  Anytime she asked me to come visit, I would
13  let her.  Sometimes we would be sitting there
14  waiting for her to show up, and she would
15  never show up.  Sometimes she would, and she
16  would be at my house for maybe an hour max and
17  that was it.  So she would probably come maybe
18  once every two weeks.
19  Q  Do you have a problem with this Court awarding
20  Shalees with some supervised visitation with
21  the child?
22  A  I don't have a problem with supervised
23  visitation.
24  Q  And do you have safety concerns for the child
25  if visitation is not supervised?

1  A  Yes, sir.
2  Q  And what would that pertain to?
3  A  Shalees has a bad drug habit that I don't want
4  Alana around.
5  Q  Does she have some associations with other
6  people that would present in your opinion a
7  safety danger to your child?
8  A  Yes, sir, just about everybody she hangs
9  around.
10  BY MR. MCKINNEY:
11      I believe that would be all my questions for
12  this witness at this time, Your Honor.
13  BY THE COURT:
14      Those are the questions you have, Mr.
15  McKinney.  Cross-examination.
16  BY MS. JACKSON:
17      Thank you, Your Honor.
18  CROSS-EXAMINATION BY MS. JACKSON:
19  Q  Mr. Mathieu, were you present when Alana was
20  born?
21  A  No, ma'am.
22  Q  Tell me about that situation.
23  A  I was working out of town and at the same time
24  I wasn't sure if she was mine or not.
25  Q  What was your initial belief when Alana was

12 (Pages 42 to 45)

| | |
|---|---|
| 1 | born? |
| 2 | A What do you mean? |
| 3 | Q Did you think that she was yours, or what type |
| 4 | of efforts did you make? |
| 5 | A I didn't think she was mine. I was told that |
| 6 | she was with other people while we were |
| 7 | together and made me people that the baby |
| 8 | wasn't mine. |
| 9 | Q Okay, and did you originally want to sign your |
| 10 | rights away to Shalees? |
| 11 | A Thinking that it wasn't my baby, I didn't know |
| 12 | if I had any rights to it. |
| 13 | Q Did you indicate to her several times via |
| 14 | Facebook message and text message that the |
| 15 | child was not yours and that you wanted to |
| 16 | sign your rights away to her? |
| 17 | A I don't believe so. |
| 18 | Q So you never told her that in Facebook |
| 19 | messages and text messages? |
| 20 | A That I wanted to sign my rights over to a baby |
| 21 | that wasn't mine? I don't know why I would do |
| 22 | that. |
| 23 | Q When did you determine or when did you make |
| 24 | efforts to determine whether or not Alana was |
| 25 | your biological child? |

| | |
|---|---|
| 1 | A Shalees had messaged me wanting to do a DNA |
| 2 | test, so I agreed to it. |
| 3 | Q Do you know when that was done? |
| 4 | A Alana was probably a couple of weeks old. |
| 5 | Q When did you consistently start seeing Alana |
| 6 | or Alana (different pronunciation)? |
| 7 | A After the DNA papers came back. |
| 8 | Q Okay, and how old was she at that time? |
| 9 | A Probably a month old. |
| 10 | Q And tell me about what type schedule at that |
| 11 | point -- as far as Alana goes, what type of |
| 12 | schedule were keeping with her? |
| 13 | A Well, I was still working out of town. So she |
| 14 | was Shalees, and then sometimes Shalees would |
| 15 | drop her off with my grandma or my mom. |
| 16 | Q And when you were working out of town, where |
| 17 | you were working? Do you recall? |
| 18 | A We were working all over, Miami, Alabama, just |
| 19 | different places. |
| 20 | Q And when you were doing that, for time periods |
| 21 | would you be gone? |
| 22 | A It could be up to three or four weeks at a |
| 23 | time. |
| 24 | Q And when did that work schedule change? |
| 25 | A I worked there for about eight months. So |

| | |
|---|---|
| 1 | when I would come in town, I would see Alana |
| 2 | because I knew at the time she was mine after |
| 3 | the papers came back. So I would probably |
| 4 | keep her for a few days until I went back out |
| 5 | of town. |
| 6 | Q So during that first eight months of Alana's |
| 7 | life when you were working out of town, how |
| 8 | often do you recall that you saw her? |
| 9 | A I mean, after she signed the temporary rights, |
| 10 | she was at my house until we went to full |
| 11 | custody. |
| 12 | Q So how often would you see her when you were |
| 13 | working out of town? |
| 14 | R When I was in town. When I was in town. So I |
| 15 | would be in town for probably a week at a |
| 16 | time. |
| 17 | Q Okay, and then you would go back for three to |
| 18 | four weeks? |
| 19 | A Not always. Sometimes it would be a week or |
| 20 | two weeks. It could be up to four weeks, but |
| 21 | not always. |
| 22 | Q And during that period of time, who was caring |
| 23 | for Alana? |
| 24 | A My mom. |
| 25 | Q And you currently live with your mom? |

| | |
|---|---|
| 1 | A Yes, ma'am. |
| 2 | Q Where do you work now? Did you say at Murphy |
| 3 | Medical? |
| 4 | A Yes, ma'am. |
| 5 | Q Does your mom provide most of the medical |
| 6 | treatment for Alana and bring her to most |
| 7 | doctor appointments? |
| 8 | A It's probably an even split. We both bring |
| 9 | her. |
| 10 | Q Do you have any history of drug use in the |
| 11 | last two years? |
| 12 | A Yes, I used to smoke. |
| 13 | Q Smoke what? |
| 14 | A Marijuana. |
| 15 | Q When you say used to, when did that end? |
| 16 | A Probably almost a year ago. |
| 17 | Q Do you take any pills, suboxone, anything of |
| 18 | that nature? |
| 19 | A No, ma'am. |
| 20 | Q Have you ever? |
| 21 | A Yes. |
| 22 | Q When did you quit taking suboxone? |
| 23 | A I haven't done anything in the past year. |
| 24 | Q Now, during the period of time where you and |
| 25 | your mother were keeping Alana, Shalees did |

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com

1  make active efforts to see her through your
2  mother; didn't she?
3  A  Yes.
4  Q  So Shalees was still trying to see Alana?
5  A  Yes.
6  Q  And visit with her?
7  A  Yes.
8  Q  And did she do that?
9  A  Sometimes.
10  Q  How often would you say that she visited with
11  her?
12  A  Maybe once every two weeks.  Sometimes she
13  wouldn't even show up when she wanted -- when
14  she asked to come visit.
15  Q  When these documents were signed -- or rather
16  the CVA -- so the second one that was signed
17  at the department, who did you speak with when
18  that was signed?
19  A  I'm not sure of the lady's name that had the
20  custody papers.  I don't remember her name,
21  but she was about the only one I talked to.
22  Q  When you went to DSS, did you go back into an
23  office, or did you sign it out in the lobby?
24  Tell me about that.
25  A  We went into the office.  I think it was the

1  lady's office that had the papers.
2  Q  And do you -- do you recall who the lady was?
3  A  I don't remember her name.
4  Q  Okay, and was anybody else present when you
5  signed it?
6  A  My mom.
7  Q  Anybody else?
8  A  No.
9  Q  Was there a notary present?
10  A  She -- we signed the papers, and then she
11  walked out with the papers.  I'm not sure what
12  she did with them.  She could have went to a
13  notary, but I'm not sure if she had or not.
14  Q  Did you provide your ID to anybody that day?
15  A  Yes, ma'am.
16  Q  Are you a licensed driver?
17  A  I have a licensed.
18  Q  So you are licensed to drive right now?
19  A  I think my licenses are suspended at the
20  moment.
21  Q  Do you know why it's a suspended?
22  A  About three years ago, I got a -- I was
23  drinking and driving.
24  Q  Okay, so you have a prior DWI conviction?
25  A  Yes, ma'am.

1  Q  So what type of ID were you able to provide
2  there a the department?  Was it like a state
3  issued ID or a driver's license?
4  A  It was an old driver's license.
5  Q  So it was an old driver's license?
6  A  Yes, that was the only identification I had.
7  Q  So it wasn't a valid driver's license?
8  A  No.
9  Q  And did you -- when that was notarized, was it
10  notarized in front of you or you gave it to
11  somebody and they took it away?
12  A  Right.
13  Q  So you gave it to somebody, they took it away,
14  and then they brought it back and it was
15  notarized?
16  A  I guess.
17  Q  But it wasn't done in front of you?
18  A  No.
19  BY MS. JACKSON:
20  Your Honor, if I may approach?
21  BY THE COURT:
22  You may.  Do you want the --
23  BY MS. JACKSON:
24  I do, Your Honor.
25  CROSS-EXAMINATION RESUMED BY MS. JACKSON:

1  Q  And just to clarify, I'm going to show you
2  what has been marked previously as Plaintiff's
3  Exhibit 1.  And you see here where it looks as
4  though you signed and this was stamped?  Was
5  that done in front of a notary?  (Tenders)
6  A  (Upon review)  Is that the notary?
7  Q  Uh-huh.  (Affirmative)
8  A  Okay, it probably was.
9  Q  Well, do you ----
10  A  It was.
11  Q  Do you remember that ----
12  A  It was.
13  Q  --- or was that taken away ----
14  A  Yes.
15  Q  --- and done?
16  A  No, that was definitely stamped right in front
17  of me, sorry.
18  Q  That's okay.  I just wanted to clarify.  Now -
19  - so during the period of time you said that
20  Shalees was making active efforts through your
21  mom to see Alana; is that correct?
22  A  Yes.
23  Q  Okay, and at that time, you were working out
24  of town, so your mother was the primary
25  caregiver?

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com

Case 1:21-cv-00284   Document 1   Filed 10/11/21   Page 62 of 119

1  A  Right.
2  Q  Okay, at what time did you become the primary
3     caregiver of Alana?
4  A  I quit working out of town, and that's when I
5     went to Brother's and that's when I was in
6     town all the time.
7  Q  When did you start working at Brother's?
8  A  It was last year. Probably the beginning of
9     last year.
10 Q  So the beginning of 2017?
11 A  Yes.
12 Q  And how long did you work there?
13 A  For about -- about a year.
14 Q  And why did your employment cease?
15 A  We were slow on business there. The
16    restaurant was kind of slow on business.
17 Q  And now after the agreement, the one that I
18    showed you there, was signed at DSS, Shalees
19    continued to try to see Alana; didn't she?
20 A  There was a long period of time, maybe three
21    or four months where she went without trying
22    to see her or anything.
23 Q  Didn't she consistently message you through
24    the month of November trying to see Alana and
25    confused about what she had signed?

1  A  The reason that sometimes I would not let her
2     come visit is because she had just gotten out
3     of jail and I knew she was bad off doing drugs
4     and stuff. And in the papers, it says it was
5     up to me whether I let her visit or not if I
6     knew she was high.
7  Q  So she did try to see her during November?
8  A  Right.
9  Q  Okay, so after these documents were signed,
10    she continued to try to see the child?
11 A  Not continuously, no.
12 Q  Did you tell her that she should have read the
13    papers more carefully?
14 A  Yes.
15 Q  So you completely understood what the papers
16    said?
17 A  Right.
18 Q  Okay, and you weren't there when she signed
19    these papers; correct?
20 A  Correct.
21 Q  Do you know under what situation or under what
22    circumstances she signed the documents?
23 A  I wasn't there when she signed them, so I
24    don't know.
25 Q  Have you guys talked about that?

1  A  She did tell me she was willingly wanting to
2     sign the papers to give her rights over.
3  Q  Did she continue -- or did she tell you that
4     she wanted to continue to be able to see Alana
5     on a regular basis?
6  A  Not a regular basis, but she would like to
7     visit every now and then.
8  Q  So you indicated to Mr. McKinney that you
9     don't have any problem with Shalees having
10    visitation?
11 A  Supervised visitation.
12 Q  And when you say supervised, who would be an
13    appropriate supervisor?
14 A  Me or my mom.
15 Q  Okay, what about somebody in Shalees' family?
16 A  No.
17 Q  What about her grandmother?
18 A  No.
19 Q  Why?
20 A  I don't know them, and I don't trust any of
21    them.
22 Q  At one point, didn't Alana live with her
23    mother Melissa for a period of time?
24 A  Maybe the first couple of weeks she was born
25    before we got the DNA.

1  Q  So she didn't live there at any other prior
2     time?
3  A  Not that I know of.
4  BY MS. JACKSON:
5     I don't have anything further.
6  BY THE COURT:
7     Any followup, Mr. McKinney?
8  REDIRECT EXAMINATION BY MR. MCKINNEY:
9  Q  Mr. Mathieu, after you signed those documents
10    at the Department of Social Services, did you
11    ever get any visits from any social workers at
12    the Cherokee County Department of Social
13    Services?
14 A  No, sir.
15 Q  Did they contact you in any way? Did any
16    employees for the Cherokee County Department
17    of Social Services contact you after that
18    Plaintiff's Exhibit No. 1 was signed?
19 A  No, sir.
20 Q  Has your daughter received any services
21    whatsoever from the Cherokee County Department
22    of Social Services since Plaintiff's Exhibit
23    No. 1 was signed?
24 A  No, sir.
25 BY MR. MCKINNEY:

1 That would be all my questions.
2 BY MS. JACKSON:
3 No followup.
4 BY THE COURT:
5 Thank you, Mr. Mathieu. You may step down.
6 Mr. McKinney, your next witness.
7 BY MR. MCKINNEY:
8 We call Sheila Mathieu, Your Honor.
9 BY THE COURT:
10 Sheriff, if you will, go get Ms. Mathieu for
11 us. Thank you.
12 SHEILA ANN MATHIEU, being duly sworn to tell
13 the truth, the whole truth, and nothing but the
14 truth of her own knowledge concerning the within
15 matter, testified as follows:
16 DIRECT EXAMINATION BY MR. MCKINNEY:
17 Q Please state your full name.
18 A Sheila Ann Mathieu.
19 Q And where do you live?
20 A On 14 Hiawassee Street here in Murphy.
21 Q And you know Michael Mathieu?
22 A I do. He's my son.
23 Q And do you know Alana Roberts?
24 A I do. She's my granddaughter.
25 Q And, Ms. Mathieu, can you tell me what sort of

1 relationship that Michael has with Alana?
2 A A father-daughter relationship, a very good
3 one. He's a good dad.
4 Q Have you assisted Michael in caring for Alana?
5 A I do. They live in my home.
6 Q How long have they lived in your home?
7 A She was there off and on when she was first
8 born. And then when he got her in November of
9 2016, she's been there since then.
10 Q And can you tell me what care that Michael has
11 given to the child since she came to live with
12 you?
13 A I mean, the responsibility of a father. He
14 works and provides for her, like her diapers
15 and her food and stuff like that she needs and
16 clothes.
17 Q Does he help feed her?
18 A Oh, yeah.
19 Q Does he help bathe her?
20 A Yes.
21 Q Does he take her to the doctor on occasion
22 when she has doctor's appointments?
23 A Yeah, on the days that he's off work, he will
24 take her.
25 Q How has Michael been doing the past two years?

1 A Good.
2 Q Does he go to work on a regular basis at
3 Murphy Medical Center?
4 A He does.
5 Q Let's go back to November -- October and
6 November of 2016. What contact, Ms. Mathieu,
7 did you have with the Cherokee County
8 Department of Social Services with respect to
9 your granddaughter during that period of time?
10 A I had contact with one of the social workers
11 that in the beginning wasn't very good.
12 Shalees was trying to let us have visitation
13 with Alana when she had custody with her, and
14 her mom, I guess -- I guess from my
15 understanding the mom had custody as far as
16 Social Services was concerned, but Shalees was
17 trying to place her with us, and there was a
18 conflict between her and her mom. I don't
19 know if the social worker was related to them
20 or what the deal was with them, but she didn't
21 want Shalees placing Alana with us. And we
22 did have Alana one time on visitation, and
23 Shalees said for us to keep her. But her mom
24 kept calling wanting Alana back, and then the
25 social worker called me and said that we had

1 to take Alana back. And I said, "But Shalees
2 is the mom, and she said that she could stay
3 here with us." I even called the magistrate,
4 and the magistrate said I didn't have to, but
5 the social worker said I did.
6 Q The social worker -- and who was the social
7 worker?
8 A I don't know how to say the name. Jeryl,
9 something like that.
10 Q And what -- so the child came to live with
11 you?
12 A Yes.
13 Q And ----
14 A So -- now, they -- the same social worker
15 called and said that Shalees had agreed to
16 sign over custody to my son and that the
17 paperwork was, you know, drawn up and
18 everything, that he needed to come and sign
19 the paperwork.
20 Q And did she tell you who had drawn the
21 paperwork up?
22 A I don't recall that she said exactly who drew
23 it up.
24 Q Okay, but anyway it was -- it was an employee
25 of the Department of Social Services?

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And did you go with your son to the Cherokee |
| 3 | | County Department of Social Services to sign |
| 4 | | the custody agreement? |
| 5 | A | I did. |
| 6 | Q | And can you tell me what happened when you got |
| 7 | | there? |
| 8 | A | It was the same social worker that was there |
| 9 | | to have him sign the papers and the notary, |
| 10 | | and the social worker told me that she tried |
| 11 | | to talk Shalees out of signing the papers. |
| 12 | Q | Did she tell you why she tried to talk her out |
| 13 | | of signing the papers? |
| 14 | A | She didn't say why. She just said she tried |
| 15 | | to talk her out of it which irritated me, but |
| 16 | | I was happy that it was being done. |
| 17 | Q | And what did she -- well, did the social |
| 18 | | worker make any representations about what |
| 19 | | that agreement meant to you? |
| 20 | A | She -- I mean, she had us read it before he |
| 21 | | signed it. |
| 22 | Q | Did she -- did she say anything about the |
| 23 | | agreement to you other than she told Shalees |
| 24 | | not to sign it? |
| 25 | A | Huh-uh. (Negative) She didn't say nothing -- |

| | | |
|---|---|---|
| 1 | | she didn't say nothing else to us about it |
| 2 | | that I recall. |
| 3 | Q | And once your son signed the agreement, what |
| 4 | | was your understanding about the effect of the |
| 5 | | agreement? |
| 6 | A | That he was -- she was placed in his custody |
| 7 | | and that it -- from what the papers said, it |
| 8 | | was up to him when -- when Shalees called and |
| 9 | | wanted to come see Alana and -- and if he |
| 10 | | suspected any kind of alcohol or drugs in her |
| 11 | | system, he could tell her no. |
| 12 | Q | Okay, so he was more or less appointed the |
| 13 | | gatekeeper? |
| 14 | A | Right. |
| 15 | Q | And after the agreement was signed, did |
| 16 | | Shalees come visit with the child? |
| 17 | A | Yes. |
| 18 | Q | And how frequently did she visit the child |
| 19 | | from the time the agreement was signed until |
| 20 | | now? |
| 21 | A | In the beginning, she was -- she was there |
| 22 | | usually about once a week. That was in |
| 23 | | November. I know at Christmastime she asked |
| 24 | | if she could take Alana with her, and my son |
| 25 | | told her no. He didn't want her in the car |

| | | |
|---|---|---|
| 1 | | with her, not until she was -- from our |
| 2 | | understanding, she was still abusing drugs. |
| 3 | | So he didn't want her alone with her or, you |
| 4 | | know, in the car. But he told her, "You're |
| 5 | | welcome to stay here to visit with her," which |
| 6 | | she did. |
| 7 | Q | And did you -- have you continued to allow her |
| 8 | | to visit with the child at your home? |
| 9 | A | Yes. |
| 10 | Q | In a supervised setting? |
| 11 | A | Yes. |
| 12 | Q | Have there been any problems? |
| 13 | A | I even allowed Cody to come in one time. |
| 14 | Q | And who is Cody? |
| 15 | A | Cody was her husband -- is her husband. He's |
| 16 | | the one that's on the birth certificate. |
| 17 | Q | And have you ever made any attempt to keep her |
| 18 | | from her child? |
| 19 | A | No. |
| 20 | Q | Do you want your granddaughter to be safe? |
| 21 | A | Yes. |
| 22 | Q | And does your granddaughter have any health |
| 23 | | problems now? |
| 24 | A | Not nothing that she's been diagnosed with. |
| 25 | | We were told in the beginning that because of |

| | | |
|---|---|---|
| 1 | | the withdrawals that she was born with that |
| 2 | | she could have problems later, that she could |
| 3 | | have anger issues. I don't see anything right |
| 4 | | now out of the context of almost a two-year- |
| 5 | | old. She, you know, can be that way, but --- |
| 6 | Q | Seems to be happy? |
| 7 | A | She's very happy. |
| 8 | Q | Is she well-adjusted? |
| 9 | A | Yes. |
| 10 | Q | Does she enjoy the environment she's in? |
| 11 | A | Oh, yeah. |
| 12 | Q | Does she enjoy seeing or being with her daddy? |
| 13 | A | Oh, she loves her daddy. |
| 14 | Q | Does she enjoy seeing her mama? |
| 15 | A | Yeah, I mean, I don't -- I don't know that she |
| 16 | | knows that it's her mom. |
| 17 | Q | Do you -- do you work? |
| 18 | A | Yes. |
| 19 | Q | Does Alana go to daycare? |
| 20 | A | Yes. |
| 21 | Q | Where does she go to daycare? |
| 22 | A | Southwestern over by Save-A-Lot. |
| 23 | Q | And tell me what days of the week she goes to |
| 24 | | daycare and what the hours are there. |
| 25 | A | The days can depend. Usually, when Michael is |

17 (Pages 62 to 65)

1     at home, he keeps her at home. So it's
2     usually the days that he's at work she'll go
3     to daycare.
4 Q  So Michael provides full-time care for her
5     when he's off work; is that correct?
6 A  Yes.
7 Q  What are your concerns, Ms. Mathieu, about
8     allowing Shalees Greenlee to visit with the
9     child in an unsupervised setting?
10 A  I don't like it.
11 Q  What are your concerns?
12 A  I'm just concerned about her welfare, about
13     her safety.
14 Q  Why?
15 A  Because Shalees doesn't have a very good
16     reputation with her other three kids not being
17     with her with her abusing drugs. She's in and
18     out of jail.
19 Q  And you're concerned about that?
20 A  Yes.
21 BY MR. MCKINNEY:
22     That would be all my questions for this
23     witness, Your Honor.
24 BY THE COURT:
25     Cross-examination.

1 BY MS. JACKSON:
2     Yes, thank you, Your Honor.
3 CROSS-EXAMINATION BY MS. JACKSON:
4 Q  Good morning, Ms. Mathieu.
5 A  Good morning.
6 Q  You indicated that when you went to the
7     department and that document was signed -- did
8     you speak -- do you know who the social worker
9     is that you spoke to?
10 A  Jeryl.
11 Q  Was it Jeryl?
12 A  Yeah.
13 Q  Okay, and was that a female social worker?
14 A  Yes.
15 Q  Was anybody else there?
16 A  The notary, and it seems like somebody else,
17     but I'm not sure.
18 Q  Were the documents signed and then brought out
19     of the room, or how was it done? Can you
20     explain that?
21 A  What do you mean signed and brought back out
22     of the room?
23 Q  When you went there and your son signed the
24     documents, did they ever take the documents
25     out of the room and bring them back in, or did

1     everybody just stay in the room?
2 A  I think so. I don't recall.
3 Q  Okay, was there an attorney present or anybody
4     else that you know has any legal experience?
5 A  I don't know. I said there was the social
6     worker, the notary, and somebody else, I
7     think, was in the room, but I'm not sure who
8     it was.
9 Q  Was it a male or female?
10 A  I don't remember.
11 Q  When you signed this, what did they indicate
12     to you were signing?
13 A  I didn't sign ----
14 Q  Or when he signed it, I'm sorry. When your
15     son signed it, did they indicate to him what
16     he was signing?
17 A  That it was custody papers.
18 Q  Had your son talked to an attorney about this?
19 A  No.
20 Q  Had you?
21 A  No.
22 Q  Did they give you -- or tell you or advise you
23     to talk to an attorney about this?
24 A  No.
25 Q  So after your son signed this, was it your

1     understanding and, if you know, his
2     understanding that this was a legal, binding
3     document?
4 A  Yes.
5 Q  So when -- like for example, when Shalees
6     wanted to take Alana for Christmas, you didn't
7     -- your son didn't let her; is that correct?
8 A  Right.
9 Q  Because he had custody with this document?
10 A  Right.
11 Q  That at the time he thought was binding and
12     legal?
13 A  Yes, ma'am.
14 Q  And you indicated that after it was signed
15     that Shalees did make efforts to come and try
16     to continue to see Alana?
17 A  In the beginning, she would come about once a
18     week. Then I think some time after he had
19     told her know, she did quit for a little
20     while.
21 Q  After he had told her no?
22 A  Uh-huh. (Affirmative)
23 Q  You indicated during your testimony that when
24     Alana was born that there were some issues
25     with withdrawals?

18 (Pages 66 to 69)

1  A    Uh-huh.  (Affirmative)
2  Q    What did the medical -- or what did they tell
3       you about that or ----
4  A    It was -- she had went to a doctor's
5       appointment, and the doctor had told me that
6       there was medicine that she had to be on when
7       she was in the hospital because of
8       withdrawals.
9  Q    Do you know when that was when the doctor told
10      you that?
11 A    I mean, she was like two months old.
12 Q    Okay, it was -- it was fairly early?
13 A    Oh, yeah.
14 Q    And they had told you that there could be some
15      issues as she got older?
16 A    Yes.
17 Q    Once these documents were signed -- or that
18      one document there was signed, did anybody
19      from DSS do any followup on the medical
20      condition of Alana?
21 A    Not that I -- to us they didn't.
22 Q    Did anybody ever contact you?
23 A    No.
24 Q    Did any workers ever contact your son?  Do you
25      know?

1  A    Not that I know of.
2  Q    Did anybody ever come out to your house?
3  A    No.
4  Q    When this document was signed -- before it was
5       signed, did a social worker come out and do a
6       home study of your house?
7  A    No.
8  Q    Do you know if they came out and did a home
9       study or did any type of testing on your son,
10      drug testing, anything of that nature?
11 A    Not that I know of.
12 Q    Do you know if they did any investigation on
13      your son or on you?
14 A    No.
15 Q    Did anybody ever come into your house?
16 A    No.
17 Q    Did you ever talk to DSS about the withdrawal
18      symptoms or anything of that nature?
19 A    No.
20 Q    Did anybody ever tell you any information
21      about that?
22 A    From DSS?
23 Q    Uh-huh.  (Affirmative)
24 A    No.
25 BY MS. JACKSON:

1       If I could have one second, Your Honor?
2  BY THE COURT:
3       You may.
4  CROSS-EXAMINATION RESUMED BY MS. JACKSON:
5  Q    So when you went to DSS with your son, you
6       were present when he signed the document?
7  A    Yes.
8  BY MS. JACKSON:
9       Your Honor, if I may approach?
10 BY THE COURT:
11      You may.
12 CROSS-EXAMINATION RESUMED BY MS. JACKSON:
13 Q    I'm going to point out to you Plaintiff's
14      Exhibit 1, I believe.  Is that the document
15      that you remember your son signing?  (Tenders)
16 A    (Upon review)  Yes.
17 Q    And you indicated that you did not recall if
18      there was an attorney in the room?
19 A    The person -- other person that was in there I
20      don't I -- I don't know if there was an
21      attorney or not.
22 Q    And originally it sounds like you were keeping
23      Alana some when your son was working out of
24      town?  He said he was working out of town and
25      that you would keep her for months at a

1       time -- well, not for months, but while he was
2       out of town.  Does that sound right?
3  A    He was out of town a whole lot when we first
4       got her.  He quit and came back home to stay.
5       But yes, I did have her.
6  Q    And during that time that you had her, did
7       anybody ever come out to your house?
8  A    No.
9  Q    Did anybody ever -- or did anybody from the
10      Department of Social Services ever make any
11      inquiry of you as to whether or not you did
12      any illegal substances?
13 A    No.
14 BY MS. JACKSON:
15      Nothing further, Your Honor.
16 BY THE COURT:
17      Okay.  Mr. McKinney?
18 BY MR. MCKINNEY:
19      I don't have any other questions, Your Honor.
20 BY THE COURT:
21      Thank you, Ms. Mathieu.
22 BY THE WITNESS:
23      Thank you.
24 BY THE COURT:
25      You may step down.  Ms. Mathieu, you will have

1   to step back out from the room.
2   BY THE WITNESS:
3       Okay.
4   BY THE COURT:
5       And remember you're not to discuss your
6       testimony with anyone outside the room.  Thank
7       you.  Your next witness.
8   BY MR. MCKINNEY:
9       That would be our evidence for the purposes of
10      the temporary hearing, Your Honor.
11  BY THE COURT:
12      That's your evidence, okay.  All right.
13  BY MS. JACKSON:
14      We call Shalees Greenlee.
15      SHALEES GREENLEE, being duly sworn to tell the
16  truth, the whole truth, and nothing but the truth
17  of her own knowledge concerning the within matter,
18  testified as follows:
19  DIRECT EXAMINATION BY MS. JACKSON:
20  Q   Could you please state your full name for the
21      Court?
22  A   Shalees Marie Greenlee.
23  Q   And, Shalees, do you know the gentleman seated
24      over here, Mr. Mathieu?
25  A   Yes.

1   Q   And how do you know him?
2   A   He's my child's father.
3   Q   And when you say your child, are you referring
4       to -- is it Alana or Alana (different
5       pronunciation)?
6   A   It's Alana.
7   Q   Alan, okay, sorry.  And what is Alana's date
8       of birth?
9   A   July 5, 2016.
10  BY THE COURT:
11      I'm going to have to ask you to speak up just
12      a little bit, Ms. Greenlee.
13  DIRECT EXAMINATION RESUMED BY MS. JACKSON:
14  Q   And when you first had Alana or -- yeah,
15      Alana, were there some issues with withdrawal
16      and things of that nature?
17  A   Yes.
18  Q   Tell me about that.
19  A   She did go through withdrawal after I had her.
20      When I was pregnant with her, Dr. Holder sent
21      me to Chattanooga.  And they put me on
22      medication, and they were weaning me off of
23      opiates.
24  Q   Did you have an opiate problem when you became
25      pregnant with her?

1   A   Yes, ma'am.
2   Q   So you had to go, it sounds like, to a special
3       doctor?
4   A   Yes.
5   Q   And did you do that?
6   A   Yes.
7   Q   And did you follow the medical advice?
8   A   Yes.
9   Q   And when Alana was born, was there a test on
10      her meconium?
11  A   Yes, ma'am.
12  Q   Was that positive or negative?
13  A   Negative.
14  Q   And although it was negative, did she still
15      exhibit signs of withdrawal?
16  A   Yes.
17  Q   How was that treated?
18  A   With neonatal morphine.
19  Q   Do you know how long she received neonatal --
20      or -- is it called neonatal morphine?
21  A   Yeah.
22  Q   Okay, do you know how long she received that?
23  A   I think it was two and a half weeks.
24  Q   And when they exhibit signs of withdrawal,
25      were you there in the hospital with her?

1   A   Yes.
2   Q   Okay, tell me about that.
3   A   I was released before she was, but they gave
4       me -- they asked me if I wanted to stay, and
5       they gave me a room so I could stay with her -
6       - stay with her the whole time.
7   Q   So you were there at the hospital with her the
8       entire time?
9   A   Yes.
10  Q   And what were her withdrawal symptoms?
11  A   She sometimes would eat and then she would
12      puke and that was it.
13  Q   And how did you deal with that?
14  A   The hospital did.
15  Q   But you were there providing care?
16  A   Yes.
17  Q   Did the Department of Social Services become
18      involved in your case from that point?
19  A   Not at the very beginning.
20  Q   Okay, tell me when they first became involved.
21  A   It was four days before we were released.
22  Q   When you say we, do you mean Alana?
23  A   Yes.
24  Q   So what was the initial contact?
25  A   I'm sorry?

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@ashevillereporting.com

1 Q What was the initial contact that you had with
2 the department?
3 A They just showed up and knocked on the door
4 and said that they were there to open a case.
5 Q Okay, and when you say they, who showed up?
6 A Katie and Diana.
7 Q Would that be Katie Brown and Diana Garrett?
8 A Yes.
9 Q Okay, and at that time, what were you told?
10 A They didn't really tell me much of anything,
11 just that she showed some signs of withdrawal
12 so they came. That's about it.
13 Q And at that time, do you know if -- from your
14 own knowledge, do you know if the department
15 opened a case? Did you start having to do
16 things?
17 A They opened a case, and I didn't hear from
18 them until the day me and Alana left the
19 hospital.
20 Q Were you allowed to leave the hospital with
21 Alana?
22 A Yes, ma'am.
23 Q And where did you go?
24 A I went to my mom's.
25 Q And who is your mother?

1 A Melissa (inaudible).
2 Q And I know you've heard some testimony about
3 David Cody Roberts. Is his name on the birth
4 certificate?
5 A Yes, ma'am.
6 Q And were you married to him at the time?
7 A Yes, ma'am.
8 Q And have you since done DNA testing?
9 A Yes, ma'am.
10 Q And have -- what are the results of that?
11 A That Michael is the father.
12 Q After you left the hospital, when was the
13 first contact that Mr. Mathieu had with the
14 child?
15 A It was after we did the DNA test. I tried to
16 get a hold of him and call him, and he would
17 never reply. So I ended up having to message
18 his mom. And he told me he wanted DNA
19 testing, and I tried to get in touch with him
20 over and over again to get him to do the DNA
21 testing. I ended up going to buy the DNA test
22 myself and brought it to his house so he could
23 do it. And then after he did that, he started
24 to, you know ---
25 Q Do you know how soon that was after Alana was

1 born?
2 A It was about -- I want to say two and a half
3 months after she was born.
4 Q And I may have forgotten to ask you, what is
5 Alana's date of birth?
6 A July 5, 2016.
7 Q So you said about two and a half months after
8 the DNA test was completed?
9 A Uh-huh. (Affirmative)
10 Q And what was the contact with Mr. Mathieu at
11 that point between Mr. Mathieu and Alana?
12 A Before or after the DNA?
13 Q After the DNA test.
14 A I think he seen her like twice after the DNA
15 test. He worked out of town a lot.
16 Q And during that first two and a half months
17 that you left the hospital, was there any --
18 what was going on with the Department of
19 Social Services?
20 A I had to do a drug test every week.
21 Q How many drug tests -- well, let me ask: How
22 many drug test you know -- if -- if you know,
23 how many did you take?
24 A Maybe five or six.
25 Q And out of those five or six, do you know how

1 many you failed?
2 A One.
3 Q And was that the first drug test? When was
4 that failed?
5 A It was the day I left the hospital with Alana.
6 Q So all the subsequent drug tests, they were
7 negative?
8 A Yes, ma'am.
9 Q What was the department's involvement with you
10 specifically after you left the hospital? How
11 often did you see them?
12 A Maybe once a month.
13 Q And what would that contact be, and where
14 would that be?
15 A I think I went into the office most of the
16 time. I think I -- they came to my mom's
17 house like twice.
18 Q And at that time were you living with your
19 mother?
20 A Yes.
21 Q And did you have a case worker?
22 A Katie was the case worker in the beginning.
23 Q You say in the beginning. How long was she
24 the case worker?
25 A She was the case worker -- I want to say like

21 (Pages 78 to 81)

1    the first three months.
2  Q  And at some point that changed?
3  A  Uh-huh.  (Affirmative)
4  Q  And who became your case worker?
5  A  Jeryl.
6  Q  What else did the department have you do
7     during that period of time after Alana was
8     born?  You said you had to take some drug
9     tests?
10 A  Uh-huh.  (Affirmative)
11 Q  Was there anything else that you had to do?
12 A  Not really.
13 Q  At some point, did the department call you in
14    and talk to you about signing some papers?
15 A  Yes.
16 Q  Do you know when that was?
17 A  I can't remember the exact date.
18 BY MS. JACKSON:
19    Your Honor, if I may approach?
20 BY THE COURT:
21    You may.
22 DIRECT EXAMINATION RESUMED BY MS. JACKSON:
23 Q  I'm going to hand you what's been marked as
24    Plaintiff's Exhibit 1.  Do you recall -- well,
25    does that document look familiar to you?

1     (Tenders)
2  A  (Upon review)  Yes.
3  Q  Was there a time before you signed this
4     document that you were asked to sign it?
5  A  Yes.
6  Q  When was that?
7  A  I had went and made an appointment with Katie
8     to speak with her, and I went in to talk to
9     her about the case and why it wasn't
10    progressing and everything.  And she pulled
11    out the paper and told me that I could sign
12    that paper and give custody to whomever I
13    wanted and that would end the -- or it
14    wouldn't end the case.  She said that it would
15    just give like them medical -- to be able to
16    take her to doctor's appointments and -- taxes
17    and such.
18 Q  And that document that she asked you to sign
19    on that occasion, is it the same document that
20    I've showed you here, Plaintiff's Exhibit 1?
21 A  Yes.
22 Q  And at that time, did you agree to sign it?
23 A  No.
24 Q  Why?
25 A  Because I didn't want to.  I didn't want

1     anyone to have my child.  I wanted to have my
2     child.
3  Q  So you were wanting to work a case plan; you
4     were wanting to get custody?
5  A  Yes.
6  Q  Were you making efforts in your case plan?
7  A  Yes.
8  Q  Were you working?
9  A  I don't think I was working at the time.
10 Q  Were you making efforts to?
11 A  Yes.
12 Q  I'm kind of jumping around, but are you
13    currently working?
14 A  I am.
15 Q  And where are you working?
16 A  Burger King.
17 Q  How long have you been working at Burger King?
18 A  A month and a half, I think.
19 Q  I'm going back.  So Katie asks you to sign
20    this, and you tell her no?
21 A  Yes.
22 Q  Do you know around when that was?
23 A  I want to say August maybe -- like the end of
24    August, the end of September.
25 Q  So about two months after Alana was born?

1  A  Yes.
2  Q  What happened when you refused to sign it?
3  A  She started asking me if -- she told me that
4     she would start letting me take Alana and
5     stuff, but I left the -- I left her there and
6     nothing ever happened.
7  Q  At that time, you said that she would starting
8     you take Alana.  What does that mean?
9  A  She was placed with my mom when I went to
10    jail.
11 Q  Okay, when did you go to jail?
12 A  I think it was in September.
13 Q  So when you went to jail, did you give your
14    mother kinship placement?
15 A  Katie came to the jail and wrote out the
16    paper, and she said it was kinship.
17 Q  And when you got out of jail, were you able to
18    revoke that paperwork?
19 A  She told me I could, but they didn't let me.
20 Q  So from September, it sounds like, in 2016,
21    Alana was placed with your mother?
22 A  Uh-huh.  (Affirmative)
23 Q  When did that change?
24 A  October.
25 Q  And how did that change?

1  A   I had contacted Michael because there was some
2     issues about him getting to see her and stuff
3     with my mom.
4  Q   Was your mother letting him see her?
5  A   She was, yes.
6  Q   Well, what were the issues?
7  A   He wanted more visitation than what he was
8     getting.
9  Q   Okay, so you contacted Michael, and then what?
10 A   I told him in order -- I told him that we
11     could do some kind of custody agreement to
12     where he would have some kind of rights to her
13     so no one else could say anything about him
14     getting to see her.
15 Q   And did you hear Michael testify about --
16     something about a Quick Lube?
17 A   Yeah.
18 Q   Explain that.
19 A   It's the Express Lube. There's a notary there
20     that's ---
21 Q   So you did some type of agreement there at the
22     Express Lube?
23 A   Uh-huh. (Affirmative)
24 Q   Okay, what happened after that?
25 A   She went to stay with them -- or Michael and

1     Sheila. I think he was going out of town
2     still at that time, but I was going to -- I
3     actually went and got her two weekends. So I
4     was getting her on the weekends.
5  Q   And when did that change?
6  A   When he quit his job.
7  Q   And then he came home?
8  A   Uh-huh. (Affirmative)
9  Q   And what changed?
10 A   I'm not sure. He just -- supposed --- from
11     what I understand, his ex-girlfriend was in
12     the picture, so I wasn't supposed to be.
13 Q   So at that time, you weren't able to see her
14     as much?
15 A   Uh-huh. (Affirmative)
16 Q   Now, I've shown you what's been marked as
17     Plaintiff's Exhibit 1.
18 A   Uh-huh. (Affirmative)
19 Q   Do you recall under what circumstances that
20     you signed that?
21 A   Yes, I do.
22 Q   Tell me about that.
23 A   I had talked to Michael, and I told him -- so
24     he could have -- see her like as much I could
25     -- I told him that I'm going to sign -- we'll

1     give you custody if you promise me that we can
2     split -- that you won't keep her from me.
3  Q   Okay, and did somebody come to your house?
4  A   Yes.
5  Q   Who?
6  A   David and Jeryl and a notary.
7  Q   When you say David ----
8 BY THE COURT:
9     I'm sorry, you said David and Jeryl and who?
10 BY THE WITNESS:
11     The notary.
12 DIRECT EXAMINATION RESUMED BY MS. JACKSON:
13 Q   When you say David, David who?
14 A   Hughes.
15 Q   And what time of day was that?
16 A   It was like -- maybe like 4:00.
17 Q   And he came to your house?
18 A   Well, he came -- we was at Cody's house that
19     day.
20 Q   And what happened?
21 A   He just walked in, handed me the paperwork,
22     and we signed it.
23 Q   Did you read it?
24 A   I did read it.
25 Q   Did you understand it?

1  A   I did understand it. I asked David if me
2     signing this paperwork -- if it was going to -
3     - if anything was going to change if he was
4     going to continue to let me do visitation and
5     all this stuff, and he said that it would be
6     discussed with me and Michael.
7  Q   What else did he tell you when you signed
8     this?
9  A   That my case -- there would no longer be case.
10     The case would be closed.
11 Q   Did he tell you anything else? Did he tell
12     you that you would -- that you wouldn't have
13     to take any more drug screens?
14 A   Yes.
15 Q   And that you wouldn't have to go to court?
16 A   Yes.
17 Q   Was it your understanding that you would still
18     get to see Alana?
19 A   Yes.
20 Q   Have you ever been --- let me ask: What is
21     your highest level of education?
22 A   I graduated high school and I took some
23     college classes.
24 Q   Did you have an attorney when you signed that?
25 A   No.

23 (Pages 86 to 89)

1 Q Did anybody inform you or advise you that you
2 should talk to an attorney before you signed
3 that?
4 A No.
5 Q Was it your understanding or were you told
6 that that was a legally binding document?
7 A Yes.
8 Q And was it your understanding after you signed
9 that that it was binding?
10 A Yes.
11 Q And after that, did you actually make efforts
12 to see Alana?
13 A I did.
14 Q And because of that document, you were not
15 able to see her?
16 A Yes.
17 Q Did anybody tell you from the department -- or
18 Mr. Hughes rather tell you anything about how
19 you could terminate that agreement, if you
20 could?
21 A Yes, I actually called him because I tried to
22 visit -- continue visitation with my child
23 because before we signed the document I was
24 getting her on the weekends. So that's what I
25 expected. And when he denied me that, I

1 called David, and I said, "You know, he's not
2 doing what we agreed to." And he said that I
3 would have to go to court to do something
4 about the document.
5 Q During this entire time, from the time Alana
6 was born, did you ever enter a courtroom?
7 A No.
8 Q Was court ever involved?
9 A No.
10 Q Was anything filed where you had to come to
11 court?
12 A No.
13 Q Did you ever see a judge?
14 A No.
15 Q To your knowledge, was anything ever filed
16 with a clerk?
17 A No.
18 Q How many times would you say that you made
19 efforts to see Alana and were not able to
20 because of that document?
21 A A lot.
22 Q At some point, did you give up?
23 A I did.
24 Q Why?
25 A Well, I had continuously tried, and there

1 would always be some excuse -- sometimes there
2 would be an excuse or a reason I couldn't.
3 And the last time -- one of the times I tried
4 to talk to him, he told me that he did not
5 want me confusing her that he -- I could not
6 longer visit and he blocked me.
7 Q When you say he blocked you, what does that
8 mean?
9 A From messaging him.
10 Q So you weren't even able to contact him?
11 A No.
12 Q Did you love your daughter?
13 A I do.
14 Q Do you want to continue to be able to see your
15 daughter?
16 A I do.
17 Q At some point, do you want joint custody of
18 your daughter?
19 A I do.
20 Q If you had to take a drug screen today, would
21 it be clean?
22 A It would.
23 Q And you said that you're working. How long
24 have you been working?
25 A Almost two months -- a month and a half.

1 BY MS. JACKSON:
2 Your Honor, if I may approach?
3 BY THE COURT:
4 You may.
5 (DEFENDANT'S EXHIBIT NO. 1 MARKED)
6 DIRECT EXAMINATION RESUMED BY MS. JACKSON:
7 Q I'm going to hand you what's been marked as
8 Defendant's Exhibit 1 for identification
9 purposes. Do you recognize that document?
10 (Tenders)
11 A (Upon review) Yes.
12 Q And what do you recognize that to be?
13 A My check stub.
14 Q And is that a check stub from the job that you
15 just testified about at Burger King?
16 A Yes, ma'am.
17 BY MS. JACKSON:
18 Your Honor, I would move to introduce
19 Defendant's 1.
20 BY THE COURT:
21 Any objection?
22 BY MR. MCKINNEY:
23 No objection, Your Honor.
24 BY THE COURT:
25 So admitted.

24 (Pages 90 to 93)

1  (DEFENDANT'S EXHIBIT NO. 1 ADMITTED)
2  DIRECT EXAMINATION RESUMED BY MS. JACKSON:
3  Q  And you said you had been working there for a
4     little bit over a month?
5  A  Uh-huh.  (Affirmative)
6  Q  That you could pass a drug screen?
7  A  Yes.
8  Q  Right now, do you have housing?
9  A  I live with my grandma.
10 Q  Okay, and tell me about that situation?
11 A  It's just me and her.
12 Q  What's your grandmother's name?
13 A  Pam Patterson.
14 Q  And hold old is Mrs. Patterson?
15 A  Like late fifties.
16 Q  And what type of home does she live in?
17 A  She lives in -- what do you mean?
18 Q  Well, like is a trailer, a house, how many
19    bedrooms?
20 A  It's a house.  It's a two-bedroom.
21 Q  Where is it located?
22 A  It's on -- out towards Ranger.
23 Q  Is it clean and appropriate?
24 A  Yes.
25 Q  Does your grandmother -- and I'm not trying to

1     be rude, but does your grandmother have -- is
2     she on probation?
3  A  No.
4  Q  Does she have a history of drug use?
5  A  No.
6  Q  Domestic violence?
7  A  No.
8  Q  Anything of that nature?
9  A  No.
10 Q  Are you currently with David Cody Roberts?
11 A  No.
12 Q  So you're living there with your grandmother?
13 A  Yes.
14 Q  Does anybody else live there?
15 A  No.
16 Q  Are you licensed at this time?
17 A  I'm not licensed, but I just got my tickets
18    taken care of.  And I did go to DMV, and they
19    said it's going to be $120 to get it.
20 Q  So you got all of your tickets taken care of?
21 A  Yes.
22 Q  Two weeks ago?
23 A  Yes.
24 Q  And were those seatbelt tickets that you had
25    not paid?

1  A  Yes.
2  Q  And so you are eligible for reinstatement?
3  A  Yes, ma'am.
4  Q  And do you know when that's going to happen?
5  A  My next paycheck.
6  Q  Right now, how do you get around?
7  A  I have a car.
8  Q  Who drives you though?
9  A  My grandma.
10 Q  To the best of your knowledge, after this
11    document was signed, did DSS make any efforts
12    to follow up with or have any contact with
13    Alana?
14 A  Not that I know of.
15 Q  After this was signed, did they make any
16    contact with you?
17 A  No.
18 Q  After this was signed, did they make any
19    efforts to provide any services to you?
20 A  No.
21 Q  Earlier you indicated that after this was
22    signed, at some point you were blocked by
23    Michael.  Do you remember when that was?
24 A  I think it was after Christmas.  I think it
25    was after Christmas of 2016.

1  Q  How many visits have -- or how many times have
2     you seen Alana in the last six months?
3  A  I was going to see her -- I got to see for two
4     months every weekend -- every Friday.
5  Q  Did you ever get to have any overnights with
6     her after this was signed?
7  A  No.
8  Q  Did you ever get to take her home for holidays
9     after this was signed?
10 A  No.
11 Q  Did you ever get to bring her to any of your
12    family outings or gatherings or vacations
13    after this was signed?
14 A  No.
15 Q  When you see Alana, does she recognize you?
16 A  Uh-huh.  (Affirmative)
17 Q  What does she call you?
18 A  She doesn't call me anything.
19 Q  What are you asking the Court to do today as
20    far as you getting to see Alana?
21 A  I just want to start with something, a couple
22    of days.  Even if it's supervised, that's fine
23    with me.
24 Q  So you just want to be able to see her?
25 A  Yes.

25  (Pages 94 to 97)

1  Q  And hopefully progress into seeing her more
2     and more?
3  A  Yes.
4  Q  How did you feel after you weren't able to see
5     her and after you had been blocked?  How did
6     that make you feel, not getting to see her?
7  A  It hurt my feelings.  I was really upset about
8     it actually.
9  Q  Now, you indicated that you called the
10    department at least on one occasion about this
11    agreement that you had signed, and you were
12    told you have to go to court?
13 A  Yes.
14 Q  At that time, did you have the money to hire
15    an attorney?
16 A  I did not.
17 Q  Did you have the money to go to court?
18 A  I did not.
19 Q  Does anybody in your family have the money to
20    do that?
21 A  No.
22 BY MS. JACKSON:
23    I don't have anything else, Your Honor.
24 BY THE COURT:
25    Mr. McKinney.

1  CROSS-EXAMINATION BY MR. MCKINNEY:
2  Q  Ms. Greenlee, you signed Plaintiff's Exhibit
3     No. 1 of your own free will; didn't you?
4  A  Yeah.
5  Q  And you signed Plaintiff's Exhibit No. 2 of
6     your own free will; didn't you?
7  A  Yes, sir.
8  Q  And you knew that you were turning over
9     custody of the child to Michael Mathieu;
10    didn't you?
11 A  I wouldn't say that.  I mean, I was turning
12    over custody.  I knew that we made an
13    agreement to -- that she would reside with him
14    and we split weeks.
15 Q  Can you read?
16 A  I can.
17 Q  Did you read Plaintiff's Exhibit No. 1 before
18    you signed it?
19 A  I did.
20 Q  Do you know that it says that he's got custody
21    of the child until the child is 18?
22 A  Yes.
23 Q  But you're saying you have this oral agreement
24    with him that you thought superceded the
25    written agreement; is that right?

1  A  Well, I spoke to David when he produced the
2     paperwork to me.  He told me that the
3     visitation could be -- the visitation or
4     whatever we decided was to be discussed
5     between us.
6  Q  He said you and Michael would have to work out
7     the terms of the visitation?
8  A  Uh-huh.  (Affirmative)
9  Q  And did he tell you what would happen in the
10    event you all couldn't work out the terms of
11    the visitation?
12 A  That we would have to go to court.
13 Q  Okay, that's where we are now.  The temporary
14    guardianship agreement, Plaintiff's Exhibit
15    No. 2, how did you come into possession of
16    that document?
17 A  I think that I printed it off actually.
18 Q  From where?
19 A  From home.
20 Q  Okay, how did you know to do that?
21 A  Well, I spoke with Michael's mom.  We
22    discussed at first that we were going to do
23    some kind of custody agreement with -- for
24    Michael between us.  And Michael told me that
25    -- to find a paper and that he would sign it,

1     and so I found it online.
2  Q  And so you met, you went to the Express Lube
3     for whatever -- where there was a notary, and
4     you got that notarized?
5  A  Yes, sir.
6  Q  The child has been primarily with Michael
7     since about three months after it was born; is
8     that correct?
9  A  I wouldn't say three months.  Since about --
10    she was almost four months old.
11 Q  Okay, since that time, she has been in
12    Michael's custody and he has been the primary
13    caregiver; is that correct?
14 A  His mom takes care of her really.
15 Q  Well, Michael takes care of her too; doesn't
16    he?
17 A  (Shrugged shoulders)
18 Q  How frequently have you visited with the child
19    since Michael became the primary caregiver?
20 A  As much as I could.
21 Q  Well, was it once a week, once a month?
22 A  I was told once a week, every Friday depending
23    on if his days of change.
24 Q  Were there times when you indicated to Michael
25    that you wanted to visit, but for whatever

1  reason you couldn't exercise the visit?
2  A  Yes.
3  Q  And, Ms. Greenlee, you indicated earlier that
4     during your pregnancy you -- you told Dr.
5     Holder -- and I may be wrong about what I'm
6     saying, but, if I am, you'll correct me.  You
7     told Dr. Holder that you were using narcotics;
8     is that right?
9  A  In the beginning of my pregnancy, I did.
10 Q  Okay, did you tell him that, or did he do a
11    blood test and determine that?
12 A  I told him that.
13 Q  Okay, and did you tell him what you were
14    using?
15 A  Opiates.
16 Q  Okay, what kind of opiates?
17 A  Roxy, it just depends on what it was.  It
18    really didn't matter, I guess.
19 Q  Okay, well, was it -- was it oxycodone?
20 A  Sometimes.
21 Q  Okay, did you have a prescription for that?
22 A  Huh-uh. (Negative)
23 Q  Did you use hydrocodone?
24 A  No.
25 Q  Have you ever used any hydrocodone?

1  A  Huh-uh. (Negative)
2  Q  You're absolutely certain about it?
3  A  Before my pregnancy?
4  Q  Yes.
5  A  Yeah, I'm pretty certain.
6  Q  Okay, during your pregnancy, did you use any
7     hydrocodone?
8  A  Yes, I was prescribed it.
9  Q  Okay, and who prescribed it for you?
10 A  Chattanooga, the -- the high risk hospital in
11    Chattanooga.
12 Q  Okay, and did they prescribe that for you to
13    wean you off the oxycodone?
14 A  Yes.
15 Q  And what dosage did they tell you take of
16    that?
17 A  I think it was five milligrams -- or it was
18    three a day, five milligrams.
19 Q  Okay, and that helped you with ---
20 BY THE COURT:
21    Did you say three a day, five milligrams?
22 BY THE WITNESS:
23    Yes.
24 CROSS-EXAMINATION RESUMED BY MR. MCKINNEY:
25 Q  And that helped you with withdrawals?

1  A  Yes.
2  Q  And, Ms. Greenlee, did you continue to take
3     that down to the time the child was born?
4  A  I did not.
5  Q  When did you stop taking the hydrocodone?
6  A  When my car had broke down and I couldn't make
7     it to my doctor's appointment.
8  Q  And how -- how far before the child was born
9     was that?
10 A  Maybe five months.
11 Q  So you hadn't taken any hydrocodone in five
12    months before the child was born; is that
13    right?
14 A  Uh-huh.  (Affirmative)
15 Q  And you say you don't have any problem with
16    your visitation being supervised at this
17    point?
18 A  No.
19 Q  Ms. Greenlee, would you be willing to make
20    your visitation with the child contingent on
21    passing a five panel hair and urine drug
22    screen ---
23 A  Yes.
24 Q  --- to be administered by a laboratory on the
25    federal registry?

1  A  Sure.
2  Q  You would do that?
3  A  Yeah.
4  Q  Okay, and where are you living right now?
5  A  With my grandma.
6  Q  And how long have you been living there?
7  A  Since I -- for about almost a month I would
8     say, since I started working.
9  Q  Who else lives there?
10 A  Just me and my grandma.
11 Q  Okay, Ms. Greenlee, prior to this pregnancy,
12    have you had any previous involvement with the
13    Cherokee County Department of Social Services?
14 A  Yes.
15 Q  Okay, and how long ago was that?
16 A  2014.
17 Q  And what was the occasion for you to be
18    involved with the Department of Social
19    Services at that point in time?
20 A  For a drug test, I guess.  Allegations of drug
21    use.
22 Q  And did -- did you take drug tests at that
23    time?
24 A  I did.
25 Q  And did you fail?

27 (Pages 102 to 105)

1 A I did.
2 Q And where were those drug tests administered?
3 A The Health Department.
4 Q Here in Cherokee County?
5 A Yes.
6 Q Okay, did you have other children at that
7 time?
8 A I did.
9 Q And were they removed from your care?
10 A Yes.
11 Q And how old are they?
12 A Two, one, and five months, I think.
13 Q Did you ever have any discussions with any
14 attorney with -- from the Cherokee County
15 Department of Social Services about this
16 matter?
17 A Can you repeat that, I'm sorry?
18 Q Okay, did you ever talk with the Cherokee
19 County Department of Social Services' attorney
20 about that custody agreement you signed?
21 A I don't think so.
22 Q Do you know who prepared that Plaintiff's
23 Exhibit No. 1, the custody agreement?
24 A To my knowledge, it was David Hughes.
25 Q Okay, and how do you -- why do you think it

1 was David Hughes?
2 A Because that's what he told me.
3 Q He told you that he prepared it?
4 A He -- when we -- when he told me about the
5 paperwork, he told me that he was going to fix
6 --- get the paperwork together and he would,
7 you know ---
8 Q Okay, how -- how much time elapsed between the
9 time he told you that and the time you signed
10 the agreement?
11 A Maybe a week.
12 Q From the time that you were contacted about
13 your pregnancy by the Cherokee County
14 Department of Social Services until the child
15 was born, were you offered any services by the
16 Cherokee County Department of Social Services?
17 A I don't think so.
18 Q After the child was born, were you offered any
19 services by the Cherokee County Department of
20 Social Services?
21 A No.
22 Q Did anyone discuss the need with you for drug
23 rehab?
24 A No.
25 Q Did you take any drug screens for the Cherokee

1 Department of Social Services after the child
2 was born?
3 A I did.
4 Q And what were the results of those drug
5 screens?
6 A My first one the day I got out of the hospital
7 was dirty, but the rest them were clean.
8 Q And what did you test positive for?
9 A I can not remember what it was.
10 Q Was it hydrocodone?
11 A It might have been.
12 Q Your daughter is being well taken care of;
13 isn't she?
14 A I wouldn't know.
15 Q Well, when you would exercise your visits at
16 Michael's where he was living with his mother,
17 was the child being taken well -- taken good
18 care of?
19 A I mean, I guess. They weren't really around
20 when I was in there. They would just sit on
21 the couch there. I don't know.
22 Q Well, did your daughter seem to be happy
23 there?
24 A Yeah.
25 Q She was safe?

1 A As far as I seen.
2 Q Well-fed?
3 A As far as I seen.
4 Q Taken to the doctor when she was sick?
5 A I do not know.
6 BY MR. MCKINNEY:
7 That would be all my questions, Your Honor.
8 BY THE COURT:
9 Followup?
10 REDIRECT EXAMINATION BY MS. JACKSON:
11 Q Ms. Greenlee, would you have signed that
12 agreement, Plaintiff's -- or Plaintiff's
13 Exhibit 1, if you knew that you were not going
14 to be able to get visitation with Alana?
15 A No.
16 Q Did you go to law school?
17 A No.
18 Q Do you understand -- do you understand legal
19 terminology?
20 A No.
21 Q Did anybody tell you to talk to an attorney
22 before you signed that?
23 A No.
24 Q At any time, did you talk to anybody at the
25 department about the fact that they may file a

1    petition to go to court?
2  A    No.
3  Q    So nobody ever talked to you about that?
4  A    I don't think so.
5  Q    When you signed that agreement, Plaintiff's
6       Exhibit 1, were you told by Mr. Hughes that
7       this would keep you out of court?
8  A    Yes.
9  BY MS. JACKSON:
10      I don't have anything else, Your Honor.
11 BY THE COURT:
12      Any followup?
13 BY MR. MCKINNEY:
14      I don't have any further questions, Your
15      Honor.
16 BY THE COURT:
17      Ms. Greenlee, you may step down.  If I may see
18      counsel at the bench just for a second.
19 (BENCH CONFERENCE)
20 BY THE COURT:
21      So, ladies and gentlemen, we'll be at ease for
22      just a few minutes.
23 (OFF THE RECORD)
24 BY THE COURT:
25      Are you ready to call your next witness?

1  BY MS. JACKSON:
2       I am.  Your Honor, I'm going to briefly recall
3       Ms. Shalees Greenlee.
4  BY THE COURT:
5       All right.
6  BY MS. JACKSON:
7       Just for one followup.
8  BY THE COURT:
9       Mr. McKinney, do you wish for she -- for her
10      to be re-sworn?
11 BY MR. MCKINNEY:
12      No, Your Honor.
13 BY THE COURT:
14      Ms. Greenlee, come on around for me.  I will
15      advise you that you remain under oath.
16 REDIRECT EXAMINATION RESUMED BY MS. JACKSON:
17 Q    Ms. Greenlee, I just had one followup question
18      for you.  To your knowledge, did DSS or the
19      Department of Social Services here in Cherokee
20      County ever make any efforts to reunify you
21      with your daughter?
22 A    No, ma'am.
23 BY MS. JACKSON:
24      I don't have anything else, Your Honor.
25 BY MR. MCKINNEY:

1       I don't have any further questions.
2  BY THE COURT:
3       Ms. Greenlee, you may step down.
4  BY MS. JACKSON:
5       Your Honor, the next witness would be David
6       Hughes.
7  BY THE COURT:
8       All right, Sheriff, if you will, bring Mr.
9       Hughes in for us, please.  Mr. Mathieu, you
10      can come back around if you want to sit at the
11      table with Mr. McKinney.
12 (OFF THE RECORD)
13 BY THE COURT:
14      Come on around, Mr. Hughes.
15      DAVID HUGHES, being duly sworn to tell the
16 truth, the whole truth, and nothing but the truth
17 of his own knowledge concerning the within matter,
18 testified as follows:
19 DIRECT EXAMINATION BY MS. JACKSON:
20 Q    Good afternoon, Mr. Hughes.  Would you please
21      state your full name for the Court?
22 A    David Allen Hughes.
23 Q    And, Mr. Hughes, how are you currently
24      employed?
25 A    Cherokee County Department of Social Services.

1  Q    And how long have you been employed with the
2       department?
3  A    Going on seven years.
4  Q    And what -- in what capacity are you employed
5       there currently?
6  A    I'm the Child Protective Service Unit
7       supervisor.
8  Q    How long have you been the supervisor?
9  A    This year will be two years.
10 Q    Do you recall when you became the supervisor?
11 A    Yes.
12 Q    When was that?
13 A    It was in September of '16.
14 Q    And you said you've been employed there total
15      for seven years?
16 A    Going on seven years.
17 Q    Going on seven years, okay.  So for the five
18      years prior to September 2016, in what -- what
19      was your status there?
20 A    I was a social worker.
21 Q    A social worker.  What is your educational
22      background?
23 A    I have a bachelor's degree in business
24      administration.
25 Q    And is that a four-year degree?

1  A  Yes.
2  Q  As part of your work at the department, do you
3     regularly go to any type of training or in-
4     services?
5  A  Yes.
6  Q  Can you tell me about that?
7  A  Well, we have certain courses that the state
8     requires that we have.  I think it's maybe 24
9     hours minimal continuing education each year.
10    At the office, I have a list of all the
11    courses and classes that I've attended, but I
12    don't have them with me.
13 Q  Okay, have you kept that current?
14 A  Yes.
15 Q  Okay, and have you always kept that current in
16    your seven years of employment?
17 A  Yes.
18 Q  And are those trainings -- do you go to those?
19    Are they at the department?
20 A  Usually we go to them, but -- occasionally, if
21    it's some type of short training, it might be
22    at the department, but -- but they're usually
23    held in Asheville or Charlotte.
24 Q  Are you familiar with the case involving
25    Shalees Greenlee and her daughter Alana?

1  A  Yes.
2  Q  Do you recall when you first began working on
3     that specific case?
4  A  Well, I was -- I was not directly involved
5     with the case initially -- at initiation
6     because there was another social worker that
7     worked that case.
8  Q  And do you know who that was?
9  A  That was Social Worker Katie Johnson.
10 Q  Do you recall what, if any, involvement that
11    you had in the case?
12 A  On that particular report?
13 Q  Correct.
14 A  Some.  I mean, not everything.
15 Q  Can you tell me what you recall?
16 A  I remember that there were -- a child was born
17    and we had received a report, and I think
18    there were ongoing substance abuse issues.
19 Q  And do you recall if you worked any with Ms.
20    Greenlee, or would that have been somebody
21    else?
22 A  Well, during -- during that particular report
23    -- report, it would have been Social Worker
24    Johnson.
25 Q  Do you recall ---

1  BY MS. JACKSON:
2     Your Honor, if I may approach the witness?
3  BY THE COURT:
4     You may.
5  DIRECT EXAMINATION RESUMED BY MS. JACKSON:
6  Q  I'm going to hand you what's been previously
7     marked as Plaintiff's Exhibit 1.  Do you
8     recognize that document?  (Tenders)
9  A  (Upon review)  Yes.
10 Q  What -- what is that document called at the
11    department?
12 A  Custody and visitation agreement or commonly
13    referred to by you all as a CVA.
14 Q  Okay, so exactly what it says there at the
15    top?
16 A  Yes.
17 Q  Do you remember when the first time is that
18    you saw one of those agreements?
19 A  I don't remember exactly.
20 Q  Can you estimate?
21 A  Years ago.
22 Q  When you say years -- I'm going to try to
23    narrow it down just a little bit -- would you
24    say five years ago or more than that?
25 A  Probably five years ago.

1  Q  Okay, and when you first saw one of those, do
2     you remember how that came about?
3  A  I don't remember the first time I was exposed
4     to one of these, how it came about.  I do know
5     that, you know, there have been -- they've
6     been used in the agency over the years.
7  Q  Okay, did you ever draft one of these?
8  A  I have, and then usually in the cases that --
9     that we use them, once the -- the changes were
10    made, then -- then our attorney would look the
11    -- the form over.  Sometimes he created them.
12 Q  Do you know who originally created that?
13 A  Because they all -- all the ones that I've
14    seen seem to sort of have the same format.  Do
15    you know who originally created the document?
16 A  I do not know.
17 Q  But you did not originally create it?
18 A  No.
19 Q  So you said the cases that would use them,
20    what did that mean?
21 A  Well, it wasn't something that was used on a
22    regular basis.  Sometimes there were cases
23    that involved grandparents having a temporary
24    custody of a child and -- or another family
25    member, and sometimes they were just done to

30 (Pages 114 to 117)

1     set it up so that the other family member
2     would have permanent custody, or so we thought
3     at the time, without having court involvement.
4 Q  Were they typically cases that you would have
5     a report on already, or how did that work?
6 A  Usually.
7 Q  Okay, when you say usually, were there ones
8     that that was not the case?
9 A  There have -- there has been one in particular
10    that I know.
11 Q  And under what circumstances do you know would
12    that be done?
13 A  Like a case that did not involve court, I
14    mean, where there was not a case? Is that
15    what you're asking?
16 Q  Yes.
17 A  We had a family approach us on one particular
18    occasion where the uncle had been granted
19    custody of the child, and the family no longer
20    had room for the child in their home. And in
21    fact, it turned out that the uncle had allowed
22    the child to live with the -- with the
23    grandparent. The grandparent died and they
24    came to us and asked us if there was something
25    that we could do to help them, that they were

1     --- due to the situation where the family no
2     longer had room for this child, they wanted to
3     transfer custody to another adult sibling, an
4     aunt, and so it was created on that occasion.
5 Q  Okay, and so that was done without a report?
6 A  Right.
7 Q  Okay, and under whose authority do you recall
8    that that was done?
9 A  Well, that -- that particular one, the family
10    came to DSS and asked us about what they could
11    do. We -- we referred them to attorneys.
12    They said, "We don't have the money to pay an
13    attorney. We just paid for the funeral
14    expense of our father. Is there anything that
15    ya'll can do to help us?" Our attorney at the
16    time, Scott Lindsay, and I met with the family
17    on that particular day and ---
18 Q  Okay, and do you remember who -- who put the
19    details in that or who drafted that one?
20 A  I'm pretty sure that Scott did.
21 Q  Was there a template for these that you would
22    just go in and fill out?
23 A  Well, I would say yes, but the template might
24    be one that you had just saved, and you went
25    in and change things.

1 Q  So like from a previous case?
2 A  Right.
3 Q  And you indicated that these were used
4    oftentimes to go to grandparents or family
5    members. Were these ever used to transfer
6    custody to a non-family member?
7 A  It's possible.
8 Q  I know I've already sort of touched on this,
9    but were these cases that were staffed on a
10    regular basis where these would be used?
11 A  Probably.
12 Q  So I guess what I'm trying to figure out is:
13    Whose decision was it ultimately whether or
14    not to use one of these?
15 A  Well, it would be -- it would be a discussion
16    held between the social worker, the
17    supervisor, the attorney, and the -- and many
18    times the family, you know, were all, you
19    know, in on the discussion.
20 Q  So I guess what I'm asking -- if there had
21    been a report within the department and you
22    were working with, let's say, a mother, how
23    would you determine on which cases it was
24    appropriate to use one of these?
25 A  Most cases were -- were cases that probably

1     would not have ended up in -- in -- I say
2     most. A lot of the cases would not have ended
3     up in court, and it was at the request of the
4     family to -- to help them place the child in -
5     - somewhere that was safe and that -- so that
6     the -- whether it be grandparents or family
7     members had a right to be able to obtain
8     medical care, enroll them in school, and do
9     things such as that.
10 Q  After these were completed, were there ever
11    any -- was there ever any followup? So after
12    a CVA was signed, all the parties signed it,
13    was the case closed?
14 A  Usually it's closed soon afterwards.
15 Q  So let's say a month later, would DSS still be
16    involved or doing any followup?
17 A  Usually by that time the case would have been
18    closed.
19 Q  So the signing of the CVA closed the case?
20 A  Usually.
21 Q  When you say usually, what does that mean?
22 A  Unless there happened to be other children
23    that were -- that were not placed in that CVA
24    and the case was maintained opened to deal
25    with that situation.

1  Q   Were -- how many of these would you say that
2      you have completed in -- during your time at
3      the department?
4  A   Maybe three as a social worker, you know.
5  Q   Okay, and how many do you think, and if you
6      know, were completed at the department while
7      you've been there whether or not you may have
8      been directly or not directly involved?
9  A   Probably somewhere in the neighborhood of 20
10     or low twenties.  Somewhere between probably
11     20 and 24.
12 Q   And when these were completed, did all of them
13     -- did all of them have to be approved by
14     Scott Lindsay, the attorney?
15 A   I do know that on occasion there was a couple
16     that he seemed to not be aware of because he
17     had made mention to me later that he did not
18     have a copy of a certain one.  So I feel like
19     that there were some that -- that were done
20     without his knowledge.
21 Q   How did the department keep track of these?
22 A   Well, honestly, we didn't keep track of them.
23     I mean, they were done, they were put in each
24     file, and -- and they were there, but we
25     didn't keep a running tally of how many had

1      been done.
2  Q   Were they saved to a computer or anything of
3      that nature, like of a list of these?
4  A   They were saved probably until the point that
5      that particular template was used again, and
6      then it was cleared.  They were -- they were
7      put in the -- in the case file.
8  Q   What about ones like the case where you said
9      there was not a current case file, that a
10     family just came to you?  Do you recall what
11     was done with that particular one?
12 A   That particular file was located in our file
13     room, and it was -- and it was put in that
14     file.
15 Q   Okay, so you did make a file on that?
16 A   Yeah.
17 Q   Okay.  When these cases were staffed, who
18     would be in the staffings?
19 A   It would usually be the -- the supervisor, the
20     social worker -- well, maybe all the social
21     workers might be -- you know, we have a group
22     staffing every -- every week.  So it's more
23     than likely that it was probably taken care of
24     during those staff meetings because Scott
25     Lindsay would be in attendance to our group

1      staffings as well.
2  Q   So he would be present when these were
3      discussed?
4  A   Yes.
5  Q   When you did these, because I know the
6      department has particular ways of coding and
7      billing, how would the case be closed?  How
8      would it be closed out with the state?
9  A   Well, it may have been the services provided.
10     It depends on what all -- what all took place
11     during the course of the case, you know, if we
12     have made referrals for assessments, we've
13     done drug screens.  Many things come into play
14     other than just that CVA.
15 Q   And when you would have the staffings, was the
16     director typically there?
17 A   Typically, no.
18 Q   But Mr. Lindsay was?
19 A   In -- on most occasions.
20 Q   Are you aware -- when these were done, were
21     they ever emailed to Mr. Lindsay for his
22     approval?
23 A   They probably were for him to look over and
24     make any changes.
25 Q   On these specific cases, why would the

1      department not file a petition?
2  A   Well, for example, in the -- in this
3      particular case of Alana Roberts, Shalees had
4      asked for something to be done.  She wanted to
5      assign custody over to Michael Mathieu.
6  Q   You indicated in the beginning that you -- or
7      during the beginning of your testimony rather
8      that you do typically 24 hours of training a
9      year?
10 A   Uh-huh.  (Affirmative)
11 Q   During any of that training, did they ever
12     discuss or talk about doing private custody
13     agreements or CVAs?
14 A   No.
15 Q   Did any of the training ever indicate that
16     that was a proper method of closing a case?
17 A   No.
18 Q   Did you ever question doing these or question
19     whether or not they were proper?
20 A   Well, I'm not an attorney.  I figured this is
21     a legal form.  We had an attorney, and that's
22     -- I just don't feel like that's my role.
23 Q   Okay, so as far as you knew, these were
24     proper?
25 A   They had been used at the agency before I came

1    to the agency. So I didn't -- I didn't really
2    see that there was a problem.
3 Q  So when you said that the ones that you were
4    aware of are probably somewhere between 20 to
5    24 -- so that would be since your time with
6    the agency?
7 A  Well, no, I think that's how many we have been
8    able to locate that has been done.
9 Q  Okay. Do you know when those date back?
10 A  For probably about ten years.
11 Q  In the specific case that we're here about
12   today, Shalees Greenlee, did you along with
13   the social workers go to Ms. Greenlee's
14   residence?
15 A  Yes.
16 Q  Can you tell me about that?
17 A  A social worker and myself, and we also took a
18   notary with us -- we took it out and went over
19   it, and she said that's what she wanted to do.
20   She signed it. It was notarized. We took it
21   back and put it in the file once it was signed
22   by the -- by the father.
23 Q  And did -- did you give her the impression or
24   tell her that that was a legally binding
25   document?

1 A  I don't know what all the discussion was that
2    day. We informed her that it was taking care
3    of what she wanted, that it was a custody and
4    visitation agreement. We went over it, and
5    she signed it.
6 Q  And on that day, did she question you about
7    whether or not she would continue to have
8    visitation?
9 A  Yes, and visitation was addressed in there, if
10   I'm not mistaken.
11 BY MS. JACKSON:
12   And, Your Honor, if I may briefly approach?
13 BY THE COURT:
14   You may.
15 BY MS. JACKSON:
16   If I may approach, Your Honor, I'm sorry.
17 DIRECT EXAMINATION RESUMED BY MS. JACKSON:
18 Q  If can point you to No. 2, the only visitation
19   that Ms. Greenlee was allowed was in fact at
20   the placement's discretion; would that be
21   correct? (Tenders)
22 A  (Upon review) I think that's correct.
23 Q  So in fact she -- she hypothetically didn't
24   have any visitation?
25 A  Well, it says that she shall have the right to

1    visitation with her children at reasonable
2    times and for reasonable length of time. We
3    kind of leave it up to where it's up to them
4    to work it out.
5 Q  So if the placement provided doesn't want to
6    allow visitation, then they don't have to?
7 A  Well, I guess it's not set up on specific
8    dates, specific time for each week.
9 Q  At some point after this was signed in
10   November of 2016, did Ms. Greenlee contact you
11   in regards to the fact that she was not
12   getting visitation?
13 A  Yes.
14 Q  And what did you tell her?
15 A  I don't remember exactly what I told her. I
16   just remember her calling about that. You
17   know, I just -- I can't remember the
18   conversation exactly.
19 Q  So do you recall that she was concerned --
20   that she still wanted to see Alana and wasn't
21   being allowed to
22 A  Yes.
23 Q  So she was making efforts to continue to see
24   her?
25 A  Yes.

1 Q  Do you recall if you told her that she would
2    have to go to court?
3 A  I don't remember the conversation exactly, I'm
4    sorry.
5 Q  Were any of these ever signed by a judge? Do
6    you know?
7 A  Not -- not that I'm aware of.
8 Q  Were any of them ever filed at the clerk's
9    office?
10 A  There was one that we -- we did file, and I
11   remember talking to the clerk of court's
12   office about it. And they informed me that --
13   that it couldn't be file-stamped. It would
14   just be basically there. It wasn't something
15   that they were accustomed to doing.
16 Q  Why was that specific one filed with the
17   clerk's office?
18 A  Because somebody had asked us if -- if it
19   would be filed there, and I told them that
20   typically they were not filed there, that they
21   were just in the file at DSS office and I
22   would look into the process of filing it in
23   the clerk's office.
24 Q  So in this specific case with Ms. Greenlee,
25   did you tell her that if this was signed, she

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
                    ars@ashevillereporting.com

1   wouldn't have to do anymore drug screens?
2 A  I think we probably told her that the case
3   would be closed.
4 Q  And that there wouldn't be any court
5   involvement?
6 A  Yes.
7 Q  And that there would be no chance that the
8   child would go to foster care?
9 A  I don't -- I don't know that that was the
10   extent of the discussion, but (pause) ----
11 Q  Do you know why there isn't a minimum
12   visitation put into those CVAs?
13 A  No.
14 Q  Was she ever advised to speak with an
15   attorney? Do you know?
16 A  She was.
17 Q  You did tell her to talk to an attorney?
18 A  We talked with her one time and -- and when
19   she was first asking about signing over
20   custody to Michael, we advised that she
21   probably should talk to an attorney.
22 Q  And why did you advise her of that?
23 A  Well, that's just usually what we do.
24 Q  Because signing custody is a pretty big deal?
25 A  Sure.

1 Q  In this specific case -- it's been cleared up
2   now, but at the time, Michael Mathieu was not
3   the legal father; is that correct?
4 A  There was always some discrepancy about who
5   the father was.
6 Q  Who was the legal father? Who was on the
7   birth certificate?
8 A  I think Cody Roberts was on the birth
9   certificate.
10 Q  When this was signed, was there any
11   communication with him?
12 A  To the best of my knowledge, I think he was
13   there when it was signed by Shalees. I can't
14   remember, but he -- he did -- Cody will play a
15   role -- he will be active for a while and then
16   -- and then you won't see him for a while.
17   He's -- he's in and out. So you never -- you
18   never really know what the relationship was
19   going to be like from one month till to the
20   next.
21 Q  So at the time this was signed to Michael
22   Mathieu, the department did not know who the
23   actual father of the child was?
24 A  It was just based on what the birth
25   certificate said, you know.

1 Q  So at that time, you thought it was David Cody
2   Roberts?
3 A  Well, at some point along the way, I think
4   that Shalees had indicated that -- that
5   Michael was the father.
6 Q  Do you know if the department ever did any DNA
7   testing or anything of that nature?
8 A  I don't think it was done by the department.
9   It was talked about, but I don't think that it
10   was ever done.
11 Q  Since David Cody Roberts was on the birth
12   certificate, did you have him sign anything?
13 A  I don't think that he signed this CVA.
14 Q  When the child was placed through the CVA with
15   Mr. Mathieu, was there any home study done?
16 A  I would have to look at the documentation and
17   see. I don't -- I don't know right off hand.
18 Q  Was there any drug testing on Mr. Mathieu?
19 A  I don't know if a drug test was done. I do
20   remember seeing somewhere in the notes that
21   Katie Johnson had done background checks and
22   RIL checks on, I think, he and his parents.
23 Q  So looking at the broader picture, when these
24   CVAs were used, were there typically home
25   studies done on where these children were

1   being placed?
2 A  Usually they were because in many times there
3   was already a -- a kinship placement or a -- a
4   temporary parental safety agreement in place,
5   and that's where the children were already
6   staying.
7 Q  And when these were used, was there ever -- I
8   know that we kind of touched on it, but was
9   there ever any followup?
10 A  After the case was closed, no.
11 Q  So for example, like if there was a child that
12   was meth addicted that was taken from the
13   hospital and placed via a CVA, was there any
14   followup because of medical reasons?
15 A  No. Once the case was closed, there was no
16   followup.
17 Q  Why did the department not follow up?
18 A  Well, once -- once our case is closed, we --
19   we work with open cases.
20 Q  So is this a way to close cases fast?
21 A  I wouldn't say that. I think that most of
22   these agreements were done in what we thought
23   was the best interest of the child at the
24   time.
25 Q  Do you know if anybody at the department ever

1      questioned the legality of these?
2 A   Not while I've been there.
3 Q   Did you ever talk directly with Mr. Lindsey
4      about these?
5 A   Usually just when we were doing one, I mean
6      (pause) ----
7 Q   And would he approve of them?
8 A   Yes.
9 Q   Did you rely on his legal advice?
10 A   Yes.
11 Q   Did you think that what you were doing was in
12      the best interest?
13 A   Yes.
14 Q   When was the first time that you discovered
15      that these were not in fact binding documents?
16 A   Well, I -- I knew all along that they were not
17      recorded in the clerk's office. So probably
18      from as far back from when we -- when I was
19      first exposed to one. I knew that they were
20      not filed, but -- as far as legally binding,
21      you know, both -- both parties I should say,
22      all the parents that signed it -- that usually
23      constitutes that you know what you're signing
24      and you're agreeing to it. So until, I guess,
25      this lawsuit and everything started coming

1      about, I guess that's when we really -- it
2      came to light about the -- the legality part
3      of it.
4 Q   After these CVAs are signed and the files are
5      closed, where were the files placed?
6 A   In our file room at DSS.
7 Q   Other than that one occasion when Ms. Greenlee
8      tried to get in contact with you about
9      visitation, did you have any contact with her,
10      Alana, or Mr. Mathieu after this document was
11      signed?
12 A   No. I mean, occasionally I might run in to
13      Shalees somewhere in the community or here at
14      the courthouse or something, but -- but not on
15      DSS business.
16 Q   When you would specifically do one of these,
17      would you present it to Mr. Lindsay?
18 A   Yeah.
19 Q   And would he approve of it?
20 A   Well, he would -- he would look over them and
21      make any changes that he felt like were
22      necessary.
23 Q   Was there ever one that was presented to him
24      that he disapproved of?
25 A   Not that I'm aware of.

1 Q   Did he ever tell you how -- or did you ever
2      tell people when they signed these how they
3      could terminate them?
4 A   No.
5 Q   How DSS maintain their files?
6 A   I'm not sure what you're asking.
7 Q   After a case is closed, what happens with the
8      file?
9 A   The social worker completes all the
10      appropriate paperwork, turns it in to the
11      supervisor. The supervisor goes through it to
12      verify that everything is in the file that's
13      supposed to be. The case is closed out
14      through the state, and the file is then filed
15      away in our file room.
16 Q   After -- probably the same thing -- but after
17      these were signed, were there any more
18      services provided to the parents?
19 A   If the case was closed, no.
20 Q   Do you have electronic filing, or is it all
21      paper filing still?
22 A   It's still paper.
23 BY MS. JACKSON:
24      If I could have one moment, Your Honor?
25 DIRECT EXAMINATION RESUMED BY MS. JACKSON:

1 Q   Do you know how long the department maintains
2      their files -- or keeps them rather?
3 A   I think that they just stay on, you know,
4      until the state decides that you might be able
5      to purge them, but I've -- we talked about
6      that recently, and I think that you pretty
7      much have to keep CPS files.
8 Q   You indicated earlier in your testimony that
9      you thought that there was somewhere around 20
10      to 24 of these; is that right?
11 A   Yes.
12 Q   How did the department determine that?
13 A   We have gone through the files.
14 Q   Were you present when Mr. Lindsay stated in
15      open court that he brought 30 of these with
16      him today?
17 A   I heard that.
18 Q   Were you aware of that?
19 A   No.
20 Q   Do you know if they're the same ones that you
21      have?
22 A   I would assume that they -- that they make up
23      the same number that we have been able to
24      locate in the files.
25 Q   But have you talked to him about that

1    directly?

2  A   No.

3  Q   In regards to the specific case on hand,

4    Shalees Greenlee, the child in that case, that

5    child was born with some dependency; would

6    that be correct?

7  A   That would be correct.

8  Q   Is it typical in a case like that to close it

9    with no followup?

10  A   Well, we worked with the family for --- from

11    probably July till November. So once the

12    child was in what we felt like was a safe

13    place, that's when the case was closed.

14  BY MS. JACKSON:

15    I don't have anything further, Your Honor.

16  BY THE COURT:

17    All right, it's -- would this be a good place

18    to break before you start cross-examination?

19  BY MR. MCKINNEY:

20    (Affirmative nod)

21  BY THE COURT:

22    All right, we'll be at ease for our lunch

23    break until 2:15.

24  (OFF THE RECORD)

25  BY THE COURT:

1    Sheriff, if we'll find Mr. Hughes, I believe

2    Mr. Hughes was on the stand, David Hughes.

3    You did have questions for cross-examination

4    or no? Wait just a second, Sheriff. Mr.

5    McKinney is hesitating for a moment. Do you

6    have any questions?

7  BY MR. MCKINNEY:

8    I'm just trying to think about where we were.

9  BY MS. JACKSON:

10    I had just quit.

11  BY THE COURT:

12    He had just ---

13  BY MR. MCKINNEY:

14    Yes.

15  BY THE COURT:

16    She had just finished.

17  BY MR. MCKINNEY:

18    I have a couple of questions for him.

19  BY THE COURT:

20    Okay, bring Mr. Hughes in, please. Mr.

21    Hughes, you remain under oath.

22  BY THE WITNESS:

23    Okay, thank you.

24  BY THE COURT:

25    You may have a seat.

1  CROSS-EXAMINATION BY MR. MCKINNEY:

2  Q   Mr. Hughes, as a part of the DSS investigation

3    related to the complaint in this case, did the

4    Department of Social Services require Shalees

5    Greenlee to submit to any drug screens?

6  A   I'm certain that we did.

7  Q   Could you ---

8  A   I would have to verify in the file, but -- but

9    I think that we did.

10  Q   Could you do that and, if you could, let me

11    know what the results of those tests were?

12  A   And I assume that you're talking about the

13    latest report that involved when the --- where

14    the CVA came out of?

15  Q   Yes, sir.

16  A   Okay, I have found where we have made three

17    separate referrals on three dates, but I only

18    see the drug screen results on two dates. The

19    first one was on 7-25, 2016. It was negative

20    for all substances. The one on July 14, 2016,

21    was positive for oxycodone. However, I do

22    believe that she had a prescription for that.

23  Q   Do you know who that prescription was from?

24  A   I think Dr. Holder.

25  Q   Do you know what Dr. Holder was treating her

1    for?

2  A   I just assumed that he was her OB doctor.

3  Q   Do you have a record of any other drug screens

4    that she was administered?

5  A   Not in this particular case file. I do in

6    other case files.

7  Q   And had the Cherokee County Department of

8    Social Services previously removed children

9    from Shalees Greenlee's care?

10  A   We had placed the children in kinship care

11    several times previous to this.

12  Q   Were there civil custody agreements used ---

13    and I'm calling Plaintiff's Exhibit No. 1 ---

14    that's what I'll refer to by as a civil

15    custody agreement.

16  BY THE COURT:

17    You mean the CVA?

18  BY MR. MCKINNEY:

19    Yes, CVA.

20  CROSS-EXAMINATION RESUMED BY MR. MCKINNEY:

21  Q   Were there CVAs used in those cases?

22  A   No, there were not.

23  BY MR. MCKINNEY:

24    That will be all my questions, Your Honor.

25    Well, wait, I have one more question.

CROSS-EXAMINATION RESUMED BY MR. MCKINNEY:

1  Q  Mr. Hughes, when the Department of Social
2     Services closed this case -- okay, when you
3     folks closed this case, were you required to
4     file a form with the people in Raleigh ---
5  A  No.
6  Q  --- indicating that the case had been closed?
7  A  Well, I say no.  In our system, one of the
8     clerks codes that the system is closed on a
9     particular date.  So that indirectly does go
10    to Raleigh at some point in time.
11 Q  Is there a reason given when they code it?  Is
12    there a reason given for why the case was
13    closed?
14 A  It is -- it is noted as how the case was
15    staffed.  Like if it were staffed as a
16    substantiation or a -- or services need or a
17    services provided, we have different codes for
18    each one of those.  So it is noted in that
19    manner.
20 Q  And how was this case closed?
21 A  It was staffed as services needed, but it was
22    placed into case management after that.  So we
23    didn't close the case completely until the
24    case management -- that -- during the case

1     management file was when the CVA was created.
2     So it was done during the in-home service.
3  BY MR. MCKINNEY:
4     That will be all my questions.
5  BY MS. JACKSON:
6     Just a few more, Your Honor.
7  REDIRECT EXAMINATION BY MS. JACKSON:
8  Q  You indicated earlier that you do training
9     yearly, 24 hours.  Did any of the trainings
10    that you ever -- that you ever attended
11    provide you with any way to remove a child out
12    of the home other than what was contained
13    within Chapter 70?
14 A  No.
15 Q  And when we talked earlier, you testified
16    about what efforts were made to locate files
17    of the CVAs.  What efforts were made, just
18    physical inspection?
19 A  Yes.
20 Q  Anything else?
21 A  No, we've -- we've just gone through the file
22    room.
23 Q  And are all the files in the file room?
24 A  Yes.
25 Q  Are there missing files?

1  A  It appears that there are some missing files.
2  Q  Do you know how many?
3  A  No.
4  Q  Do you know from what years?
5  A  No.  I do know that there was some from 2009
6     because that -- that just came up one day when
7     we were in the file room.
8  Q  How did you discover that there were missing
9     files?
10 A  We had a -- we had a list of cases, and we
11    were using that list to cross-reference and
12    check.
13 Q  And we talked earlier about staffings of these
14    CVAs.  Was Cindy Palmer ever present or did
15    you ever discuss the CVAs with her?
16 A  She was not present when we staffed these, and
17    I'm not sure that she was ever notified when
18    one was being done.  We consulted with our
19    attorney.
20 Q  And I know that you had received a subpoena,
21    and you were served with that subpoena on
22    February 5th; is that correct?
23 A  I've had it a while.
24 BY MS. JACKSON:
25    Your Honor, if I may approach?

1  (DEFENDANT'S EXHIBIT NO. 2 MARKED)
2  REDIRECT EXAMINATION RESUMED BY MS. JACKSON:
3  Q  I'm going to hand you what's been marked as
4     Defendant's 2 for identification purposes.  Is
5     that -- or do you recognize that rather?
6     (Tenders)
7  A  (Upon review)  Yes.
8  Q  And is that the subpoena with which you were
9     served?
10 A  Yes.
11 Q  And that was served on February 5th?
12 A  I guess.
13 Q  Or early February?
14 A  Yeah.
15 Q  And there was a list of documents that you
16    were asked to bring?
17 A  Yes.
18 Q  Did you bring those documents?
19 A  Yes.
20 BY MS. JACKSON:
21    Your Honor, at this time, I would ask that
22    those documents be turned over to the Court
23    for an inspection -- or for an in camera
24    inspection.
25 BY THE COURT:

1      Okay, do you have any response?
2  BY MR. MCKINNEY:
3      I don't know what he brought, Judge. So I
4      don't know whether I consent or object. Mr.
5      Hughes, what documents did you bring to court
6      pursuant to the subpoena?
7  BY THE WITNESS:
8      I have the entire case files from all of our
9      involvement with Shalees Greenlee and her
10     children.
11 BY THE COURT:
12     On the three children that there were prior
13     CPS history and on Alana ---
14 BY THE WITNESS:
15     Yes.
16 BY THE COURT:
17     --- the child that's subject to this ---
18 BY THE WITNESS:
19     Yes, that's correct.
20 BY THE COURT:
21     Okay, so basically the Department of Social
22     Services records on those four juveniles.
23 BY MR. MCKINNEY:
24     I don't think I have a dog in that fight.
25 BY THE COURT:

1      And we already have a protective order in
2      place. So then the Court can make an in
3      camera inspection.
4  (DEFENDANT'S EXHIBIT NO. 3 MARKED)
5  BY MS. JACKSON:
6      Your Honor, I don't have anything else.
7  RECROSS-EXAMINATION BY MR. MCKINNEY:
8  Q    Mr. Hughes, with respect to the Department of
9      Social Services files, are those files put on
10     microfiche?
11 A    The CPS files are not.
12 Q    So the files that you say are missing, those
13     files don't exist anywhere else; is that what
14     you're telling the Court?
15 A    That's what I'm saying.
16 Q    Okay, what documents that DSS has possession
17     of -- what documents are microfilmed?
18 A    I think they do -- I don't work in that
19     department, but I think they do things for
20     food stamps and Medicaid.
21 Q    Do you know why the CPS files are not
22     microfiched?
23 A    Well, the state is in the process of working
24     out what is referred to as NC FAST where
25     everything will become digital.

1  Q    Online?
2  A    Yes.
3  Q    Accessible?
4  A    Yeah, it's -- it's in the process of being put
5      in place now. So many counties are at
6      different times becoming active, and ours is
7      not scheduled until near the end of the year,
8      and it possibly could even be put off past
9      then.
10 Q    When you all transfer information -- this
11     particular case here, when you all transfer
12     information interoffice, is that done through
13     a network?
14 A    No, it's just -- I mean, there -- there can be
15     emails from -- from a social worker to a
16     supervisor, but we tend to copy any email and
17     put it in the file because we -- we have to
18     clear out our emails periodically as our --
19     you know, as it gets full.
20 Q    I did a bad job asking that question.
21 A    Okay.
22 Q    Are your computers at the Department of Social
23     Services networked? Do you understand what I
24     mean by that?
25 A    I'm not sure what you're wanting out of this.

1      So -- I mean, we're all tied together, but
2      (pause) ---
3  Q    You're all tied together, and you can access
4      Katie Johnson's files and Katie Johnson can
5      access your files?
6  A    No, no.
7  Q    Okay, why not?
8  A    It's not set up that way.
9  Q    So you're not networked?
10 A    We're not -- we're not networked, if that's
11     what you're asking.
12 Q    Okay. All right, so nobody in the Department
13     of Social Services can access your working
14     files except for you?
15 A    Correct.
16 BY MR. MCKINNEY:
17     That will be all my questions.
18 RE-REDIRECT EXAMINATION BY MS. JACKSON:
19 Q    So does the department use a file sharing
20     system?
21 A    We have recently set up to where the
22     supervisor can look at documentation from the
23     other social workers, but that has just been
24     recently set up, and that's all that we have
25     access to. Now, once the NC FAST system goes

1  on live, then we will be networking and have
2  access to basically anybody within the state.
3  Q   And do you use like any type of corporation or
4      program where the DSS files are downloaded to
5      -- to like a hard drive or something?
6  A   No.
7  Q   So it's just a paper file?
8  A   Yeah, it's just a paper file.
9  Q   Has there been any other effort to locate the
10     missing files?
11 A   We have looked in the file room.  We have
12     looked in all the offices.  We've tried to
13     turn up those -- those missing files, but --
14     but we haven't been able to find any.
15 Q   Is there any indication that those files were
16     kept at Mr. Lindsay's home office or office
17     here in town?
18 A   No.
19 Q   You've never been provided that information?
20 A   I've never been provided that information, and
21     I've never known any files to leave the office
22     with the exception of coming to court.
23 Q   So you've never known Mr. Lindsay to have to
24     leave the office to go get files from his home
25     office or from his office located in Murphy?

1  A   No, I'm not aware of that.
2  BY MS. JACKSON:
3      Okay.
4  BY MR. MCKINNEY:
5      I don't have any other questions.  Thank you,
6      Mr. Hughes.
7  BY THE COURT:
8      All right, Mr. Hughes, if you will, hand over
9      the file so I can ---
10 BY THE WITNESS:
11     Can I ask something about the -- the reporter
12     letters are still in the files.  We have
13     removed the reporter page from the reports,
14     but the letters that go out to the reporters
15     are still in the files.  So (pause) ---
16 BY MR. DAVID MOORE:
17     I think we would simply ask the Court that if
18     you deem that as a document that should be
19     produced that we would have the opportunity to
20     redact the reporter information.
21 BY THE COURT:
22     That's -- I mean, I'm the only one that's
23     going to see it.
24 BY THE WITNESS:
25     Oh, okay, okay.

1  BY MS. JACKSON:
2      I've actually marked those for identification
3      purposes.
4  BY THE COURT:
5      Why don't we make that a collective exhibit?
6  BY MS. JACKSON:
7      If I may approach?
8  BY THE WITNESS:
9      Okay, here's both.
10 BY MR. RON MOORE:
11     Is it the one child, the child we're here on,
12     and the other three all together in the other
13     file?
14 BY THE WITNESS:
15     I think the thinner file is for Alana, and the
16     other is for the other three.
17 BY MR. RON MOORE:
18     Your Honor, we call Cindy Palmer.
19 BY THE COURT:
20     All right.
21 BY MR. DAVID MOORE:
22     Your Honor, I'm going to -- I don't know what
23     grounds I've got here.  I'm not a party.  But
24     she is the director of Department of Social
25     Services.  She (inaudible) her official

1  capacity.  I'm not sure how her testimony is
2  relevant to a private custody action here.  I
3  understand Mr. Hughes' and the documents that
4  he was asked to produce.  So it is my concern
5  at this point in time -- it is not -- it's
6  obvious that there is -- there is other
7  litigation either pending or going to happen
8  with regard to the CVAs.  My concern is that
9  this is essentially turned into a discovery
10 deposition without the Department of Social
11 Services being able to defend itself or
12 represent itself.  So that's my objection to
13 Ms. Palmer and her testimony at this time.
14 BY THE COURT:
15     Response?
16 BY MR. RON MOORE:
17     Judge, I don't believe he has any standing to
18     object.  She's been subpoenaed as a witness.
19     He's not a party.  She's not a party.  She's
20     got a subpoena to bring some documents that
21     relate to what we just talked about, and we've
22     now found some documents are missing -- that
23     some files are missing.  So we're entitled to
24     explore things like that.  We also are asking
25     the Court to declare these unconstitutional or

1  illegal, the CVAs in this case, and I'm
2  entitled to explore what she knows about it,
3  what the policy is, what the procedure is, and
4  so I think she's a relevant witness.
5  BY MR. DAVID MOORE:
6      I just want to clarify the Department of
7      Social Services is not a party, correct
8  BY MR. RON MOORE:
9      You had a chance to be a party, but you chose
10     not to because you didn't -- you didn't go
11     file a petition in front of the Court.  You
12     should have been a party.  This -- yes, you're
13     not a party, that's correct.
14 BY MR. DAVID MOORE:
15     I'm not represented by counsel.
16 BY MR. RON MOORE:
17     Nor were the -- Ms. Greenlee or Mathieu or any
18     of the other people.
19 BY MR. DAVID MOORE:
20     I'm not able to cross-examine, correct?
21 BY MR. RON MOORE:
22     You're not a party.
23 BY MR. DAVID MOORE:
24     Okay.
25 BY MR. RON MOORE:

1      You have no standing to object to a witness.
2  BY THE COURT:
3      However, Mr. McKinney's client is a party.  So
4      I'm going to ask Mr. McKinney.  Just hang
5      tight, Mr. Moore.  Do you have a response?
6  BY MR. MCKINNEY:
7      Your Honor, my client finds himself having to
8      pay my law firm to come into court to try to
9      retain custody of the child that he thought he
10     had custody of under a document that had been
11     presented to him by the Cherokee County
12     Department of Social Services, and I think the
13     Court ought to hear why my client is in this
14     situation and why Your Honor is having to do
15     this now under these circumstances.
16 BY THE COURT:
17     Can I see all the attorneys at the bench?
18 (BENCH CONFERENCE)
19 BY MR. DAVID MOORE:
20     Your Honor, am I allowed up there, or are you
21     just chatting with these parties?  Because I
22     hear me being mentioned.
23 BY THE COURT:
24     I'm going to put what we said at the bench on
25     the record.  The Court is going to allow Ms.

1      Palmer to be called for the limited purpose --
2      I indicated at the bench this is not a fishing
3      expedition.  The Court has had the opportunity
4      to review the file.  There has not been a
5      motion to quash the file.  There has not been
6      a notice entered by an attorney on Ms.
7      Palmer's behalf.  There is a valid subpoena
8      subpoenaing her to court.  So I will allow her
9      to be called.
10 BY MR. DAVID MOORE:
11     That's fine, Your Honor.  I just -- I do want
12     it noted for the record that we are not a
13     party to the action.
14 BY THE COURT:
15     Absolutely.
16 BY MR. DAVID MOORE:
17     And we do not have the -- whether I had filed
18     a motion to quash or not, I would not have the
19     opportunity to cross-examine or to examine any
20     witnesses or to ---
21 BY THE COURT:
22     However, you are not Ms. Palmer's personal
23     attorney.
24 BY MR. DAVID MOORE:
25     I understand I'm not her personal attorney.

1      I'm here on behalf of the Department of Social
2      Services.
3  BY THE COURT:
4      I knew that.
5  BY MR. DAVID MOORE:
6      I just needed that as part of the record since
7      we are recording.
8  BY THE COURT:
9      Yes.
10 BY MR. DAVID MOORE:
11     Thank you.
12 BY THE COURT:
13     Ms. Palmer, please.
14     CINDY PALMER, being duly sworn to tell the
15 truth, the whole truth, and nothing but the truth
16 of her own knowledge concerning the within matter,
17 testified as follows:
18 DIRECT EXAMINATION BY MR. MOORE:
19 Q  Ms. Palmer, my name is Ron Moore.  Would you
20     state your name and where you work for the
21     record, please?
22 A  Cindy Palmer.  I work at the Department of
23     Social Services.
24 Q  And in what capacity?
25 A  Director.

1 Q How long have you been director?
2 A How long?
3 Q Yes, ma'am.
4 A Two and a half years.
5 Q And prior to that?
6 A I started in 1998 with the department.
7 Q As a social worker?
8 A I did, income maintenance and then social work
9   and then business officer.
10 Q And so you worked there for 19 years -- almost
11   20 years, two and a half as director? Did
12   that include interim director time also?
13 A No, I was interim director for about nine
14   months prior to that.
15 Q All right, and could you just tell us your
16   educational background?
17 A I have a bachelor's in business
18   administration.
19 Q Any post graduate?
20 A No.
21 Q All right, and I believe that -- I'm sure
22   you're familiar with 7B in the statutes and
23   the authority that a director has, that
24   basically you decide in cases how you proceed,
25   you have obligations under the law if you get

1   a report of abuse, neglect, or dependency, you
2   have to look into it, and then you have to
3   decide whether to close the case or whether
4   you proceed with the case, whether you open a
5   case, whether you file a petition, etcetera?
6 A Yes, sir.
7 Q All right, and I assume that you have to go
8   get training on a regular basis on terms of
9   what the law requires, if there are any
10   changes in the laws or things like that?
11 A Yes, sir.
12 Q And also your social worker supervisors have
13   to do a certain amount each year?
14 A Correct.
15 Q Do you receive training on issues in the law
16   such as how you're able to remove children
17   from their homes, what situations?
18 A Yes.
19 Q And is that a seminar -- have you been to some
20   seminars, or do you do it on webinar or
21   download things on the computer? How do you
22   do that?
23 A There are trainings that are required within
24   the first year, and it's part of those
25   trainings. So there's only one training if

1   they have changes in policy.
2 Q Okay, did it require training -- it required
3   training for you to become director the first
4   year also, I would assume; is that right?
5 A There is.
6 Q Different training?
7 A Yes.
8 Q All right, have you had training on the types
9   of methods that you can use to take children
10   out of the home?
11 A I have had legal basics -- it's been a few
12   years -- when I became a social worker. I've
13   also had legal basics for directors. They
14   didn't drill down specifically to that
15   information.
16 Q Now, you got there in 1998. What time frame
17   were you a social worker?
18 A I was a social worker for -- are you looking
19   for dates or a period?
20 Q Roughly.
21 A About two, two and a half years.
22 Q And were CVAs being used then when you were a
23   social worker?
24 A Not that I recall.
25 Q So about what year was that?

1 A 2007, 2008.
2 Q Right now the state also mandates training for
3   your workers, and they go and learn the same
4   types of things that you have. Do you share
5   information that you learn at these things
6   since obviously everybody can't go at the same
7   time?
8 A We do share information. If they -- if
9   there's new policy that comes about, we try to
10   get everybody into that training. But the
11   other training is required within the first
12   year.
13 Q Does your lawyer give you training at DSS? Do
14   they tell you about new trends or what the law
15   is?
16 A Yes.
17 Q Do you have some kind of staff trainings, or
18   how do you do that?
19 A We -- we try to schedule those certain times
20   based on what -- if new policy was coming out.
21   We don't have a set schedule for that, if
22   that's what you're asking.
23 Q No. Do you have records for the seminars that
24   everybody takes each year? Do you have to
25   keep records?

1 A   Yes, sir.

2 Q   Now, with regard to the training for your

3     lawyer, they have specialty training. Social

4     worker attorneys have a group, the Institute

5     of Government, give seminars. Do you keep

6     records for the ---

7 A   I do not specifically keep records of those.

8 Q   Did the DSS attorney in this case, Mr. Lindsay

9     -- did he turn in vouchers asking for

10    reimbursement for travel to seminars and

11    payment of these?

12 A   He would not turn those in directly to me, but

13    would have turned them in to the finance

14    office.

15 Q   Okay, so would that be paid by the county or

16    by the Department of Social Services?

17 A   They -- if it was a Social Services event, it

18    would come out of our budget, so out of our --

19    -

20 Q   You turn it in the same place; they just

21    allocate it to whichever budget that ---

22 A   Correct.

23 Q   Okay, thank you. And of course going back to

24    the authority of the director, basically the

25    DHHS puts out manuals that outlines all your

1     duties and your responsibilities kind of like

2     what we talked about earlier, and so can you -

3     - can you walk us through -- and let's take --

4     are you familiar with the Greenlee case, the

5     one we're here on today?

6 A   Yes.

7 Q   Could you walk us through how you would

8     respond in a case like that? You first get a

9     call -- I think we've heard testimony the gist

10    of which was here's a baby in the hospital

11    that may have some symptoms of being addicted

12    to drugs. What does the Cherokee Department

13    of Social Services do in a case like that?

14 A   We would send a worker out that will talk to

15    the family members if the child is of age. Of

16    course if it's a baby in a hospital, they

17    would not be, but -- you know, talk to all the

18    parties involved. We would then make a

19    decision as to whether or not that child was

20    safe to remain in that home. If not, we would

21    contact our attorney who would then contact a

22    judge to attempt to get a non-secure custody

23    order.

24 Q   All right, and in this particular case, have

25    you reviewed the file?

1 A   I have not specifically reviewed this file,

2     no. I have looked at pieces of it, but not

3     the entire file.

4 Q   We know no petition was ever filed. And are

5     you familiar with the custody agreements that

6     were involved in this case? There were a

7     couple of them.

8 A   Yes, sir.

9 Q   Have you reviewed it enough to know why a

10    petition was not filed?

11 A   Not specifically as to why a petition was not

12    filed. I do know that Ms. Greenlee had asked

13    for this agreement to be signed.

14 Q   All right, I have -- I have some portion of

15    the file that, since we represent Ms.

16    Greenlee, was provided. And I want to show

17    you -- it's a portion of it -- I think it's

18    eight pages -- and it's entitled, "In-Home

19    Family Services Agreement." When do you use

20    those, in what scenario?

21 A   Once the -- if -- if we substantiate the case,

22    it gets moved to in-home services, and at that

23    point they create those in-home service

24    agreements with the families in order to

25    correct the issues that caused our

1     involvement.

2 BY MR. RON MOORE:

3     Okay. Judge, are we on 4? Did you mark that

4     3?

5 BY THE COURT:

6     Yes, sir.

7 BY MR. RON MOORE:

8     Okay, thank you.

9 (DEFENDANT'S EXHIBIT NO. 4 MARKED)

10 BY MR. RON MOORE:

11    May I approach, Your Honor?

12 BY THE COURT:

13    You may.

14 DIRECT EXAMINATION RESUMED BY MR. MOORE:

15 Q   Let me show you what I've marked as

16    Plaintiff's -- or Defendant's Exhibit 4. I'll

17    just ask you to look at it. Does that look

18    like your in-home service agreement that you

19    use? (Tenders)

20 A   (Upon review) Yes, sir.

21 Q   And it's dated 10-14, 2016. Do you see that

22    on the top corner?

23 A   Yes.

24 Q   And this is an eight-page document? It's all

25    part of the in-home family services agreement;

1  is that right?
2  A  Uh-huh.  (Affirmative)
3  Q  All right, now, can you look at that and just
4     tell me what -- this is the front page.  So
5     what is -- what is happening here?  You have
6     Alana Roberts, the baby, and the birth date.
7     You have Ms. Greenlee and Mr. Roberts.  Of
8     course, Mr. Roberts was on the birth
9     certificate; are you aware of that?
10 A  Yes.
11 Q  Okay, there hadn't been a DNA test at that
12    point, or maybe that was about the time that
13    it was going on.  But Cody Roberts was
14    actually on the birth certificate, and then
15    Kathy Rogers apparently was the grandmother
16    that was helping with the baby; I assume
17    that's why she's listed?
18 A  She would have been involved in the
19    development of this plan.
20 Q  Okay, and as -- then your social worker is Ms.
21    Johnson?
22 A  Uh-huh.  (Affirmative)
23 Q  And so she writes, I guess, notes, "family
24    strengths and resources, strong relationship
25    and support, communication, sense of humor,

1     housing, transportation, support from extended
2     family; Cody and Shalees love their children."
3     Do you recognize that to be in Ms. -- I guess
4     Ms. Johnson's handwriting?
5  A  Yes.
6  Q  Okay, and then looking over -- and again some
7     of this says that they were going to have
8     urine tests and, you know, they've admitted to
9     using pills and stuff.  So you were, I guess,
10    coming to some agreement or -- I don't know
11    what you call it -- trying to get them to
12    straighten up their act?
13 A  Uh-huh.  (Affirmative)
14 Q  And so they're going to seek to get
15    employment.  But then you look over on Page --
16    I believe it's Page 5, and it talks about what
17    services are being provided, Medicaid, food
18    stamps -- is that WIC or ----
19 A  WIC, yes.
20 Q  Daycare, drug screens, kinship placement, case
21    management.  So case management, what does
22    that -- what does that entail?
23 A  It's the in-home services which is -- once
24    they're substantiated and they go into in-home
25    services, that is considered case management.

1  Q  Okay, and so is -- is that services that are
2     being provided?  You've actually got the child
3     on Medicaid and you're -- is that what that
4     means?
5  A  Uh-huh.  (Affirmative)
6  Q  All right, so then you -- you guys note -- or
7     Ms. Johnson noted, "Mr. Mathieu is the
8     biological father but has no custody rights.
9     Shalees signed a temporary guardianship
10    agreement for Alana.  Alana currently with
11    Michael and his family."  So this is dated 10-
12    14.  And there was testimony earlier, I think,
13    when Mr. Mathieu testified ---
14 BY MR. RON MOORE:
15    Your Honor, do we have Exhibits 1 and 2?
16 BY THE COURT:
17    The clerk has the exhibits.
18 BY MR. RON MOORE:
19    Okay, thank you.
20 DIRECT EXAMINATION RESUMED BY MR. MOORE:
21 Q  So looking at Plaintiff's Exhibit 2, you see
22    that there was a temporary guardianship
23    agreement.  Do you see that?  (Tenders)
24 A  (Upon review)  Yes, sir.
25 Q  And again, you weren't here, but the gist of

1     it was apparently Ms. Greenlee found it on the
2     internet, and she and Mr. Mathieu went to
3     Quick Lube or somewhere and got a notary to
4     execute it.  So that was on the 6th of
5     October.  So the document I've asked you about
6     what we've been talking about, Defendant's
7     Exhibit 4, that's dated eight days later, 10-
8     14.  And under the services you're providing,
9     you note, "What will happen if the child
10    safety is no longer assured?  The department
11    will file a juvenile petition and take case to
12    juvenile court."  And then at the end, it
13    says, "Under what circumstances will the
14    agency and services" -- "end services and
15    close the case?  When the case plan has been
16    successfully completed and no safety concerns
17    exist regarding Alana being in the physical
18    area of Cody and Shalees."  So they've agreed
19    to share custody.  Eight days later, your
20    report says you will file a juvenile petition
21    and -- and then six weeks later, people from
22    your office go to the -- or have Shalees come
23    to the Department of Social -- no, they go to
24    Shalees' house and have her sign a CVA.  Now,
25    any idea why you didn't file a petition in

1  this case?
2  A  It was my understanding that Ms. Greenlee at
3     that point had asked for the CVA.  She wanted
4     to sign over custody to Mr. Mathieu.
5  Q  Okay, well, now, here's a baby that's in
6     distress clearly because it was born into the
7     world with some -- apparently some problems
8     with drug abuse.  I mean, isn't that the kind
9     of case that Social Services designed to help?
10 A  Yes, sir.
11 Q  So, again, why would you let her give the
12    child to somebody who may not have any ability
13    to help a kid like that?
14 A  I was not specifically involved in that
15    conversation.  So I can not attest to what Ms.
16    Johnson's thinking was on that case.
17 Q  Nobody has talked about it since this came to
18    light?
19 A  Well, we've talked about the fact that -- Ms.
20    Johnson is no longer in the agency.  So we --
21    I have not specifically talked to her about
22    it, no.
23 Q  All right, well, let's talk about the CVAs.
24    Can you tell us what you know about the use of
25    CVAs at the Cherokee County Department of

1  Social Services?
2  A  More specifically?  I'm not sure what you're
3     asking.
4  Q  When was the first time you ever heard of one?
5  A  The first time I ever recall hearing of one
6     was December 6, 2017, when I received a call
7     from Mr. Lindsay about a similar agreement.
8  Q  That was when Ms. Jackson had called Mr.
9     Lindsay because she had come upon one in this
10    case?
11 A  Not this case, no.
12 Q  No, actually Hogan case?
13 A  Yes.
14 Q  Now, you were familiar with the Hogan case?
15 A  Was I at the time or am I now?
16 Q  No, were you -- you had had some contact with
17    the Hogan case?
18 A  I had not had contact with the Hogan case as
19    of December 6th, no.
20 Q  When Judge Sellers signed an order giving Mr.
21    Hogan ----
22 BY THE COURT:
23    Move on.
24 DIRECT EXAMINATION RESUMED BY MR. MOORE:
25 Q  Going back to the -- so you didn't know

1  anything about any CVAs prior to December?
2  A  Not that I recall, no.
3  Q  Do you ever sit in on the staff meetings?
4  A  I do occasionally.  I had not been sitting in
5     on them as of late ----
6  Q  Mr. Lindsay was here earlier this morning.
7     He'll be here shortly.  I think I heard him
8     say that he had found 30 CVAs that he's
9     prepared to, I guess, turn over in response to
10    a subpoena.  How many have the Department of
11    Social Services found?
12 A  That have been executed?  I can't say
13    specifically, but -- it depends on whether
14    you're looking at actual cases or if you're
15    looking at children.  There's about 25 that
16    have been executed that I have located.
17 Q  And again, can you help me distinguish between
18    children and ----
19 A  Well, there are some that involve more than
20    one child.  So I don't know if his number is,
21    you know, specific between children.
22 Q  The ones you've found, each child has their
23    own CVA; is that what you're saying?
24 A  No, not always.
25 Q  So you're saying you don't know if he's

1  counting the family CVA or if he's counting
2  the child?
3  A  Correct.
4  Q  Okay.  All right, so after -- after the CVA
5     came to light in the Hogan case, the State
6     Department of Health and Human Services was
7     notified, and I believe you got a letter?
8  A  Yes, sir.
9  Q  And subsequently, they indicated that they
10    were going to investigate.  And what, if
11    anything, were you directed to do in terms of
12    trying to get information for them?
13 A  I received a list from the state of cases for
14    the past ten years, and I and my staff had
15    gone through all of those cases and attempted
16    to locate any CVAs that are involved.
17 Q  And that's where you came up with the number
18    that ----
19 A  Yes, sir.
20 Q  Now, there was never any discussion amongst
21    your social workers asking you about whether
22    they should be using CVAs?
23 A  Not that I recall.
24 Q  So you had never heard of CVAs until December?
25 A  Correct.

44 (Pages 170 to 173)

| | |
|---|---|
| 1 Q | How could 20 or 30 be executed and you not |
| 2 | know anything about it? |
| 3 A | Well, a lot of them were even before I became |
| 4 | director, and they don't come to me with every |
| 5 | case. I -- I don't handle or see or discuss |
| 6 | every case with them. |
| 7 Q | Now, in order to get paid in cases, you have |
| 8 | some kind of billing code, is that correct --- |
| 9 A | Uh-huh. (Affirmative) |
| 10 Q | --- which pot of money that your refund comes |
| 11 | out or whatever? How would you code a CVA? |
| 12 A | We don't code -- coding is based on what |
| 13 | service they're providing, like 210 is |
| 14 | investigation, 215 is case management. So we |
| 15 | have different funding sources that go along |
| 16 | with those. |
| 17 Q | So, again, in this case, it would have been a |
| 18 | 215. So it was -- what did you say, in-homes? |
| 19 A | In-home services. |
| 20 Q | Home service? |
| 21 A | Yes, case management and home services. |
| 22 Q | All right, have any of your social workers |
| 23 | talked to you about the use of CVAs since |
| 24 | December? |
| 25 A | We've had some discussions about them, yes. |

| | |
|---|---|
| 1 Q | Did Mr. Lindsay ever tell you how they got |
| 2 | started with those there? |
| 3 A | Yes, he said that he received the agreement |
| 4 | from some workshop or training that he went to |
| 5 | many years ago. |
| 6 Q | And did -- did you find out the procedure that |
| 7 | he used? Because apparently he created a |
| 8 | template that your -- your folks could fill in |
| 9 | the names and the dates of birth and he would |
| 10 | review them. |
| 11 A | Yes. |
| 12 Q | Is that basically the procedure? |
| 13 A | Yes. |
| 14 Q | And you had never heard of that either? |
| 15 A | No. |
| 16 Q | Now, Mr. Lindsay was the attorney for Social |
| 17 | Services as well as the county. Did he have |
| 18 | an office in Social Services' space? |
| 19 A | Yes, sir. |
| 20 Q | Did he have a Social Services computer? |
| 21 A | Yes, sir. |
| 22 Q | Did he ever do work at home that you know |
| 23 | about, exchanging information? |
| 24 A | Not that I'm aware of. |
| 25 Q | So your workers -- well, have you since found |

| | |
|---|---|
| 1 | out that your workers would email these to him |
| 2 | sometimes for his approval? |
| 3 A | Yes. |
| 4 Q | Do you know whether all that was done when he |
| 5 | was in the Social Service building or was he |
| 6 | in the county building or was he at home or |
| 7 | did he have an office? |
| 8 A | I would imagine a lot of it was done during |
| 9 | the day where he would have either been at his |
| 10 | office at Department of Social Services or in |
| 11 | the courthouse office. |
| 12 Q | Is the courthouse office -- is that the county |
| 13 | attorney office? |
| 14 A | Yes. |
| 15 Q | Now, did he also have a computer that belonged |
| 16 | to the Department of Social Services? |
| 17 A | That belonged to the county. |
| 18 Q | Okay, assigned to Social Services? |
| 19 A | Well, he used it for both. He didn't have |
| 20 | separate computers. |
| 21 Q | Okay, and where was that located? |
| 22 A | It was a laptop, and he carried it back and |
| 23 | forth. |
| 24 Q | So he carried it home and may have worked on |
| 25 | it from there also? |

| | |
|---|---|
| 1 A | (Affirmative nod) |
| 2 Q | Okay, so he had no computer at home, just -- |
| 3 | okay. |
| 4 A | I have no idea. |
| 5 Q | All right. Okay, did -- in your search for |
| 6 | trying to find the CVAs, were you able to look |
| 7 | into the information on his computer? |
| 8 A | Our county IT has. |
| 9 Q | Okay, and did -- how many did they find on his |
| 10 | computer? |
| 11 A | I don't have that information. |
| 12 Q | Okay, what --- |
| 13 A | He had sent me the ones that he had drafts of, |
| 14 | and we found a lot of them -- the drafts in |
| 15 | his office that were printed that had not been |
| 16 | signed. |
| 17 Q | Were those the ones yet to be used, or were |
| 18 | those just copies of the ones that were |
| 19 | actually signed? |
| 20 A | Copies of ones that were actually signed. |
| 21 Q | But then you were able to go into the file and |
| 22 | find --- |
| 23 A | The signed copy, correct. |
| 24 Q | In every case? |
| 25 A | Not every case. Some cases, there was a draft |

45 (Pages 174 to 177)

1    copy, but it may have been a POA that was
2    signed and not actually a CVA, power of
3    attorney.
4  Q  Do you provide power of attorneys for people
5    to sign? I'm just curious.
6  A  Mr. Lindsay did.
7  Q  All right. Now, in this particular case ---
8    and let me just say Mr. Mathieu presented
9    himself very well today, as did Ms. Greenlee.
10   What type of assessment would be done in a
11   case like this where you had a case open where
12   Ms. Greenlee had done, I think, the temporary
13   placement agreement? You file says you're
14   thinking about filing a petition if there's
15   any problems, and then she wants to sign or --
16   or she wants to give him custody ---
17 BY THE COURT:
18   Mr. Moore, I'm sorry, can you ask a question?
19 BY MR. RON MOORE:
20   Yes, ma'am.
21 BY THE COURT:
22   I mean just ask a question.
23 BY MR. RON MOORE:
24   Sure.
25 BY THE COURT:

1    Get to the heart of it ---
2  BY MR. RON MOORE:
3    Sure.
4  BY THE COURT:
5    --- for me, please.
6  BY MR. RON MOORE:
7    Sure. Give me a moment. I lost ---
8  DIRECT EXAMINATION RESUMED BY MR. MOORE:
9  Q  Oh, in a situation like that, what would --
10   what would the Department of Social Services
11   do in order to make sure that the custody
12   agreement that she was signing was -- or had
13   the child going to a good environment?
14 A  If we do -- if we do the actual placement,
15   then we go into the home to do a kinship study
16   -- kinship assessment where we go and look at
17   the house and do background checks on the
18   family members.
19 Q  There was testimony earlier today that there
20   wasn't any type of stuff like that in this
21   case done.
22 A  In this case, there probably was not since the
23   CVA was signed rather than us placing the
24   child with someone else.
25 Q  So even though you created the CVA, you don't

1    do any kind of background to see if you're
2    sending the child to a good place?
3  A  Best practice would be yes, we would.
4  Q  Yes, you would look at it?
5  A  We would do background checks, yes.
6  Q  And what about -- how do you deal with
7    offering services when you place a child into
8    a new family environment, you know, whether
9    it's medical or whether it's food stamps?
10 A  If we do the kinship assessment or the way it
11   was done with the CVA?
12 Q  Well, again, you placed the child via the CVA.
13 A  If we do a kinship placement, then we go into
14   the home and do the checks. I'm not -- I'm
15   not sure I understand what you're asking.
16 Q  Well, it would appear in this case that the
17   CVA was executed and Mr. Mathieu or Ms.
18   Greenlee or the juvenile never heard from
19   Social Services again, and I'm asking you --
20   there apparently is no vehicle for you to
21   follow up, is that correct, when you use a
22   CVA?
23 A  Not with the CVAs. If we do a kinship
24   placement, then we continue to work with that
25   parent who the child was removed from to

1    complete the assessments or whatever they have
2    put in -- in this agreement.
3  Q  Can you tell me in a situation like this case
4    where the mother is asking to place the child
5    with the father -- the biological father, why
6    you wouldn't do a kinship placement there so
7    you could provide services?
8  A  Provide services to ---
9  Q  The child or new family. I mean, you have a
10   child that is a baby with drug problems at the
11   time she is born.
12 A  The best example that I can give is if -- if
13   someone is arrested and that -- that person
14   calls Grandma or biological dad or whoever to
15   come and get that child. They have that right
16   to make that placement without our
17   involvement. That's kind of what Ms. Greenlee
18   did. She made that decision to place the
19   child with the biological father.
20 Q  But you did get involved?
21 A  Well, we were involved, yes.
22 Q  And again ---
23 A  We did not force her to make that.
24 Q  Right, but you had a case file on the baby,
25   knowing the baby had issues. So why wouldn't

46 (Pages 178 to 181)

1    you say, "Well, let's do a kinship placement
2    so we can provide services to that client or
3    child"?
4  A  Typically, that -- that is what we do.
5  Q  Well, you've got 20-some CVAs, and in each of
6    those you wouldn't have provided any services;
7    would you?
8  A  There were no services provided when the CVA
9    was signed.
10  Q  So, again, can you tell me why that would not
11    -- would not have been the better practice to
12    -- let's do a kinship agreement?
13  A  Looking back, it was -- it is the better
14    practice, but we were acting upon what our
15    attorney said to do in a situation where Ms.
16    Greenlee wanted to voluntarily allow the child
17    to go to its biological father.
18  Q  And when you have a case like where -- like in
19    this case where you have a legal father who's
20    on the birth certificate and a biological
21    father who has not been legitimized at the
22    time, how do you handle that?  I mean, what's
23    -- you know, Mr. Roberts was not asked to sign
24    the CVA, and he's, under North Carolina law,
25    the legal father.  So why was he not involved?

1    Why didn't you seek the help to legitimize ---
2  A  Again, I wasn't involved in those
3    conversations, so I don't -- I can't answer
4    that question.
5  Q  So, again, these kinds of things aren't talked
6    about at staff meetings?
7  A  They may have been, but I -- I wasn't
8    necessarily at that staff meeting.  Sometimes
9    they are just discussed one-on-one between the
10    supervisor and the social worker and not
11    actually in a staff meeting.
12  Q  Now, when DSS came in after this case raised
13    its head in December, did they do an
14    investigation?
15  A  DHHS?
16  Q  Yes, ma'am.
17  A  They have sent me the list of cases to go
18    through, and I have sent them the information
19    that I have.  So they're in the process of an
20    investigation, but they're not -- that has not
21    been completed.
22  Q  Does DSS come in and do random audits?
23  A  They do.
24  Q  Well ---
25  A  Well, audits is not the right term, but ---

1  Q  Were there -- were there -- anything they
2    could look at to see that CVAs were being used
3    in cases?  Is there any kind of list or code
4    or anything?  Or did they just happen to have
5    an open file that had one in it and discovered
6    it?
7  A  They would have just needed to open a file to
8    see one in it.
9  Q  And when you got the letter from DHHS saying
10    that this is against policy and law, what did
11    you do?
12  A  I told the social workers -- I had already
13    told the social workers not to be using that
14    agreement.
15  Q  And did you have discussion with Mr. Lindsay?
16  A  Yes.
17  Q  And what did he say about using it?
18  A  He said as far as he's concerned that he
19    thinks they are legal agreements.
20  Q  Now, have you reviewed the cases that you have
21    found?  Have you looked in the cases to see --
22    --
23  A  I have looked in them.  I haven't, per se,
24    reviewed them because I haven't had time, but
25    (pause) ----

1  Q  There has been some discussion.  Apparently,
2    some of the folks who worked there in the past
3    indicate that maybe cases that were weak or
4    you didn't have enough information to ---
5  BY THE COURT:
6    Mr. Moore, I'm going to ask you to move on to
7    what we have here before us today.
8  BY MR. RON MOORE:
9    Okay.  May I have just a moment, Your Honor?
10    That's all, Your Honor.  Thank you, ma'am.
11  BY MR. MCKINNEY:
12    Mr. Moore, I don't know if you offered those
13    documents that were shown into evidence or
14    not.
15  BY MR. RON MOORE:
16    I have not, but I would.  I don't think we've
17    offered -- State's Exhibit 3 ----
18  BY THE COURT:
19    Four.
20  BY MR. RON MOORE:
21    Four, sorry.
22  BY THE COURT:
23    So you are asking it to be admitted into
24    evidence?
25  BY MR. RON MOORE:

828-254-9230      ASHEVILLE REPORTING SERVICE      800-357-5007
ars@ashevillereporting.com

1    Yes, ma'am.
2 BY THE COURT:
3    Any objection?
4 BY MR. MCKINNEY:
5    No objection, Your Honor.
6 BY THE COURT:
7    So admitted.
8 (DEFENDANT'S EXHIBIT NO. 4 ADMITTED)
9 CROSS-EXAMINATION BY MR. MCKINNEY:
10 Q    Ms. Palmer, after you were informed by the
11    state department in Raleigh that these
12    documents that the Cherokee County Department
13    of Social Services had been using were not
14    legally binding documents, did you notify --
15    did your department notify my client, Michael
16    Mathieu, of such fact?
17 A   We have not notified anyone at this point.
18 Q   And when did you find out that a CVA had been
19    used to close the Alana Roberts file?
20 A   I don't specifically remember the date, but
21    Ms. Greenlee came into the office to talk
22    about it after she had been contacted by Ms.
23    Jackson.  And that was the date that we had
24    the discussion with her, and I found out that
25    it had been executed in this case.

1 Q    Was that -- was that December?
2 A    It would have been late December.
3 BY MR. MCKINNEY:
4    I don't have any further questions, Your
5    Honor.
6 BY THE COURT:
7    Mr. Moore.
8 BY MR. RON MOORE:
9    Nothing further.
10 BY THE COURT:
11    Thank you, Ms. Palmer.  You may step down.
12 BY MR. RON MOORE:
13    Scott Lindsay, Your Honor.
14 BY THE COURT:
15    Sheriff, if you will, bring Mr. Lindsay in.
16    Before we proceed with Mr. Lindsay's
17    testimony, we'll take about a five-minute
18    break.
19 BY MR. RON MOORE:
20    Thank you, Your Honor.
21 (OFF THE RECORD)
22 BY THE COURT:
23    I'm ready when you're ready.
24 BY MR. RON MOORE:
25    Yes, ma'am.  Judge, one bit of housekeeping.

1    I asked Mr. Moore -- Ms. Palmer, I think, was
2    supposed to bring a list of names and -- Mr.
3    Moore indicates on a flash drive that he's
4    going to print off a copy and provide the
5    Court -- I'll get that on the record.
6 BY MR. DAVID MOORE:
7    We will tender those to the Court after the
8    Court has signed that protective order for the
9    in camera ---
10 BY THE COURT:
11    And it's already -- it's already been signed.
12 BY MR. DAVID MOORE:
13    We'll provide this to the Court, thank you.
14 BY THE COURT:
15    Thank you, Mr. Moore.
16 BY MR. RON MOORE:
17    And now we call Mr. Lindsay, Your Honor.
18 BY THE COURT:
19    All right, before Mr. Lindsay takes the stand,
20    I want to speak with counsel at the bench.
21    Just -- Mr. Lindsay, just have a seat for just
22    a moment.
23 (BENCH CONFERENCE)
24    SCOTT LINDSAY, being duly sworn to tell the
25 truth, the whole truth, and nothing but the truth

1 of his own knowledge concerning the within matter,
2 testified as follows:
3 DIRECT EXAMINATION BY MR. MOORE:
4 Q    Would you state your name for ---
5 A    My full name is Ronnie Scott Lindsay.
6 Q    Mr. Lindsay, you were served a subpoena, and I
7    believe you brought some documents to provide
8    the Court concerning some CVAs that you -- you
9    found?  Could you describe what you have
10    brought before the Court?
11 A    Approximately 30 custody visitation
12    agreements.  They're all blank.  They're --
13    none of them are signed.  They're just what I
14    had.
15 Q    Were those copies of some that have been
16    signed?
17 A    I have no copies that have been signed.
18 Q    No, I'm saying:  Were those copies of some
19    that were actually signed?  Is that what
20    you're saying?
21 A    I believe so, yes.
22 Q    All right, and what time period?
23 A    They would have been from July 1, 2014,
24    through -- I'm not sure of the last date, but
25    my last date at DSS was January 10, 2018.

1   There are none in here that were done in 2018.
2   The last one would have been done in late
3   2017.
4   BY MR. RON MOORE:
5       And, Judge, we would ask the Court to take
6   possession of those since they're -- they're
7   the CVAs from -- that he has found.  I don't
8   know if we should mark the exhibit -- I'll put
9   in here ---
10  BY MR. MCKINNEY:
11      I have no objection.
12  BY THE COURT:
13      No objection?  Since I -- this would be also
14  included into what I'll make an in camera
15  inspection on, I'm just going to include it in
16  Defendant's No. 3.
17  BY MR. RON MOORE:
18      Thank you, Your Honor.
19  DIRECT EXAMINATION RESUMED BY MR. MOORE:
20  Q   And, Mr. Lindsay, could you for the record
21      state your place of employment prior to
22      January the 10th, 2018?
23  A   From July 1, 2014, through January 10, 2018, I
24      was full-time county attorney with duties
25      assigned to represent the Department of Social

1       Services.
2   Q   And prior to that, you had worked part-time on
3       retainer or contract?
4   A   I was on retainer for the county and hourly
5       for the Department of Social Services.
6   Q   In what time period did you do DSS work?
7   A   I'm not sure of the exact date, but it was
8       either late -- well, 1999, early 2000s.
9   Q   And turning your attention to -- and in this
10      case, we're talking about the Greenlee case.
11      Do you have some familiarity with that case?
12  A   Only that there's an agreement.  I don't know
13      the parties or the individuals involved in it.
14  Q   All right, could you explain for us how the
15      CVA came into being at the Cherokee County
16      Department of Social Services?
17  A   Looking at it, it appears that it was drafted
18      by a social worker supervisor.  It was -- the
19      normal course was they would have sent that to
20      me to review and make changes if necessary.
21      After that, I didn't see the agreements again.
22  Q   It would be sent to you by email?
23  A   For the -- yes.
24  Q   Is that a DSS email that ---
25  A   It was a county email system.

1   Q   So you just had one address?
2   A   Yes.
3   Q   But you were also full-time county attorney?
4   A   Yes.
5   Q   Now, what is the origin of the CVA agreement?
6       I mean not -- how did you develop it or -- you
7       developed it, I take it?
8   A   Yeah, I was at a CLE and -- I'm not sure what
9       the date was, but it would have been 2010 or
10      2007, perhaps earlier.  I just got a form or a
11      copy from another attorney, and we started
12      using that -- or I started using that.  And at
13      some point -- and I'm not sure at what point -
14      - it was -- I gave the form or the form was
15      taken by a supervisor or someone at DSS
16      because -- they had the form themselves
17      because at some point they started sending
18      forms to me with names and dates and --
19      already filled in.
20  Q   And like -- in a case like the one in this
21      case, the Greenlee one, was there some
22      discussion that you would have with the social
23      workers or supervisors or anybody about this?
24  A   On some of them I did, yes.
25  Q   Who would you talk to?

1   A   Whoever the supervisor was at that time.
2       Sometimes a social worker, but -- on this --
3       on this particular case, I -- if I would have
4       spoke to anybody, I would have spoke, I think,
5       with David Hughes who was the -- I don't know
6       if he was a supervisor at that time or not,
7       but I would have spoke to him.
8   Q   What about Ms. Palmer?  Did you have
9       conversations with her about the CVAs?
10  A   Only two.  Not this one.
11  BY MR. DAVID MOORE:
12      I'm not sure where attorney-client privilege
13      comes in.  At some point in time, somebody is
14      going to have to make an objection with his --
15      as the attorney for the department, whether or
16      not Ms. Palmer was the director at the time or
17      not -- I don't know when and where, but I just
18      had to say something for this proceeding.
19  BY THE WITNESS:
20      I did not have any discussion with Ms. Palmer
21      on this agreement.
22  DIRECT EXAMINATION RESUMED BY MR. MOORE:
23  Q   But to others ---
24  BY THE COURT:
25      Move on.

1  BY THE WITNESS:
2      Yes.
3  BY THE COURT:
4      Move on.
5  DIRECT EXAMINATION RESUMED BY MR. MOORE:
6  Q   Now, did you at some point or different times
7      -- did you give, for lack of a better word,
8      education about how to handle these CVAs or
9      how to address people who wanted them or how
10     to effectuate them?
11 A   To whom?  To ---
12 Q   To the people that worked with you.
13 A   I don't have -- I don't have a recollection of
14     a specific gathering of people where we
15     talked.  We did talk at some point in CPS
16     staffings which took place usually on a weekly
17     basis, most of which I attended, some which I
18     did not.  Sometimes the information came that
19     the folks didn't want to sign or had
20     questions.  My advice was they needed to
21     contact an attorney.  I would not speak with
22     them.  I could not speak with them or advise
23     them.  They needed to get an attorney if they
24     had questions.
25 Q   Now, in the Greenlee case, there was a baby

1      who had been born with symptoms of being
2      addicted to drugs, and DSS opened a case and
3      there was some indication in the file that
4      there might be a petition filed.  Ms. Greenlee
5      had done a custody ---
6  BY THE COURT:
7      Ask a question, please, Mr. Moore.
8  DIRECT EXAMINATION RESUMED BY MR. MOORE:
9  Q   Why in a case like the Greenlee case would the
10     department not file a petition?
11 A   I don't know.
12 BY MR. DAVID MOORE:
13     I don't when ---
14 BY THE COURT:
15     Okay.
16 BY MR. DAVID MOORE:
17     I am -- on behalf of the department, I'm
18     involving attorney-client privilege in this
19     specific case with this individual.
20 BY THE COURT:
21     I need to see counsel at the bench.  Mr.
22     Lindsay, step down.  No, I want to see you in
23     chambers.
24 BY THE WITNESS:
25     Does that mean I can stay?

1  (OFF THE RECORD)
2  BY THE COURT:
3      After conferring with counsel in chambers, I
4      will put on the record the Court has in the
5      Court's possession the documents that Mr.
6      Lindsay was asked by subpoena to bring for the
7      Court to look at for in camera review as well
8      as the documents that were provided by Mr.
9      Hughes from the Department of Social Services.
10     The Court informed counsel that we would
11     continue the questioning with Mr. Lindsay in
12     specifics to the case before the Court today
13     and no other proposition.  Are there any
14     further questions, Mr. Moore?
15 BY MR. RON MOORE:
16     I have one question, Your Honor.
17 BY THE COURT:
18     Yes, sir.
19 DIRECT EXAMINATION RESUMED BY MR. MOORE:
20 Q   The CVAs that you brought today and turned in
21     to the judge, did that file include the CVA in
22     the Greenlee case?
23 A   It does.
24 Q   Where did you find that?
25 A   It was -- the form, it was on my computer.

1  Q   Personal computer?
2  A   Yeah.
3  Q   Sir?
4  A   The county computer which I was assigned was
5      subsequently -- I am in the process of
6      purchasing from the county, but it's there.
7  BY MR. RON MOORE:
8      Thank you, sir.  No further questions, Your
9      Honor.
10 BY THE COURT:
11     Mr. McKinney, do you have questions?
12 BY MR. MCKINNEY:
13     I have no questions.
14 BY THE COURT:
15     All right, Mr. Lindsay, you may step down.  Do
16     you have any other questions?
17 BY MR. RON MOORE:
18     No, ma'am.
19 BY THE COURT:
20     Any further evidence, Mr. Moore?
21 BY MR. RON MOORE:
22     No, ma'am.
23 BY THE COURT:
24     Any further evidence, rebuttal?
25 BY MR. MCKINNEY:

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@ashevillereporting.com

1    No, Your Honor.
2  BY THE COURT:
3    I have a number of documents that I'm going to
4    have to make an in camera inspection of.
5    Procedure for time purposes, if you all will
6    approach.
7  (BENCH CONFERENCE)
8  BY THE COURT:
9    All right, we're going to be at ease until
10    about 4:30 so that the Court can review any
11    documentation that's been presented.
12  BY MR. RON MOORE:
13    Judge, Ms. Jackson went to see if she could
14    make a copy of the list of ---
15  BY THE COURT:
16    That fine.  Somebody can bring it to me in
17    chambers.
18  BY MR. RON MOORE:
19    Thank you, Your Honor.
20  BY MR. DAVID MOORE:
21    Your Honor, unless you need me any further,
22    may I be excused?
23  BY THE COURT:
24    You may.  Mr. Moore, will there be somebody
25    here for these records?

1  BY MR. RON MOORE:
2    Which ---
3  BY THE COURT:
4    DSS records that I have.
5  BY MR. RON MOORE:
6    What about ---
7  BY THE COURT:
8    Well, I'm going to make an in camera
9    inspection of these in the back.
10  BY MR. RON MOORE:
11    We need to get ---
12  BY MR. WIJEWICKRAMA:
13    Your Honor, we have one other issue.  Your
14    Honor, if we're on the record, may we please
15    be allowed to dismiss the witnesses?
16  BY THE COURT:
17    You may.
18  BY MR. WIJEWICKRAMA:
19    Thank you.
20  (OFF THE RECORD)
21  BY MR. MCKINNEY:
22    Your Honor, the parties have entered into a
23    temporary custody arrangement in this case by
24    memorandum of judgment.  The parties have
25    signed it along with counsels.  The substance

1    of the agreement is Plaintiff shall have
2    temporary custody of the minor child, Alana
3    Roberts, subject to temporary visitation
4    rights of the defendant for seven hours each
5    Sunday for the next three months.  The
6    defendant's visitation shall be supervised by
7    the defendant's grandmother at the home of the
8    grandmother.  This matter shall be reviewed at
9    the next session of district court after June
10    1, 2018.  All the defendant's visitation under
11    this order is contingent on the defendant
12    submitting to a five-panel urine and hair drug
13    screen and the results being negative for the
14    presence of illegal drugs for drugs for which
15    the defendant does not have a prescription.
16    The parties waive child custody mediation.
17    The defendant shall submit to the drug test
18    within seven days of the execution of this
19    memorandum of judgment at Alpha Drug Testing
20    in Blairsville, Georgia.  The test shall be
21    paid for by the plaintiff, and the results
22    shall be sent to counsel for the plaintiff and
23    the defendant.  That's the substance of that -
24    ---
25  BY MS. JACKSON:

1    That is correct, Your Honor.  I have signed.
2    My client has signed as well.
3  BY THE COURT:
4    And, Mr. McKinney, you and your client have
5    signed as well?
6  BY MR. MCKINNEY:
7    Yes.
8  BY THE COURT:
9    And Mr. McKinney, will you be typing this up
10    into a formal ---
11  BY MR. MCKINNEY:
12    Yes, Your Honor.
13  BY THE COURT:
14    --- judgment to present back to Ms. Jackson --
15    -
16  BY MR. MCKINNEY:
17    Yes, Your Honor.
18  BY THE COURT:
19    --- in reference to this case?
20  BY MR. MCKINNEY:
21    I will.
22  BY THE COURT:
23    Ms. Jackson, I believe that that only leaves
24    left for the Court to make the determination
25    in the declaratory judgment ---

51 (Pages 198 to 201)

## Page 202

1  BY MS. JACKSON:
2      Correct, Your Honor.
3  BY THE COURT:
4      --- as well as the issue for the designation
5      of a 2.1 judge?
6  BY MS. JACKSON:
7      That is correct, Your Honor.
8  BY THE COURT:
9      At present, the Court is going to take both of
10     those matters under advisement and will be
11     presenting an order to the parties.
12 BY MS. JACKSON:
13     Do you want to hear arguments?
14 BY THE COURT:
15     Does anyone want to hear -- does anyone want
16     to put anything in particular on the record in
17     reference to those matters?
18 BY MR. RON MOORE:
19     I don't think so.
20 BY THE COURT:
21     After -- after the Court had the opportunity
22     for about a 45-minute break to review
23     Defendant's No. 3, I did not get the
24     opportunity to review all of those records
25     within its entirety.  Therefore, the Court

## Page 203

1      feels that it would be premature to make a
2      decision on either one of those matters.
3      There's a number of documents within
4      Defendant's No. 3 that has information that
5      can't be provided to the parties because it
6      will need to be redacted under the protective
7      order and under statute, as well as there were
8      a number of proposed CVAs that Attorney Scott
9      Lindsay presented to the Court today due to
10     subpoena, and the Court needs to make further
11     inquiry of the documentation that was
12     presented here today before making a final
13     judgment in reference to those two particular
14     prongs that are still outstanding as
15     counterclaims.  Anything further for the
16     parties?
17 BY MS. JACKSON:
18     Your Honor, my only other request would be --
19     or a question rather to the Court:  Is a copy
20     of those CVAs going to be provided to counsel?
21 BY THE COURT:
22     The clerk is in the --- the clerk is making
23     copies of those right now.  It is my
24     understanding that Mr. Lindsay complied with
25     the subpoena today.  So those will be

## Page 204

1      presented here shortly.
2  BY MS. JACKSON:
3      Thank you, Your Honor.  You're going to take
4      that under advisement on those?
5  BY THE COURT:
6      No, this is the other one.
7  BY MS. JACKSON:
8      Okay, okay.
9  BY MR. MCKINNEY:
10     Thank you, Your Honor.
11 BY THE COURT:
12     This was the preliminary order.  Mr. Mathieu.
13 BY MR. MATHIEU:
14     Yes?
15 BY THE COURT:
16     Good luck to you, sir.
17 BY MR. MATHIEU:
18     Thank you, Your Honor, I appreciate it.
19 BY THE COURT:
20     Ms. Greenlee ---
21 BY MS. JACKSON:
22     Your Honor, Ms. Greenlee only had one ride and
23     that ride was not able to stay.  So she had to
24     step out.
25 (PROCEEDINGS WERE CONCLUDED AT 5:08 P.M.)

## Page 205

205

CERTIFICATE

I, Mai-Beth Ketch, CVR-M, CCR, Court Reporter
and Notary Public, do hereby certify that the
foregoing is an accurate transcript, taken by me
and transcribed under my supervision.

I further certify that I am not financially
interested in the outcome of this action, a
relative, employee, attorney or counsel of any of
the parties, nor am I a relative or employee of
such attorney or counsel.

This is the 7th day of March, 2018.

_____

MAI-BETH KETCH, CVR-M, CCR

Notary Public No.: 19981410006

(The foregoing certification of this transcript
does not apply to any reproduction of the same by
any means, unless under the direct control and/or
supervision of the certifying reporter.)

Asheville Reporting Service
111 McDowell Street, Asheville, NC 28801
828-254-9230

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@ashevillereporting.com

STATE OF NORTH CAROLINA                    IN THE GENERAL COURT OF JUSTICE
CHEROKEE COUNTY                            DISTRICT COURT DIVISION
                                           18 CVD 0046

MICHAEL MATHIEU               )
        Plaintiff,            )
                             )            **ORDER**
Vs.                          )
                             )
SHALEES GREENLEE             )
        Defendant,           )
                             )

THIS MATTER coming on to be heard before the undersigned judge of the

district court at the session of civil district court in Cherokee County on February 28,

2018 on Defendant Greenlee's motions, the Court heard from the parties thru their

attorneys.

IT APPEARING TO THE COURT that both parties are present; the Plaintiff is

represented by Zeyland McKinney and the Defendant is represented by David A.

Wijewickrama, Ron Moore, D. Brandon Christian, and Melissa Jackson, and as to the

following the Court so Orders:

1. As to the Defendant's motion for Complete recordation, and by consent of the
   plaintiff, the Court finds in the interest of justice, that a complete recordation is
   granted.

2. All subpoenas properly filed and served and no motions to quash were filed by
   any witnesses pursuant to the NCRCP.

3. As to the Defendant's motion to open this hearing to the public, and by consent
   of the plaintiff, the Court finds a compelling interest of justice that this matter
   shall be open to the public and to the media and is so Ordered.

**EXHIBIT**
*E*

4. As to the Defendant's motion to sequester witnesses, and by consent of the plaintiff, the Court finds a compelling interest of justice that the witnesses shall be sequestered both prior to and after their testimony and as such, is so Ordered.

5. As to the Defendant's motion to request a 2.1 Judge from the Chief Justice of the North Carolina Supreme Court, and by consent of the plaintiff, the Court finds, upon compelling testimony and facts as set forth within the Declaratory judgment ordered this day, that this request should be made, and is so Ordered.

6. Upon hearing testimony and reviewing the documents *in camera* as requested by a validly issued subpoena by the defendant to witnesses David Hughes, Cindy Palmer and Scott Lindsay, in their Official Capacities, in compliance with the NCRCP, as to the motion for a protective Order, the Court finds, upon testimony regarding the CVAs that:

    a. The CVAs are void *aba initio* and that it is in the best interest of this minor child and any other minor children involved in any CVAs, that Defense Counsel be granted access to any and all information under the subpoena regarding any CVAs in existence or those yet to be discovered, which were created or in the possession of Cherokee County Department of Social Services, their employees or agents or Attorney Scott Lindsay.

    b. The Court further Orders that Defense Counsel shall be allowed to have a verbatim copy of any and all documents including but not limited to any records of any kind involving any CVAs, kept by or in the possession of Cherokee County Municipal Government, Cherokee County DSS or Attorney Scott Lindsay in any requested format. This shall include but not

be limited to, the entire file, unredacted, unedited and unaltered in form or content.

c. Exact details of said CVAs shall not be allowed to be disclosed pending further Order of this Court.

d. Defense Counsel shall be allowed to provide information to mental health providers and counselors for any children or parents and shall be allowed to have access to any mental health records or resulting reports arising from any children or biological parents involved in any CVAs.

e. There exist no other means or way at this time for Defense Counsel to obtain this information other by this Court Order.

f. Defense Counsel shall be allowed to share any information obtained with subsequent counsel involved with a 2.1 Court if so appointed and Ordered.

7. Counsel for the Defense shall be allowed to use all exhibits, documents, evidence and information from today's proceeding, including that covered by and thru a protective order signed in this case for and in any subsequent, motions or legal actions in either state or Federal Court and shall be allowed to share said information with affiliated counsel as well as Attorney Sean Perrin and Attorney Patrick Flannigan and their respective firms, staff and insurance carriers.

## CONCLUSIONS OF LAW

1. The Court has personal and subject matter jurisdiction over the parties and subject matter as set out within these pleadings.

2. This Order is in the best interest of the minor child.

3. All necessary parties were present and represented by counsel.

4. The Court incorporates by reference the above findings as if fully set forth herein.

5. The Court upon hearing arguments and evidence concludes that the matters involving the CVA's presented to the Court as part of the Declaratory Judgment Claim present complex issues of law and fact and involve an unknown but extremely large number of potential litigants. Therefore, the Court concludes that severance of all matters involving the Declaratory Judgment claim from the above captioned custody case is necessary and appropriate for the proper administration of justice.

**IT IS HERBY ORDERED ADJUDGED AND DECREED** that:

1. The aforestated are made a binding Order of this Court.

2. The Court incorporates within this Order by reference the above findings and conclusions as if fully set forth herein.

3. The Court hereby severs all matters involving the Declaratory Judgment claim and the resulting names and information provided to the Court by Attorney Lindsay and the CCDSS from the above captioned custody case for use by the defense counsel in subsequent actions in state or federal court.

This the 28th day of February, 2018

Tessa Sellers, Honorable Judge Presiding

FILED

2018 MAR 14 PM 4: 14

CHEROKEE CO. C. S.C.

STATE OF NORTH CAROLINA        IN THE GENERAL COURT OF JUSTICE

CHEROKEE COUNTY        DISTRICT COURT DIVISION

18 CVD 0046

MICHAEL MATHIEU

       Plaintiff,

                         )

                         )       DECLARATORY JUDGMENT

Vs.                       )

                         )

SHALEES GREENLEE       )

       Defendant,          )

                         )

THIS MATTER coming on to be heard and being heard before the undersigned judge of the district court at the session of civil district court in Cherokee County on February 28, 2018 on Defendant Greenlee's counterclaim for declaratory judgment, the Court heard from the parties and their attorneys.

IT APPEARING TO THE COURT that both parties are present; the Plaintiff is represented by Zeyland McKinney and the Defendant is represented by David A. Wijewickrama, Ron Moore, D. Brandon Christian, and Melissa Jackson, and;

IT FURTHER APPEARING TO THE COURT that this action for child custody was filed by the Plaintiff in this Court seeking, *inter alia*, custody of the minor child Alana Roberts, born July 5, 2016. Plaintiff further sought and received an emergency *ex parte* order granting him temporary custody of the minor child pending further order of this Court, based in material part, on maintaining the status quo which Plaintiff contends was established by a Custody and Visitation Agreement. The Defendant filed a special appearance, answer, counterclaim, and several procedural motions, including a plea for a declaratory judgment, and;

EXHIBIT

F

IT FURTHER APPEARING TO THE COUT that Defendant filed an action seeking a declaratory judgment that the Custody and Visitation Agreement ("CVA") utilized by the Plaintiff in his application for an emergency *ex parte* custody order is unlawful, was created in violation of Defendants rights, and is void *ab initio*, and;

IT FURTHER APPEARING TO THE COURT that Defendant has filed this action for a declaratory judgment as a counterclaim, and Plaintiff has agreed to have the declaratory judgment action heard this date, expressly waiving any additional notice and the opportunity to file a responsive pleading or answer to the declaratory judgment action, and;

IT FURTHER APPEARING TO THE COURT that both sides were given an opportunity to be heard, the court received evidence in documentary and testimonial formats.

Based upon the arguments of counsel, evidence presented, and the applicable rules the Court makes the following

### FINDINGS OF FACT

1. Defendant is the biological mother of Alana Roberts ("Alana"), born July 6, 2016, both of whom reside in Cherokee County, NC.

2. The legal father of the minor child, on the birth certificate, is David Cody Roberts.

3. The Biological father of the minor child is Michael Mathieu.

4. The CVA in question was used by the Plaintiff as part of the basis for his complaint for an *ex parte* custody order.

5. There were gross irregularities in not merely the process used to obtain the CVA, but in the illegality of the CVA itself.

6. At or around the time the CVA was executed by Defendant, DSS social worker David Hughes went to the residence of Shalees Greenlee with a notary to have her sign the CVA.

- 2 -

7. SW Hughes told Greenlee that by signing the CVA Greenlee (1) would avoid court involvement, and (2) could avoid further drug testing.

8. SW Hughes also told Greenlee that, under the CVA, Greenlee would have visitation as agreed upon by the parties.

9. Greenlee understood and believed that to mean that her visitation with her child would be at least what she had been getting and probably more.

10. Beyond these assertions, SW Hughes did not explain or attempt to explain any of the terms and conditions of the CVA to Greenlee.

11. SW Hughes told Greenlee that once she signed the CVA:

    a. The case would be closed and there would be no follow up by the Department;

    b. The CVA was a legally binding document and was valid until the child turned 18 years of age; and

    c. That she would have to get an attorney to change and or modify the CVA.

12. Greenlee did not have independent counsel, was not offered independent counsel, and due to the fact that the SW Hughes came to her home with a notary on the date the CVA was signed, Greenlee did not have the opportunity to seek independent legal counsel.

13. Greenlee did not understand the terms and or conditions of the CVA.

14. There has never been a judicial determination as to custody of this minor child.

15. After the parties executed the CVA on November 13, 2016, custody of Alana Roberts was assumed by the Plaintiff.

16. The Defendant was unable to see her daughter for approximately one year based on the CVA.

17. Greenlee attempted on a number of occasions to visit with her minor child.

- 3 -

18. Greenlee contact Mathieu on several different dates and was denied visitation with the minor child.

19. Mathieu understood when he signed the CVA that visitation was discretionary.

20. At all relevant times, SW Hughes was an employee or agent of Cherokee County DSS (hereafter CCDSS) and was acting within the course and scope of his employment thereof.

21. CCDSS social worker David Hughes went to the residence of Shalees Greenlee with a notary to have her sign the CVA.

22. Greenlee had prior involvement with the CCDSS prior to having the child subject to this action.

23. Greenlee had a substantial history with CCDSS due to prior involvement with her three older children.

24. CCDSS occupied a place of trust, making representations to the Defendant about the state of the law and the legal effects of her signing the CVA.

25. A person in the Greenlee's position would have reasonably relied upon the representations of the social worker because of who he was and the special position of trust he held.

26. Moreover, that position of trust was reinforced because Defendant did not have and was not offered counsel when she was asked to sign the CVA.

27. SW Hughes clearly made material mispresentations about the CVA and the CVA process to induce Defendant to sign.

28. SW Hughes did not explain or attempt to explain any of the terms and conditions of the CVA to Greenlee.

29. Greenlee had began working with SW Katie Johnson and had signed a case plan indicating the issues which led to the removal of the child and the steps that Greenlee would need to take in order to reunify with her child.

30. Greenlee submitted herself to drug testing pursuant to her case plan.

31. SW Hughes as well as Director Cindy Palmer indicated that the Defendant requested the CVA.

32. The Defendant nor the Plaintiff ever indicated by their testimony, that either party requested to sign a CVA.

33. The execution of a case plan contradicts the use or facilitation of a CVA.

34. The CVA was drafted and created by employees of CCDSS in conjunction with, at the direction of, and with and the approval of the Cherokee County Department of Social Services Attorney Scott Lindsay.

35. CCDSS has used CVAs to routinely remove children from their biological parents without due process of law or Court oversight.

36. The use of CVAs by CCDSS has been a regular course of dealing and pattern of practice over the course of many years.

37. The CVA or some variation thereof has been used by CCDSS for a number of years.

38. No CVA has ever been reviewed, signed, or entered and filed as an Order of the North Carolina District Court.

39. CCDSS Director Cindy Palmer, insisted that she did not know of the practice of using CVA until December of 2017 when she was informed of a prior incident with another CVA.

40. At all times relevant as set forth herien, Director Cindy Palmer, Social Worker Hughes and Attorney Scott Lindsay were acting within there Official scope of duty as employees and agents of Cherokee County Department of Social Services.

41. At the time the CVA was executed, Defendant was informed by CCDSS agents and employees that it carried the force of law, and the she was legally bound to adhere to its terms.

- 5 -

42. This material misstatement of law and fact is yet another example of CCDSS's agents and employees threatening Defendant and making material, false, and fraudulent assertions to coerce her to sign the CVA.

43. As a direct result of the use of a similar CVA in another case by CCDSS, a sitting Judge of the District Court notified the North Carolina Department of Health and Human Services ("DHHS") on December 20, 2017 of CCDSS's practices in using CVAs.

44. DHHS responded to this notification by letter. (Defendant's Exhibit A to her Answer, which was received into evidence by the Court during this hearing)

45. DHHS states in its letter that "facilitating such private custody agreements without the oversight of the Court falls outside of both law and policy."

46. The Court accepts the Defendant's prayer for declaratory judgment relief as a counterclaim.

47. Based on the findings as set forth herein, this Order is in the best interest of the minor child.

Based upon the foregoing Findings of Fact, and in consideration of all applicable statutes, rules, cases, and other mandatory and compelling authority, the Court reaches the following:

### CONCLUSION OF LAW

1. Pursuant to the Uniform Declaratory Judgment Act, N.C. Gen. Stat. §§ 1-253 through 1-267, parties, between whom exists a genuine controversy, are entitled to an action before a court of competent jurisdiction to determine the rights of the parties as to any instrument or other document.

2. The court accepts the Defendants prayer for Declaratory Judgment relief as a counterclaim.

- 6 -

3. The CVA (Exhibit A to Plaintiff's Complaint) purports to create legal rights as between the parties regarding the custody of the minor child Alana Roberts, born July 5, 2016, and was relied upon by the Plaintiff as part of the basis for his *ex parte* custody order, which remains in effect.

4. Therefore, there exists between the parties a genuine controversy over the legal rights created by the CVA, and the parties are entitled to a declaratory judgment setting forth what rights, if any are created by the CVA.

5. For the reasons set forth more specifically below, the CVA creates no rights, is illegal, and is *void ab initio.*

6. The Fourteenth Amendment to the Constitution of the United States provides that no person shall be "deprive[d] . . . of life, liberty, or property, without due process of law . . . ." Article I, Section 19 of the North Carolina Constitution states that "[n]o person shall be . . . or in any manner deprived of his life, liberty, or property, but by the law of the land."

7. In *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000), the United States Supreme Court held that "[i]n light of . . . extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."

8. To ensure that all parents enjoy the protections of due process in any case where DSS seeks to remove a child from his or her parent, the North Carolina General Assembly has enacted the Juvenile Code in Chapter 7B of the North Carolina General Statutes to govern all proceedings in which a juvenile is alleged to be abused, neglected, or dependent.

9. It is beyond dispute that one of the fundamental rights enjoyed by all parents under the United States Constitution is the right to raise their children without government

interference. *See e.g. Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) ("The liberty interest at issue in this case -- the interest of parents in the care, custody, and control of their children -- is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court."); *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923), ("[T]he 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children' and 'to control the education of their own.'"); *Pierce v. Society of Sisters*, 268 U.S. 510, 534-535 (1925), ("[T]he 'liberty of parents and guardians' includes the right 'to direct the upbringing and education of children under their control'; . . . "the child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."); *Prince v. Massachusetts*, 321 U.S. 158 (1944), ("It is cardinal . . . that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("[T]he relationship between parent and child is constitutionally protected"); *Parham v. J. R.*, 442 U.S. 584, 602 (1979) (The United State Supreme Court's "jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. [Its] cases have consistently followed that course"); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (discussing "the fundamental liberty interest of natural parents in the care, custody, and

management of their child"); and *Troxel*, at 66 ("In light of . . . extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.")

10. The same protection is extended to the people of North Carolina by Article 1, Section 19 of the North Carolina Constitution.

11. The term "law of the land" as used in Article I, Section 19 of the North Carolina Constitution means the general law, the law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. It means the regular course of the administration of justice through the courts of competent jurisdiction, after the manner of such courts. Procedure must be consistent with the fundamental principles of liberty and justice. *State v. Chesson*, 228 N.C. 259, 45 S.E.2d 563 (1947), *writ dismissed*, 334 U.S. 806, 68 S. Ct. 1185, 92 L. Ed. 1739 (1948). *See also, Eason v. Spence*, 232 N.C. 579, 61 S.E.2d 717 (1950). Among other things, "the law of the land" or "due process of law" imports both notice and the opportunity to be heard before a competent tribunal. *Parker v. Stewart*, 29 N.C. App. 747, 225 S.E.2d 632 (1976); *Utica Mut. Ins. Co. v. Johnson*, 41 N.C. App. 299, 254 S.E.2d 643 (1979).

12. Moreover, the North Carolina "Supreme Court has held that the term 'law of the land,' as used in Article I, Section 19 of the North Carolina Constitution, is synonymous with 'due process of law' as that term is applied under the Fourteenth Amendment to the United States Constitution. *In re Petition of Smith*, 82 N.C. App. 107, 109, 345 S.E.2d 423, 425 (1986) (quoting *In re Moore*, 289 N.C. 95, 221 S.E. 2d 307 (1976)). *Also see State v. Smith*, 90 N.C. App. 161, 368 S.E.2d 33 (1988), *aff'd*, 323 N.C. 703, 374 S.E.2d 866, *cert.*

*denied*, 490 U.S. 1100, 109 S. Ct. 2453, 104 L. Ed. 2d 1007 (1989); and *McNeill v. Harnett County*, 327 N.C. 552, 398 S.E.2d 475 (1990).

13. The General Assembly has clearly states that the DSS Code "shall be interpreted and construed so as to . . . provide procedures for the hearing of juvenile cases that assure fairness and equity and that *protect the constitutional rights of juveniles and parents* . . . ." N.C. Gen. Stat. § 7B-100(1) (emphasis added).

14. Complying with the DSS Code by the State and CCDSS is the means by which the constitutional rights described above are protected.

15. There is no provision of law permitting the use of extrajudicial CVAs to obtain the voluntary surrender of parental custody.

16. DHHS has recognized this. After CCDSS's use of CVAs, such as the one in this case, was brought to the attention of the District Court of Cherokee County, the presiding judge, notified DHHS of CCDSS's action. Upon receipt of this notice, DHHS issued the letter attached to Defendant's Answer as Exhibit A. In the letter DHHS states that "facilitating such private custody agreements without the oversight of the Court falls outside of both law and policy."

17. CCDSS, Director Palmer, Attorney Lindsay, and all agents and employees of CCDSS acting in the course and scope of their employment violated Defendant Greenlee's rights under the Fourteenth Amendment to the Constitution of the United State, Article I Section 19 of the Constitution of the State of North Carolina, and Chapter 7B of the North Carolina General Statutes by using the CVA to remove the minor child from her mother's custody.

18. Any and all CVAs which are obtained outside the judicial process violate the rights of both the parents and children affected under the Fourteenth Amendment to the Constitution of

- 10 -

the United State, Article I Section 19 of the Constitution of the State of North Carolina, and Chapter 7B of the North Carolina General Statutes

19. The complete, utter, willful, and malicious decision of CCDSS, Director Palmer, Attorney Lindsay and David Hughes to willfully and deliberately remove the minor child in this case from Defendant Greenlee's custody by means of this unlawful CVA is the direct and proximate cause of Defendant Greenlee being separated from her child.

20. Any injury or harm accruing to any parent or child affected by a CVA is the direct and proximate result of CCDSS's, Director Palmer, Attorney Lindsay and the other policy makers for CCDSS deciding to violate the rights of parents and children.

21. The CVA before the court in this case was obtained outside of the judicial process, and therefore was obtained in violation of Defendant Greenlee's rights under the Fourteenth Amendment to the Constitution of the United State, Article I Section 19 of the Constitution of the State of North Carolina, and Chapter 7B of the North Carolina General Statutes.

22. Pursuant to the North Carolina General Statutes, the District Court Division of the General Court of Justice has original and exclusive jurisdiction over all matters pertaining to DSS cases brought under Chapter 7B and custody action brought under Chapters 50 and 50A.

23. There has never been a judicial determination as to custody of this minor child, therefore, the CVA cannot have legal authority.

24. North Carolina recognizes two types of fraud, actual and constructive.

25. Actual fraud occurs when a person obtains something from another person by means of a misrepresentation. "In pleading actual fraud, the particularity requirement is met by alleging time, place and content of the fraudulent representation, identity of the person

- 11 -

making the representation and what was obtained as a result of the fraudulent acts or representations." *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981).

26. Constructive fraud is similar. "The very nature of constructive fraud defies specific and concise allegations and the particularity requirement may be met by alleging facts and circumstances '(1) which created the relation of trust and confidence, and (2) [which] led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff.'" *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678-79 (1981) (quoting *Rhodes v. Jones*, at 548-49, 61 S.E. 2d at 725.)

27. As it pertains to the CVA in this case, both were present and all elements of both have been met to the Court's satisfaction thru exhibits and testimony.

28. As stated in the findings of fact above:

   a. At or around the time the CVA was executed by Defendant, CCDSS social worker David Hughes went to the residence of Shalees Greenlee with a notary to have her sign the CVA.

   b. CCDSS occupied a place of trust, making representations to the Defendant about the state of the law and the legal effects of her signing the CVA.

   c. A person in the Defendant's position would have reasonably relied upon the representations of the social worker because of who he was and the special position of trust he held.

   d. Moreover, that position of trust was reinforced because Defendant did not have and was not offered counsel when she was asked to sign the CVA.

- 12 -

e. SW Hughes clearly made material misrepresentations about the CVA and the CVA process to induce Defendant to sign.

f. Additionally, SW Hughes told Greenlee that by signing the CVA Greenlee (1) would avoid court involvement, and (2) could avoid further drug testing.

g. SW Hughes also told Greenlee that, under the CVA, Greenlee would have visitation and contact with the minor child.

h. Beyond these assertions, SW Hughes did not explain or attempt to explain any of the terms and conditions of the CVA to Greenlee.

i. SW Hughes told Greenlee that once she signed the CVA the case would be closed and there would be no follow up by the Department; the CVA was a legally binding document and was valid until the child turned 18 years of age; and that she would have to get an attorney to change and or modify the CVA.

j. Despite the fact that SW Hughes told Greenlee that she was signing a binding legal document, which would have the force and power of a court order and bind her rights insofar as they concerned her custody of her minor child, Greenlee did not have independent counsel, was not offered independent counsel, and was not given the opportunity to speak with independent legal counsel.

k. Moreover, Greenlee did not understand the terms and or conditions of the CVA, especially the fact that the CVA did not create any legal rights as to the minor child's custody.

l. Yet, after the parties executed the CVA on November 13, 2016, custody of Alana Roberts was assumed by the Plaintiff.

- 13 -

29. These material misrepresentations made by the social worker induced Defendant into signing the CVA, making it the product of fraud, and therefore carries no legal effect.

30. The Court upon consent of the parties allows the Defendant's prayer for declaratory judgment to be made in the form of claim rather than a motion.

31. The Court has personal and subject matter jurisdiction.

32. This Order is in the best interest of the minor child.

33. The aforestated findings are incorporated as if fully set forth herein.


## DECREE

In consideration of the forgoing Findings of Fact and Conclusion of Law this Court now ORDERS, ADJUDGES, and DECREES pursuant to the North Carolina Declaratory Judgment Act, N.C. Gen. Stat. § 1-253 *et seq.* that:

1. The aforestated findings and conclusions are incorporated as if fully set forth herein.

2. The CVA is unlawful.

3. This Order is in the best interest of the minor child.

4. The process of obtaining the CVA violated the constitutional rights of the Defendant.

5. The CVA is the product of both actual and constructive fraud on behalf of the Cherokee County Department of Social services, its agents and employees and Attorney Scott Lindsay and Director Cindy Palmer.

6. The Court hereby declares pursuant to N.C. Gen. Stat. § 1-253 that this and all other CVAs similar to and like this in form, content and structure created by Cherokee County

- 14 -

Department of Social Services, their agents or employees and Attorney Scott Lindsay are

and shall be at all times *void ab initio*.

Entered this, the, 28th day of February, 2018.

Signed this, the, 14th day of March, 2018.

Honorable Tessa Sellers,
District Court Judge Presiding